IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 16-cv-02611-RBJ

PATRICK HOGAN, Individually and on Behalf of
All Others Similarly Situated,

  Plaintiffs,

v.

PILGRIM'S PRIDE CORPORATION,
WILLIAM W. LOVETTE, individually, and
FABIO SANDRI, individually,

  Defendants.

## ORDER ON MOTION TO DISMISS

This matter is before the Court on defendants Pilgrim's Pride Corporation's, William W. Lovette's, and Fabio Sandri's Motion to Dismiss the Amended Class Action Complaint, ECF No. 34. For the reasons discussed below, the motion is GRANTED.

## BACKGROUND

This is a securities class action claim brought by lead plaintiff George James Fuller[1] against defendants on behalf of a purported class of investors in Pilgrim's Pride Corporation ("Pilgrim's"). ECF No. 29 at 1. According to the second amended complaint, which I will refer

---

[1] The case was originally filed on behalf of Patrick Hogan with his lawyers as proposed lead counsel for the purported class. A competing plaintiff, George James Fuller, then sought his designation as lead plaintiff and his lawyers as lead counsel. Thereafter the first filers withdrew their request for lead plaintiff/counsel designation, and Mr. Fuller and his lawyers were ultimately designated as lead plaintiff and counsel. *See* ECF No. 24 (granting George James Fuller's unopposed Motion for Appointment as lead plaintiff). Mr. Fuller claims to have sustained a loss by comparing the price he paid for his shares in 2015 to the "holding value" of the shares for the 90-day period beginning on October 7, 2016. *See* ECF No. 8-2.

1

to simply as "the complaint," Pilgrim's is one of the largest producers and sellers of chicken in the United States. *Id.* at 11. Pilgrim's focuses on the production and sale of broilers, which are chickens under the age of 13 weeks that make up 98% or more of the chicken sold in the United States. *Id.* Pilgrim's is vertically-integrated, meaning that it owns or controls nearly all aspects of broiler production, from breeding, hatching, rearing, and feeding, to processing and selling. *Id.* at 13. The market for broilers is characterized by inelastic demand, meaning that demand does not meaningfully change when the price of the good changes, although a change in supply will change the price of the good. *Id.* at 12. As a result of broiler market characteristics, the price and supply of broilers have historically followed a "boom and bust" cycle, in which rising prices for broilers would incentivize rising production to capitalize on higher prices—the "boom." *Id.* The resulting oversaturation in the market would lead to a decrease in prices, and thus a decrease in production—the "bust." *Id.*

Plaintiff's complaint alleges on information and belief that beginning in 2008, after "a particularly low trough in the ordinary business cycle" and following its emergence from a bankruptcy in 2009, Pilgrim's conspired with other major players in the United States broiler market to cut production, thereby limiting supply and ensuring prices would stay high. *Id.* at 22, 31–32, 138. According to the complaint, Pilgrim's and its co-conspirators conducted two coordinated production cuts, the first between 2008 and 2009 and the second between 2011 and 2012. *Id.* at 32. These production cuts were achieved through various means, including reducing eggs, reducing broiler breeder flocks, destroying chicks or eggs, temporarily or permanently shutting down facilities, and exporting eggs or chicks. *Id.* These coordinated cuts allegedly resulted in "an artificial stabilization in the industry even during a time of soaring feed costs." *Id.* at 33. The complaint additionally alleges that Pilgrim's and its co-conspirators

2

continued to depress supply to the United States in the period from 2013 to 2016 by increasing broiler exports and cutting production overall. *Id.* at 35–37.

Plaintiff alleges that this broiler price-fixing conspiracy was facilitated through the conspirators' use of Agri Stats, a private reporting service that compiles detailed confidential data on nearly all aspects of broiler production including inventory, production, and pricing data. *Id.* at 23–25. According to plaintiff, Pilgrim's and its co-conspirators had the capacity to de-anonymize the Agri Stats data to determine which data corresponded to which industry member, thereby allowing the conspirators to track and coordinate their participation in the conspiracy. *Id.* at 26. Plaintiff also points to the "cliquish" nature of the industry and numerous industry conferences and events at which industry members may have associated to coordinate the production cuts at issue. *Id.* at 16–19.

The final element of Pilgrim's price-fixing conspiracy, according to plaintiff, was the manipulation of the Georgia Department of Agriculture's ("GDA") Georgia Dock Broiler pricing index, one of the three primary indices that tracks broiler prices.[2] *Id.* at 37. The Georgia Dock index price was compiled by a weekly telephone call to the top broiler producers in the state, who would report the price they offered to companies with whom they had contracts, such as grocery stores. *Id.* at 38. The Georgia Dock influenced "prices for roughly 25% of the entire U.S. Broiler market," but unlike the other two primary price indices, the Georgia Dock did not require verification of reported prices. *Id.* The Georgia Dock price was higher than the other two primary indices "nearly every day" between 2007 and 2016, and "diverge[d] sharply in 2011-2012 and during the class Period." *Id.* at 39. Plaintiff alleges that this divergence between

---

[2] The Georgia Dock was dismantled in December 2016 after inquiries into the index's independence led to calls for additional price verification, prompting a decline in industry submissions to the index. *Id.* at 46–48.

3

the Georgia Dock price index and the other two major price indices is evidence that the broiler industry was manipulating the index as part of the price-fixing conspiracy.

According to the complaint, this multi-pronged conspiracy to cut production and raise broiler prices led to Pilgrim's ensuing financial stability and success and artificially increased the value of Pilgrim's securities. The crux of plaintiff's complaint is that during the Class Period between February 21, 2014 and November 17, 2016, defendants made untrue or misleading public statements by failing to disclose the price-fixing conspiracy and instead touting legitimate causes for Pilgrim's success. *See id.* at 51–106 (citing annual and quarterly Securities Exchange Commission filings, press releases, and earnings calls throughout the Class Period referring, for example, to the chicken industry as "highly competitive" when in fact Pilgrim's had been allegedly colluding to inflate the price of chicken). Plaintiff asserts that "[d]efendants falsely assured investors that this stabilization was attributable to the implementation of its legitimate business strategy over the previous years, but this was not true." *Id.* at 33. Plaintiff alleges that defendants' conspiracy came to light in a series of revelations in 2016, including a private antitrust class action complaint filed in the Northern District of Illinois containing evidence of collusion and price-fixing between 2008 and 2016. *Id.* at 21–22. Plaintiff also points to a subsequent analyst report about the case and two newspaper articles about the alleged conspiracy. *Id.* As a result of these revelations, according to plaintiff, the price of Pilgrim's securities dropped from $23.54 on September 2, 2016 to $18.61 on November 17, 2016 "and continued to slide" to the detriment of the company's investors. *Id.* at 107–10.

Plaintiff thus raises three claims in his securities class action complaint: two claims for violations of § 10(b) of the Securities and Exchange Act (the "Exchange Act") and Rule 10b-5 promulgated thereunder against all defendants, and one claim for violation of § 20(a) of the

4

Exchange Act against defendants Lovette (Pilgrim's Chief Executive Officer and President during the Class Period) and Sandri (Pilgrim's Chief Financial Officer during the Class Period). *Id.* at 142–44. "Section 10(b) of the Exchange Act prohibits the 'use or employ[ment], in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.'" *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (citing 15 U.S.C. § 78j(b)). "[R]ule 10b-5 implements § 10(b) by making it unlawful to 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . in connection with the purchase or sale of any security.'" *Id.* (quoting 17 C.F.R. § 240.10b-5)). Section 20(a) of the Exchange Act establishes liability for "[e]very person who . . . controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). To establish controlling person liability, a plaintiff must establish both a primary violation and the alleged controlling person's control over the primary violator. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). Defendants move to dismiss all three claims. ECF No. 34. The motion has been fully briefed. ECF Nos. 35, 36.

## STANDARD OF REVIEW

When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

5

documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id*.

Complaints in civil actions generally should contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). "A plaintiff suing under Section 10(b), however, bears a heavy burden at the pleading stage." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). To state a securities fraud claim, a plaintiff's complaint must allege that:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Id.* (citing *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003)).

Prior to the passage of the Private Securities Litigation Reform Act of 1995 (PSLRA), Federal Rule of Civil Procedure Rule 9(b) governed the pleading requirements for securities fraud actions. *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258 (10th Cir. 2001). Now, however, under the PSLRA, a heightened pleading standard applies to the first and third elements of securities fraud claims, also referred to as falsity and scienter, respectively. *Id.* Thus, with respect to falsity and scienter the PSLRA requires that:

> (1) [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> (2) [T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1)–(2). In this case, defendants seek to dismiss plaintiff's complaint on the grounds that it fails to adequately plead falsity, scienter, and loss causation. ECF No. 34 at 2–3.

6

Because the failure to plead falsity is dispositive, I need not consider the parties' arguments with respect to either of the remaining two elements.

Although the parties agree that the PSLRA's heightened pleading standard applies to the element of falsity, they disagree about whether the heightened standard applies only to the allegedly misleading or untrue statements, or if it also applies to the facts that establish the alleged underlying price-fixing conspiracy. *Compare* ECF No. 34 at 7 (defendants arguing that "'if the complaint fails to allege facts [with particularity] which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed'") (quoting *In re Mirant Corp. Sec. Litig.*, No. 02-CV-1467-RWS, 2009 WL 48188, at *17 (N.D. Ga. Jan. 7, 2009)) (alteration in original)) *with* ECF No. 35 at 9 (plaintiff asserting that "[t]he PSLRA's heightened pleading standards apply only to allegations of falsity and scienter"). As a result, I must determine the appropriate standard of review with respect to the underlying allegations of an antitrust conspiracy before proceeding to the parties' substantive arguments.

The District Court for the Western District of Arkansas recently answered this question in the context of the very same conspiracy alleged in this case. *See In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 2017 WL 3185856, at *8 (W.D. Ark. July 26, 2017). As such, that court's resolution of the issue is instructive in this case. Like plaintiff in this case, the plaintiffs in *Tyson* argued that "'the PSLRA's heightened pleading standards apply only to allegations of falsity and scienter.'" *Tyson*, 2017 WL 3185856, at *10. While noting that this was an "undoubtedly correct proposition," the *Tyson* court emphasized that it "misses the point: The question is whether the underlying allegations of wrongdoing fall within the 'falsity' category." *Id.* Thus, the key inquiry is whether the "underlying facts purporting to establish the allegation"

7

that there was an antitrust conspiracy "must be pleaded with particularity," or if it is instead "sufficient to particularize only the allegation itself, with the underlying facts subjected to the less demanding general pleading standard?" *Id.* at *9–*10.

> After reviewing the parties' arguments, the *Tyson* court concluded that:
>
> *One*, it is clear that a plaintiff must satisfy the particularity requirement by setting forth the who, what, when, where, and how *of the statement itself* . . . . *Two*, to the extent that a plaintiff's allegations of underlying wrongdoing "regarding the statement or omission" rest "on information and belief," those allegations must be supported by particularized facts. 15 U.S.C. § 78u–4(b)(1).

*Id.* (emphasis in original). By way of example, the court explained that when the plaintiffs in that case alleged on information and belief that a chicken producer cut its production as part of an underlying conspiracy, the plaintiffs need not "supply evidence proving" their allegation in the initial complaint, but must provide "a statement of the grounds on which the pleader's belief rests." *Id.* (internal citation and quotation marks omitted).

I agree with the *Tyson* court's interpretation of the statute. Requiring that allegations of underlying wrongdoing that rest on information and belief be supported by particularized facts comports with the PSLRA's dictate that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is made." 15 U.S.C. § 78u-4(b)(1). This interpretation is also bolstered by the cases cited by the *Tyson* defendants, two of which were also cited by defendants in the present case. *See In re Immucor, Inc. Sec. Litig.*, No. 09-CV-2351-TWT, 2011 WL 2619092, at *4–*5 (N.D. Ga. June 30, 2011) (noting that "[w]here false or misleading statements are based on the failure to disclose illegal activity, the allegations about the underlying illegal activity must also be stated with particularity" and finding that the plaintiff had failed to do so where it did not "even attempt to allege facts showing an explicit agreement . . . to fix prices"); *In re Mirant Corp. Sec. Litig.*, No. 02-CV-1467-RWS, 2009 WL 48188, at *17 (N.D. Ga. Jan. 7, 2009) ("[I]n cases alleging

8

securities fraud based on the failure to disclose the existence of an underlying illegal scheme, the basis for the illegality must be pled with particularity."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005) (plaintiffs' claim that defendant made material omissions by failing to disclose violations of statutes failed where plaintiffs "failed to allege with particularity that JPM Chase or its agents violated" the statutes at issue); *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (where plaintiffs' nondisclosure claims were dependent on predicate allegations of an anticompetitive scheme, "if the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed.") (emphasis in original). Thus, in this case, where plaintiff's central allegation is that defendants' statements and omissions during the Class Period were misleading because, on information and belief, they failed to disclose an underlying antitrust conspiracy, plaintiff must plead with particularity the facts that establish the existence of the antitrust conspiracy.[3]

Having decided that the PSLRA's heightened pleading standard applies to the underlying allegation of an antitrust conspiracy, the remaining question is what standard to use to determine whether the complaint pleads such a conspiracy sufficiently. Helpfully, the Tenth Circuit interpreted the PSLRA's particularity requirement for allegations of misleading statements or omissions made on information and belief in *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099 (10th Cir. 2003). The plaintiff's complaint in *Adams* alleged that the defendant company

---

[3] The District Court for the Southern District of New York recently echoed this standard in a case "strikingly similar" to *Tyson* based on the same alleged conspiracy. *See Gamm v. Sanderson Farms, Inc.*, No. 16-CV-08420-RMB, *slip op.* at 4 (S.D.N.Y. Jan. 19, 2018) (ECF No. 39-1) ("Where the '[p]laintiffs' underlying allegation [in a Rule 10b-5 case is] that [a defendant] participated in an antitrust conspiracy' the '[p]laintiffs must plead the facts of the alleged conspiracy with particularity.'") (quoting *Tyson*, 2017 WL 3185856 at *9–*10)). The *Gamm* court found that the plaintiffs had failed to explain the "who, what, when, where and how" of the scheme, and thus found the plaintiffs had failed to plead the underlying conspiracy with particularity. *Id.* at 6.

made false or misleading statements when it claimed that a particular branch of the company was contributing positively to company earnings, when in fact that branch was losing money. 340 F.3d at 1096. The court outlined the following six-factor test to assess whether the complaint stated with particularity specific facts that "support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading":

> (1) the level of detail provided by the facts stated in a complaint;
> (2) the number of facts provided;
> (3) the coherence and plausibility of the facts when considered together;
> (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed;
> (5) the reliability of the sources from which the facts were obtained; and
> (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

*Id.* at 1098–99 (citing *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29–30 (1st Cir. 2002)). The Tenth Circuit calls this "a common-sense, case-by-case approach" to determine whether a plaintiff has alleged securities fraud with the particularity required by § 78u-4(b)(1). *Id.* at 1102. Applying this approach to the facts alleged in that case, the *Adams* court found that the "level of detail about why [the branch] was unprofitable is significant," and it noted that the plaintiffs had used "objectively verifiable market data, sources who were inside the company, and statements made by industry observers made to a trade publication" to explain the branch's unprofitability. *Id.* at 1104. As a result, the court concluded that the plaintiffs had done far more than "rest[] on conclusory assertions," but instead had sufficiently pled with particularity the facts supporting their belief that the defendant's statements were false or misleading. *Id.*

In this case, therefore, in addition to assessing whether the allegedly false or misleading statements were pled with the requisite particularity, I will apply the *Adams* framework to assess the sufficiency of the facts pled in support of plaintiff's allegation of an underlying conspiracy.

## ANALYSIS

A. <u>Sufficiency of Allegations Regarding False or Misleading Statements</u>.

As an initial matter, plaintiff has sufficiently satisfied the first PSLRA requirement for pleading false or misleading statements by "'specify[ing] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" *Adams*, 340 F.3d at 1096 (quoting 15 U.S.C. § 78u-4(b)(1)). The complaint contains a detailed accounting of each allegedly misleading statement made during the Class Period, including press releases, SEC filings, and investor calls, and the complaint explains why each statement is alleged to have been misleading at the time it was made. ECF No. 29 at 51–106 (noting that the statements were misleading because, for example, they failed to disclose the underlying anticompetitive scheme or they falsely represented that Pilgrim's success was based on legitimate strategies, rather than the price-fixing scheme). The complaint thus satisfies the PSLRA's standard for pleading a false or misleading statement.

B. <u>Sufficiency of Allegations Regarding Underlying Conspiracy</u>.

However, with respect to the complaint's allegations about the underlying antitrust conspiracy, which are made on information and belief, I agree with defendants that the complaint fails to "state with particularity all facts on which that belief is formed." *Adams*, 340 F.3d at 1096 (citing 15 U.S.C. § 78u-4(b)(1)). In this vein, defendants contend that the complaint "offers none of the requisite particulars regarding the 'who, what, when, and where' of any purported antitrust conspiracy made by Pilgrim's with its competitors during the Class Period." ECF No. 34 at 2. Plaintiff counters that his complaint adequately pleads that Pilgrim's participated in a collusive scheme to fix broiler prices, citing the complaint's allegations that the co-conspirators "shared proprietary production data to monitor and enforce compliance with an

anticompetitive agreement" and its details about the "two rounds of coordinated production cuts," the "particular industry meetings . . . attended to discuss production cuts, the specific means by which they cut production . . . and the impact of the production cuts on Broiler prices." ECF No. 35 at 10–11.

In support of his complaint's sufficiency, plaintiff cites Sherman Act antitrust cases in which such allegations of collusion were upheld. *Id.*; *see also* ECF No. 37 (citing *In re Broiler Chicken Antitrust Litig.*, No. 16-CV-8637 (N.D. Ill. Nov. 20, 2017) (denying defendants' Rule 12(b)(6) motion to dismiss the case asserting antitrust violations for the same alleged conspiracy).[4] However, as the *Tyson* court notes, while the Sherman Act provides the appropriate framework for a court reviewing underlying allegations of an antitrust conspiracy, those antitrust allegations will be held to the heightened PSLRA pleading standard when, like here, they form the basis of a securities fraud claim. Tellingly, the court in *Tyson* cautioned that its finding that the underlying antitrust allegations in that case were insufficient was "not necessarily indicative of how it would have decided the case were it presented as a regular Sherman Act claim." *Tyson*, 2017 WL 3185856, at *15, *19. Similarly in this case, I must apply the heightened pleading requirements described herein to the elements in the Sherman Act's antitrust framework.

A Sherman Act antitrust claim must satisfy a three-pronged test by demonstrating that (1) there was a conspiracy, *i.e.*, an agreement or concerted action toward a common goal; (2) the agreement unreasonably restrained trade; and (3) the restraint affected interstate commerce. *Id.*

---

[4] The 92-page decision on the motion to dismiss in *In re Broiler Chicken Antitrust Litigation* was provided to the Court by means of a letter from plaintiff's counsel. ECF No. 37 and 37-1. It was issued after the (amended) complaint in the present case, so plaintiff Fuller obviously could not have factored that decision into the allegations of his securities law complaint. In any event, that case does not change my analysis of plaintiff's complaint. He must do more than piggyback on <u>allegations</u> in the antitrust case if he wishes to prosecute a securities suit. This is not to say that a compliant complaint could not be drafted when more facts become known.

at *15.  With respect to the first prong, because direct evidence of concerted action or an agreement is "'so rare,' the antitrust law has 'granted fact finders some latitude to find collusion or conspiracy from parallel conduct and inferences drawn from the circumstances.'" *Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1072 (D. Colo. 2016) (quoting *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1450–51 (9th Cir. 1988)).  Allegations of parallel conduct alone are insufficient to satisfy the first prong, but "'must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Id.* at 1073 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Thus in this case, because there is no direct evidence of an agreement, plaintiff must allege both parallel conduct and "circumstantial evidence of a conspiracy." *Id.*

   i. Facts Supporting Parallel Conduct.

I am persuaded by defendants' argument that plaintiff has failed to plead that the co-conspirators engaged in parallel conduct in the first place.  *See In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendants' actions were parallel.").  Instead, because the complaint lacks facts about the means and amounts by which the alleged conspirators cut production or when those particular cuts occurred, it is difficult to determine whether the conspirators were acting in parallel.  Using the common-sense approach provided in *Adams* to assess the sufficiency of the complaint's allegation of parallel conduct, I find that the facts provided here fall short.  *Adams*, 340 F.3d at 1099.

Plaintiff's complaint alleges that "[t]he production cuts by Pilgrim and other Broiler producers took a number of different forms," including "[r]educing egg sets or egg placements . . . [r]educing the size of broiler breeder flocks . . . [p]ulling eggs . . . [d]estroying chicks . . .

13

[r]educing chicks sent to contract farmers . . . [i]ncreasing pickup/delivery days between flocks . . . [c]hanges to facility production, such as temporary or permanent shut-downs; and . . . [e]xporting hatching eggs or chicks." ECF No. 29 at 32. This general list of methods used to cut production does little to establish what exactly Pilgrim's actually did to cut production and when, or how its actions compared with those of its co-conspirators as necessary to establish that there was a course of parallel conduct. The complaint does not provide numbers of eggs destroyed, for example, or what impact such reductions had on broiler production levels. *See, e.g.*, *id.* at 32–33, 36 (alleging that superiors directed employees to break eggs without providing the dates or frequency of such instructions, how many eggs were to be broken, or whether other co-conspirators were acting in concert). Without more information about the particular cuts that occurred and how these compared to competitors' cuts, the complaint's allegations do not establish parallel conduct. *See, e.g.*, *Gamms*, ECF No. 39-1 at 7 (finding the complaint in that case insufficient because it did not "provide particularized facts such as when and how Sanderson Farms and its co-conspirators destroyed eggs; how many eggs the co-conspirators destroyed; [and] whether and when Sanderson Farms or any of its co-conspirators revealed that they were destroying eggs"); *see also Burtch v. Milbert Factors, Inc.*, 662 F.3d 212, 228 (3rd Cir. 2011) (noting that "allegations fall far short of demonstrating parallel behavior" where the alleged conduct occurred "at different time periods").

Moreover, to the extent the complaint does provide some detail about particular actions co-conspirators took to cut production, those actions would have had such disparate effects that they do not represent a parallel course of conduct. The complaint notes, for example, that around the same time Pilgrim's was shutting down four of its processing plants between 2008 and 2009, another industry member was making adjustments to bird weights. ECF No. 29 at 120.

14

Similarly in 2011, soon after Pilgrim's announced that it was closing a processing plant and laying off 1,000 employees, a competitor announced it would not "set any more eggs until we pick up a big account." *Id.* at 125–26. Along the same lines, in late 2015, Pilgrim's was allegedly breaking eggs while its competitor was closing a plant, eliminating a shift at another plant, and increasing purchases from competitors. *Id.* at 36–37. The disparate effect of a permanent plant closure as compared to a competitor's merely temporarily changing the weights of its broilers or the number of eggs it was setting indicates in my view that these are not parallel conduct. As defendants argue, and I agree, "it is facially implausible to assert an antitrust claim based on an allegation that a producer agreed to give up 10% of its sales, while its rivals gave up only 1%." ECF No. 34 at 13. Thus, even the somewhat more particularized information provided in the complaint fails to establish a course of parallel conduct between Pilgrim's and its co-conspirators.

Similarly, plaintiff's allegations concerning defendants' use of Agri Stats and manipulation of the Georgia Dock index fail to plead a parallel course of conduct. With respect to the use of Agri Stats, plaintiff's complaint merely alleges that Pilgrim's used the service and that it could have parsed the data to determine which data corresponded with specific competitors. ECF No. 29 at 24–30. However, there are no particularized allegations that Pilgrim's did in fact reverse-engineer the data in the way insinuated in the complaint. *See, e.g.*, *id.* at 27 (explaining that a former Agri Stats employee who took a job at Pilgrim's "may have even taken the master list with him over to Pilgrim['s]"). Such non-particularized allegations of hypothetical actions do not suffice to establish that Pilgrim's conspired to use Agri Stats data for nefarious purposes. Similarly, with respect to the alleged manipulation of the Georgia Dock price index, though the complaint is replete with allegations about the index's inaccuracy and

15

lack of verification, there are no particularized facts about Pilgrim's sending false or misleading information to the index on any particular occasion and no facts indicating that if it did, its conduct was in parallel to that of its co-conspirators. *Id.* at 38–46. I find that the complaint's allegations related to the use of Agri Stats and the Georgia Dock index manipulation fail to plead parallel conduct sufficient to meet the exacting standards of the PSLRA.

ii. <u>Facts Supporting Circumstantial Evidence of a Conspiracy</u>.

Even if plaintiff had pled particularized facts demonstrating parallel conduct, I agree with the *Tyson* court's finding that plaintiff has not provided circumstantial evidence of a conscious commitment to a common unlawful scheme.[5] "'Allegations of parallel conduct and a conclusory assertion of a conspiracy alone will not suffice to state a plausible conspiracy claim under § 1 of the Sherman Act.'" *Tyson*, 2017 WL 3185856, at *16 (quoting *Precision Rx Compounding, LLC v. Express Scripts Holding Co.*, No. 16-CV-0069-CEJ, 2016 WL 4446801, at *2 (E.D. Mo. Aug. 24, 2016)). Instead, to be liable under the Sherman Act defendants must have had a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* Where there is no "smoking gun" to establish an agreement, courts assess whether complaints contain sufficient circumstantial evidence of an agreement.

Thus, in *Tyson*, under a very similar set of facts, the court found insufficient evidence of an agreement after assessing the defendants' motive to raise prices, indications that production cuts made pursuant to the conspiracy would otherwise be against defendants' interests absent a conspiracy, and other indicia of an agreement. *Id.* at *16. In particular, Tyson's use of a "buy-versus-grow" strategy, in which it occasionally bought chicken from its competitors rather than

---

[5] Because I find that the complaint fails to provide particularized facts indicating an underlying conspiracy, I need not reach the parties' debate over whether the Court should take judicial notice of the USDA data defendants provide to undermine plaintiff's allegations of a conspiracy. *See* ECF No. 34 at 12; *see also* ECF No. 35 at 2 n.3.

growing its own, undercut its motive to keep prices high. *Id.* at *17. Similarly, the 2008 recession was deemed a plausible alternative for the *Tyson* defendants' production cuts, undermining the conclusion that such cuts would be against the defendants' interest absent a conspiracy. *Id.* at *18. Finally, with respect to other indicia of agreement, the court was unpersuaded that membership in industry associations, attendance at industry conferences, and the use of Agri Stats were enough to support the plaintiffs' "information-and-belief allegation that the industry's production cuts were coordinated." *Id.* at *19. As a result, the court found that the plaintiffs in that case had not provided sufficient evidence of an underlying agreement under the exacting PSLRA standard for pleading the falsity element of securities fraud claim.

Using *Tyson*'s analysis of circumstantial evidence as a guide, I find there are insufficient facts pled to establish circumstantial evidence of an agreement in this case. First, the complaint does not support a conclusion that production cuts made pursuant to the conspiracy would otherwise be against Pilgrim's interest absent a conspiracy. Instead, there are strong indications that cutting broiler production was in Pilgrim's interest given the company's bankruptcy in 2008-2009. The complaint notes that immediately preceding and following Pilgrim's bankruptcy, the company cut production in rather permanent ways, including by closing four processing plants in 2008 and 2009 alone. ECF No. 29 at 119–20. According to the complaint, "[t]he production cuts were not enough to save Pilgrim['s] from its immediate financial crisis," indicating that the cuts were in fact made in an effort to avert crisis rather than to comply with a price-fixing conspiracy. *Id.* at 119. The complaint further notes that "bankruptcy allowed for Pilgrim['s] to close plants, and thus when the Company emerged from bankruptcy a year later . . . Pilgrim['s] emerged with substantially reduced production." *Id.* As a result, the facts pled in the complaint

17

provide a possible explanation of why cuts in production were in Pilgrim's interest as it emerged from bankruptcy.

With respect to Pilgrim's motive to keep prices high, the company did not use a "buy-versus-grow" strategy like Tyson's that would undercut such a motive. However, in such a case where there is little other circumstantial evidence of a conspiracy, the motive to keep prices high can more aptly be said to describe the reality of an industry characterized by inelastic demand than to be an indicator that a party had a motive to conspire. Additionally, I agree with the *Tyson* court that defendants' membership in trade associations and social interactions with other industry members is insufficient "without significantly more in a Rule 10b-5 case" to establish the existence of a conspiracy. *Id.* at *18. Ultimately, I agree with defendants that it is inappropriate to plead "fraud by innuendo," which is essentially what plaintiff has done in this complaint. ECF No. 34 at 7.

C. Conclusion.

Because plaintiff did not plead the underlying antitrust conspiracy with sufficient particularity according to the PSLRA's requirements, his claims for § 10 violations fail to satisfy the falsity elements. As a result, his remaining § 20(a) claim against defendants Lovette and Sandri must also necessarily fail.[6] The Court therefore GRANTS Pilgrim's motion to dismiss plaintiff's second amended complaint.

As a final note, plaintiff requested leave to amend his complaint in response to defendants' motion to dismiss. ECF No. 35 at 20 n.13. "[A] court need not grant leave to amend when a party fails to file a formal motion." *Harris v. Avant*, No. 10-CV-00027-PAB-CBS, 2012 WL 1079318, at *3 (D. Colo. March 29, 2012). I presume that if plaintiffs had additional facts

---

[6] Where a complaint fails to state a Rule 10b-5 claim, the related Section 20(a) claim for control person liability must also necessarily fail. *Adams*, 340 F.3d at 1107–08.

to allege at this time, they would have done so. But I do not mean to foreclose the possibility that plaintiff might obtain facts (through the antitrust case or otherwise) that would enable him to assert a securities claim that would satisfy the requirements of the PSLRA. *See supra* n.4. His securities case is essentially premature but not necessarily hopeless. Accordingly, I dismiss this case without prejudice.

## ORDER

For the reasons stated herein, defendants' motion to dismiss plaintiff's second amended complaint, ECF No. 34, is GRANTED. Plaintiff's second amended complaint is DISMISSED without prejudice.

DATED this 14th day of March, 2018.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge