# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-CV-02611-RBJ

PATRICK HOGAN, Individually and on Behalf of
All Others Similarly Situated,

      Plaintiff,

v.

PILGRIM'S PRIDE CORPORATION,
WILLIAM W. LOVETTE, and
FABIO SANDRI

      Defendants.

---

**<u>SECOND </u> AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

---

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................ ..i

I.        THE COURT'S PRIOR DISMISSAL AND LEAVE TO AMEND .......................... 1

I. II.    INTRODUCTION .......................................................................... 13

II. III.  JURISDICTION AND VENUE ....................................................... 811

III. IV.  PARTIES ................................................................................... 12

    A.    Lead Plaintiff ........................................................................ 912

    B.    Defendants ........................................................................... 912

IV. V.    CONFIDENTIAL WITNESSES ...................................................... 1013

V. VI.    SUBSTANTIVE ALLEGATIONS OF PILGRIM'S FRAUD .................. 1114

    A.    Background of Pilgrim and the Poultry Industry .......................... 1114

        1.    The Broiler Industry Is Vertically Integrated ........................ 1316

        2.    The Poultry Industry Is Highly Concentrated and Familial ......... 1619

        3.    A History of Industry Collaboration .................................... 1922

    B.    Pilgrim, in Financial Distress, Colludes with Its Competitors to Reduce ____
          Broiler Production and Manipulate Broiler Prices ...................... 2225

        1.    Pilgrim and Other Broiler Producers Used Agri Stats to Both Monitor ____
              and Discipline Competitors' Supply Restraining Conduct ........... 2225

        2.    Pilgrim and Other Broiler Producers Manipulate Production and _____
              Supply from 2008 Through the Class Period to Raise Broiler Prices ......... 3134

        3.    Pilgrim and Other Broiler Companies Undertake Additional Efforts ____
              During the Class Period to Manipulate Broiler Prices .................. 3437

VI. VII. TIMELINE OF EVENTS ............................................................... 4956

VII. VIII. ........................................................................................ M
          ATERIALLY FALSE AND MISLEADING STATEMENTS AND ___ OMISSIONS
          MADE BY DEFENDANTS DURING THE CLASS PERIOD .......................... 5158

    A.    Materially False and Misleading Statements and Omissions Concerning
          Fiscal Year 2013 ...................................................................... 5259

    B.    Materially False and Misleading Statements and Omissions Concerning _____
          the —First Quarter of 2014 ......................................................... 5663

    C.    Materially False and Misleading Statements and Omissions Concerning ____
          the Second Quarter of 2014 ........................................................ 6168

i

D.   Materially False and Misleading Statements and Omissions Concerning _____
the –Third Quarter of 2014 ............................................................ 6572

E.   Materially False and Misleading Statements and Omissions Concerning
Fiscal Year 2014 ............................................................................ 7077

F.   Materially False and Misleading Statements and Omissions Concerning _____
the —First Quarter of 2015 ............................................................. 7683

G.   Materially False and Misleading Statements and Omissions Concerning _____
the Second Quarter of 2015 ............................................................ 8087

H.   Materially False and Misleading Statements and Omissions Concerning
the –Third Quarter of 2015 ............................................................. 8592

I.   Materially False and Misleading Statements and Omissions Concerning
Fiscal Year 2015 ............................................................................ 8996

J.   Materially False and Misleading Statements and Omissions Concerning _____
the —First Quarter of 2016 ............................................................. 96103

K.   Materially False and Misleading Statements and Omissions Concerning _____
the Second Quarter of 2016 ............................................................ 99106

L.   Materially False and Misleading Statements and Omissions Concerning _____
the —Third Quarter of 2016 ............................................................. 103110

VIII.IX. .......................................................................................... T
HE TRUTH EMERGES ...................................................... 106113

IX.X.   POST CLASS PERIOD EVENTS.................................... 110117

X.XI.   ADDITIONAL INDICIA OF SCIENTER ....................... 111125

XI.XII.ADDITIONAL SUPPORT FOR FALSITY AND SCIENTER:
PILGRIM AND OTHER BROILER PRODUCERS MANIPULATE
PRODUCTION AND SUPPLY FROM 2008-2016 .......................... 116130

A.   The Broiler Industry Begins Coordinated Production Cuts in 2008.............. 116130

B.   Coordinated 2008 and 2009 Production Cuts Lead to Unprecedented
Reductions in Broiler Breeder Flocks and Increased Broiler Prices.............. 120138

C.   Pilgrim and Its Industry Counterparts Coordinate a Second Round of
Production Cuts in 2011 and 2012.............................................. 123141

D.   Coordinated 2011 and 2012 Production Cuts Lead to Historical _____
Reductions in Broiler Breeder Flocks and Record Profits for the _____
Industry in 2013 and Into  —the Beginning of the Class Period ................. 128147

XIII.   THE GRAND JURY INDICTMENT CONFIRMS AND PROVIDES _____
EVIDENCE OF ILLEGAL COORDINATED ANTICOMPETITIVE _____

BEHAVIOR INVOLVING PILGRIM AND CONFIRMS FALSITY
AND SCIENTER ...................................................................................................150

XII. XIV. ......................................................................................................................... L

OSS CAUSATION/ECONOMIC LOSS .............................................................131155

XIII. XV. ........................................................................................................................ B

ASIS OF ALLEGATIONS ...................................................................................134157

XIV. XVI. ....................................................................................................................... P

RESUMPTION OF RELIANCE .........................................................................134158

XV. XVII. ....................................................................................................................... P

SLRA STATUTORY SAFE HARBOR DOES NOT APPLY ............................135159

XVI. XVIII. ..................................................................................................................... P

LAINTIFF'S CLASS ACTION ALLEGATIONS ............................................136160

XVII. XIX. ....................................................................................................................... C

AUSES OF ACTION............................................................................................138161

XVIII. XX. ....................................................................................................................... P

RAYER FOR RELIEF..........................................................................................141164

XIX. XXI. ......................................................................................................................... J

URY DEMAND....................................................................................................141165

1.       This is a federal securities class action brought by Lead Plaintiff George James Fuller ("Lead Plaintiff") on behalf of all persons or entities who purchased or otherwise acquired the securities of Pilgrim's Pride Corporation ("Pilgrim" or the "Company") between **February 21, 2014 and November 17, 2016**, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5.  Defendants are the Company, a leading chicken producer, and its two top executives: William W. Lovette ("Lovette"), Pilgrim's Chief Executive Officer, and Fabio Sandri ("Sandri"), Pilgrim's Chief Financial Officer (collectively, "Defendants").

## I.       THE COURT'S PRIOR DISMISSAL AND LEAVE TO AMEND

2.       On March 14, 2018, this Court entered a Final Judgment (ECF No. 42), granting Defendants' Motion to Dismiss (ECF No. 34) and dismissing Plaintiff's Amended Complaint (ECF No. 29) and this Action without prejudice. Notably, in the order dismissing Plaintiff's Amended Complaint (ECF No, 41), this Court presciently recognized: "[Plaintiff's] securities case is essentially premature but not necessarily hopeless."

3.       Thereafter, Plaintiff moved for reconsideration pursuant to Fed. R. Civ. P. 59(e), or, alternatively, requesting leave to amend (ECF No. 43).

4.       On November 9, 2018, this Court denied Plaintiff's Motion for Reconsideration, but granted Plaintiff's unopposed request for leave to amend (ECF No. 46). The Court, however, warned Plaintiff that it did "not want to go through the motions process again if there are not *genuinely new facts that are materially different* that those that the Court has already found to be insufficient to state a claim." *See* ECF No. 46 (emphasis added). Those "genuinely new facts that are materially different" now exist.

5.      On June 3, 2020, "[a] federal grand jury in the U.S. District Court in Denver, Colorado, returned an indictment against four executives for their role in a conspiracy to fix prices and rig bids for broiler chickens." *See* United States Department of Justice ("DoJ") Press Release dated June 3, 2020 ("DoJ Press Release");[1] *see also U.S.A. v. Jayson Jeffrey Penn, at al.*, No. 1:20-cr-00152 (D. Colo.) (ECF No. 1) ("Grand Jury Indictment"). Two of these senior executives were employees of Pilgrim: 1) Jayson Penn and 2) Roger Austin. *See* DoJ Press Release and Grand Jury Indictment. Penn, who is alleged herein to have been Defendant Lovette's right-hand man, was an Executive Vice President at Pilgrim starting in approximately January 2012 and became the President and Chief Executive Officer at Pilgrim in approximately March 2019. *See id*. Austin was a Vice President at Pilgrim starting in approximately February 2007. *See id*. The other two men charged were Claxton Poultry President Mikell Fries and Vice President Scott Brady. *See id*.

6.      "According to the indictment, from at least as early as 2012 until at least early 2017, Jayson Penn, Roger Austin, Mikell Fries, and Scott Brady conspired to fix prices and rig bids for broiler chickens across the United States." *See* DoJ Press Release. This time period covered by the indictment fully overlaps with the Class Period (February 21, 2014 through November 17, 2016, inclusive). The indictment includes evidence of communications between Defendant Lovette (described as "Supplier-1-Employee-1")[2] and Penn demonstrating Lovette's knowledge of the conspiracy and direct involvement in it.

---

[1] https://www.justice.gov/opa/pr/senior-executives-major-chicken-producers-indicted-antitrust-charges

[2] The indictment states that "Supplier-1-Employee-1 was [Pilgrim]'s President and Chief Executive Officer starting in approximately January 2011 until approximately March 2019," and that "Supplier-1-Employee-1 supervised PENN." Defendant Lovette was Pilgrim's President and CEO during that time period and supervised Penn.

7.      Accordingly, pursuant to this Court's Order (ECF No. 46) and Fed. R. Civ. P. 15, Plaintiffs hereby submit this Second Amended Complaint.

**II.    INTRODUCTION**

8.      Defendants issued materially false and misleading statements throughout the Class Period regarding Pilgrim's financial results, business operations, competition with other poultry producers, and its efforts to transform the Company post-bankruptcy, while concealing a massive collusive effort by Pilgrim and other poultry industry leaders to artificially fix, raise, and maintain high prices on broiler chicken ("Broilers"). Historically, the chicken industry has followed a predictably volatile "boom and bust" pattern, whereby poultry producers would ramp up production when chicken prices were high, the resulting overproduction and oversupply would cause prices to bottom-out, and competitors would fight to drive each other out of the market. In the throes of the economic recession beginning in 2008, however, Pilgrim and other leading Broiler producers started to take a variety of collaborative actions to reduce the overall supply of Broilers in the United States in an effort to inflate Broiler prices. These secret, collusive efforts by the industry provided unprecedented financial stability to the industry and allowed Pilgrim to report record earnings and profit margins during the Class Period between February 21, 2014 and November 17, 2016. While Pilgrim and the other participants in this scheme engaged in anticompetitive conduct, throughout the Class Period, Pilgrim issued materially false and misleading statements and omitted material information from its public statements that artificially inflated and/or maintained the price of Pilgrim's securities during the Class Period and caused Lead Plaintiff and other Class members to suffer harm when the truth was revealed to the market.

9.      Back in late 2007 and into 2008, the Broiler industry experienced a particularly

low trough in its usual boom and bust cycle, as rising feed ingredient costs provided additional margin pressure in a market already struggling with overproduction and low Broiler prices. Indeed, at the beginning of 2008, Pilgrim and executives from numerous other poultry producers regularly lamented the oversupply of chicken in the market and its negative effect on Broiler prices. Pilgrim had briefly attempted unilateral production cuts the previous year, but, as market theory would dictate, other producers filled the supply gap vacated by Pilgrim and the Company's revenues dropped further. Without any relief from high corn (the principle Broiler feed ingredient) prices in sight, the Broiler industry appeared destined for an extended "bust" period. By December of 2008, Pilgrim became the next victim of this vicious cycle, causing it to declare bankruptcy.

4.10.   Pilgrim emerged from bankruptcy at the end of 2009 through a sale of its majority stake to its parent company, JBS SA ("JBS"). Determined to maintain a consistent trend of profitability rather than suffer the effects of the boom and bust business cycle that led to its previous failures, Pilgrim coordinated with fellow industry participants—together comprising approximately 95% of the market—to embark on an orchestrated reduction of the Broiler supply. In order to ensure that their collaborators adhered to their end of the bargain and did not flood the market with chicken while Pilgrim reduced its own output, the participating companies relied on a unique, highly detailed data sharing service known as Agri Stats, through which the companies exchanged comprehensive proprietary data concerning each company's operations, production, inventory, cost and pricing, compiled in nearly real-time. This type of detailed company-specific information would ordinarily never be shared among competitors, and, according to the joint "Antitrust Guidelines For Collaborations Among Competitors" prepared by the Federal Trade Commission ("FTC") and Department of Justice ("DOJ"), is exactly the type of information

sharing that raises serious antitrust concerns.  As discussed in detail in Section ~~V~~VI.B.1 at pp. ~~22-32~~25-34, with support from former Pilgrim and Agri Stats employees, Agri Stats provided Pilgrim and other Broiler companies with the ability to monitor their co-conspirators' conduct to confidently reduce their own supply.

~~5.~~11.   Equipped with the Agri Stats data of their competitors, Pilgrim and other Broiler producers coordinated two tranches of significant Broiler production cuts between 2009 and 2016: the first occurring in 2009-10, and the second in 2011-12.  Sections ~~V~~VI.B.2 at pp. ~~70-76~~34-37 and ~~XI~~XII at pp. ~~117-132~~130-147 outline in detail how Pilgrim and other Broiler companies conducted these supply reductions—which often took place immediately after industry association events that provided opportunities for company executives to have personal interaction with one another at group dinners, golf tournaments, and other functions—by not only limiting the companies' short-term supply of Broilers (for example, breaking eggs), but also by taking the unprecedented action of severely cutting their supply of breeder flocks, which prevented them from ramping up their supply for a year or more given the time needed for breeder chickens to mature for laying eggs, hatching, and Broiler maturation.

~~6.~~12.   In 2014, at the beginning of the Class Period, when Broiler prices appeared poised to increase and breeder flocks were already substantially reduced, Pilgrim and other industry participants explored additional avenues to reduce supply and maintain high Broiler prices, including increasing exports to Mexico, selling accumulated frozen chicken to other countries at bargain prices, and purchasing Broilers from their competitors rather than producing the chicken themselves.  Participants in the scheme, including Defendants, also took the extraordinary step of systematically manipulating the Georgia Dock chicken pricing index, which served as the basis for negotiating a large percentage of the industry's contract prices with Broiler retailers, by

reporting false, higher-than-actual prices to the Georgia Department of Agriculture, which compiled the index without confirming the prices reported to it by poultry producers.  In so doing, Pilgrim and other Broiler producers caused the Georgia Dock to exceed the United States Department of Agriculture ("USDA") and Urner Barry price indices—which, in contrast to the Georgia Dock, confirm the prices reported to them through a process of secondary verification—by over 60% by 2016.  In fact, when feed ingredient prices fell drastically in 2015 and 2016 causing a corresponding steep decline of chicken prices on the USDA and Urner Barry indices, the Broiler price on the Georgia Dock barely moved, and even slightly increased during 2015.  As discussed herein at Section VI.B.3.b.i., p. 52, documentary and testimonial evidence confirms that of more than 500 price submissions by Pilgrim and other Broiler producers, price submissions to the Georgia Dock were always within a penny of the previous week's price, and very rarely lower than the previous week's price.

7.13.   The Broiler price manipulation undertaken by Pilgrim and other industry participants fundamentally changed Pilgrim's performance and transformed it from a company bankrupted by the financial pressures of a boom-and-bust cyclical industry into a financially prosperous company.  During the Class Period, Pilgrim was able to report "record" financial results, including profit margins of more than 16 percent, which were nearly three times what the Company (and other poultry companies) had historically achieved on average, and achieved double-digit profit margins an unprecedented four years straight (2013-2016).  In 2013 and 2014, the industry experienced some of the highest feed costs in over a decade, which was the very market condition that torpedoed Pilgrim into bankruptcy in 2008.  Nevertheless, by December 2014, Defendants had pumped Pilgrim's stock up to over $38 per share, when just six years earlier it had been trading at under $0.15 per share.

8.14.    In its Class Period public statements, Pilgrim did *not* credit the industry supply collusion and price manipulation as the cause of their "record" results.  Instead, by the start of the Class Period, Pilgrim and Defendants Lovette and Sandri falsely stated that they had fundamentally transformed Pilgrim's business through better product "mix" and "operational improvements," to achieve a level of unprecedented financial success and stability.  In other words, Defendants indicated they had escaped the historical boom and bust cycle by changing their business plan, when in truth, Pilgrim and other industry participants had created a chicken cartel to illegally fix, raise, and maintain high prices on Broilers.

9.15.    During the Class Period, as discussed in Section VIIVIII below on pp. 52-10758-113 (setting forth Defendants' materially false and misleading statements and omissions), Defendant Lovette stated that Pilgrim's "diverse portfolio model," "pricing strategy" and "spread business" were the sources of Pilgrim's margin, earnings, and revenue growth when, in truth, that growth was driven by Pilgrim's participation in the undisclosed price-fixing scheme.  Defendant Sandri echoed these misrepresentations, stating that margin growth during the Class Period was attributable to "mix and operational improvements."  Lovette also stated that Pilgrim created pricing models specific to its customers' needs, when, in reality, Pilgrim and its co-conspirators were actively engaged in a scheme to fix prices to the *detriment* of their customers. Lovette further falsely stated that "the profitability of the chicken industry is based on the supply and demand for chicken" when, in reality, the profitability of the industry, including Pilgrim, was predicated on the relative demand-inelasticity of Broiler chickens in conjunction with the undisclosed price-fixing scheme.  In other words, Pilgrim and its co-conspirators altered the economics of the industry with an anticompetitive scheme to reduce supply and maintain high prices.  To this end, feed costs were no longer an important input, because Pilgrim and other

Broiler companies had fixed the price of chickens.  Defendants Lovett also made misleading statements regarding  future breeder and egg levels in the industry because he omitted the crucial fact that he *knew* what those levels were going to be based on his detailed knowledge of other companies' intentions and operations, which he knew through Agri Stats data.

10.16.  In a telling display of industry symmetry and coordination, Tyson Foods, Inc. ("Tyson"), who also reported "record" profit margins of more than 13 percent during the Class Period, likewise credited their own efforts to "de-commoditize" the business through better "product mix," increased "value-added products," and improved cost-management and pricing structure.  Tyson even credited its turnaround in part to its newly adopted "buy versus grow" strategy, in which Tyson—against all established economic theory—started buying chicken on the open market from its competitors rather than produce the chicken on its own, despite Tyson's top to bottom ownership of nearly every aspect of the Broiler cultivation process.  Thus, Pilgrim and Tyson, the two largest poultry producers in the country, were not only collaborating to reduce the supply of Broilers and maintain inflated prices, but were reading off the same script to mislead the market as to what caused their improved financial results and the anomalous stability in the Broiler industry.

11.17. Investors learned the truth—that Pilgrim's record results and sustained profitability were due to Defendants' working collaboratively to manipulate the price of Broilers—through a series of partial disclosures beginning in the fall of 2016.  On September 2, 2016, a group of wholesaler customers of Pilgrim and numerous other Broiler producers filed an antitrust class action complaint in the Northern District of Illinois, styled *Maplevale Farms, Inc. v. Koch Foods, Inc.*, *et al.*, Case No. 1:16-cv-08637 (N.D. Ill. Sept. 2, 2016) (the "*Maplevale*

Action"), alleging that Pilgrim and other companies[3] participated in an illegal anticompetitive scheme "to fix, raise, maintain, and stabilize the price of Broilers," through a number of different means, including by sharing detailed, non-public, proprietary information through Agri Stats. A veteran industry analyst at Pivotal Research Group issued a report on October 7, 2016 downgrading Tyson from "Hold" to "Sell," citing the "powerfully convincing" allegations from the *Maplevale* antitrust complaint, and stating that "the evidence is quite chilling. There is no easy way to explain the perfect harmony that the industry has operated in since 2009."

~~12.~~18.  Thereafter, on November 3, 2016, the *New York Times* published an article entitled, "You Might Be Paying Too Much for Your Chicken," reporting for the first time based on documents the *New York Times* received pursuant to a Freedom of Information Act request, that the USDA initiated an inquiry into the Georgia Dock index, questioning the accuracy of unverified data that Pilgrim and other poultry producers provided to the Georgia Department of Agriculture ("GDA") for compilation of the index. A second article, "If You Thought You Were Paying Fair Prices for Chicken at the Supermarket, Think Again," published by the *Washington Post* two weeks later on November 17, 2016, revealed further information about the relevance of Georgia Dock manipulation to the poultry industry, and provided further color from Arty Schronce, a director at the GDA. The article provided a link to an internal GDA memorandum prepared by Mr. Schronce, in which he explained that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock was a "flawed product that is a liability to the Georgia Department of Agriculture."   More

---

[3] There are presently at least 30 companies that have been implicated in the anticompetitive scheme to raise the price of Broilers: Pilgrim, Koch Foods, Inc. (and three of its subsidiaries); Tyson (and three of its subsidiaries); Perdue Farms, Inc. and Perdue Foods LLC; Sanderson Farms, Inc. (and three of its subsidiaries); Wayne Farms, LLC; Mountaire Farms, Inc. (and two of its subsidiaries); Peco Foods, Inc.; Foster Farms, LLC; House of Raeford Farms, Inc.; Simmons Foods, Inc.; Fieldale Farms Corporation; George's Inc. and George's Farms, Inc.; O.K. Foods, Inc. (and two of its subsidiaries); Agri Stats, Inc.; Claxton Poultry Farms, Inc.; Harrison Poultry, Inc.; and Mar-Jac Poultry, Inc. (and numerous Mar-Jac related companies).

specifically, Mr. Schronce wrote that "I have come to question the validity of the information provided" to the GDA from poultry producers, and that they would give him "lackadaisical and rude responses to my requests for information," such as responding "just keep em' the same" when he would ask for a company's updated broiler price.

~~13.~~19.  In response to each of these revelations, Pilgrim's stock fell precipitously on heavy trading volume, losing over $1.1 billion in market capitalization as the artificial inflation in the Company stock from Defendants' materially false and misleading statements and omissions during the Class Period was removed, causing substantial damage to Pilgrim investors.

~~14.~~20.  Since the end of the Class Period, the Securities and Exchange Commission ("SEC~~") and~~"), Florida Attorney General, and DOJ have opened investigations into the Broiler price-fixing scheme.  On May 8, 2017, Pilgrim spokesman Cameron Bruett and Tyson spokesman Gary Mickelson announced that Florida Attorney General Pam Bondi's office served the companies with a "civil investigative demand" seeking information from both Pilgrim and Tyson regarding possible anticompetitive behavior.

21.    In June 2019, the DOJ intervened in the *Maplevale* Action, requesting a limited stay of discovery to protect the Grand Jury's investigation. In a June 27, 2019 *Food Dive* article entitled "As DOJ Investigates Price-Fixing Against Chicken Industry, Do Criminal Charges Loom?", Peter C. Carstensen, a professor of law emeritus at the University of Wisconsin at Madison law school, who formerly served as an attorney in the DOJ's antitrust division, explained that "[t]his is significant," because the intervention signals that the DOJ "thinks that there's a real serious violation—one or more violations—here that require grand jury inquiry and the potential for criminal indictment."  Professor Carstensen further added that "[t]he probability that there was not just an antitrust violation but a criminal violation is such that they now want to

stay the discovery so that the grand jury gets first shot at these alleged felons."

22.    The prescience of the professor's analysis became clear on June 3, 2020 with the Grand Jury Indictment of four poultry executives, including Jayson Penn and Roger Austin from Pilgrim.  As explained herein at Section XIII, the Grand Jury Indictment includes detailed content from text messages and phone conversations, some of which involving Defendant Lovette, that demonstrate systematic coordination between executives of poultry companies to fix the prices of chicken during the Class Period.  Makan Delrahim, assistant attorney general of the DOJ's Antitrust Division, said in the DOJ Release that "Executives who cheat American consumers, restauranteurs, and grocers, and compromise the integrity of our food supply, will be held responsible for their actions."

23.    In the wake of the news, Christopher Leonard, a prominent investigative journalist who has covered the poultry industry for years and written numerous articles and books including "The Meat Racket," published a series of tweets calling the indictment "breathtaking," the evidence "astounding," and, given the numerous different Broiler producers referenced in the indictment, noted "this appears to be just the beginning." In a June 4, 2013 article in *Detroit News* entitled, "If It's Illegal, 'Don't Tell Me': Chicken Probe Ensnares a CEO," Leonard is quoted saying, "It's hard to get anything more solid than having text messages of people working together to rig prices," Leonard said.  "This is the most significant action in federal government on the meat industry in probably decades."

III.    JURISDICTION AND VENUE

~~15.~~24.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

16.25.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

17.26.  Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

18.27.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of a national securities exchange.

IV.   PARTIES

A.   **Lead Plaintiff**

19.28.  Lead Plaintiff **GEORGE JAMES FULLER**, as set forth in his previously-filed certification [Dkt. # 8-1], incorporated by reference herein, purchased Pilgrim securities at artificially inflated prices during the Class Period, and was harmed when the price of Pilgrim stock dropped as a result of the revelations of the truth about Pilgrim's participation in an improper collusive scheme to fix, raise and maintain Broiler prices, the Company's business practices, and financial condition.

B.   **Defendants**

Company Defendant

20.29.  Defendant **PILGRIM'S PRIDE CORPORATION** is one of the largest poultry producers in the country.  Pilgrim is incorporated under the laws of Delaware and maintains its principal executive offices at 1770 Promontory Circle, Greeley, Colorado 80634.  After emerging from bankruptcy in 2009, Pilgrim sold a majority ownership to Brazilian meat giant, JBS for $800 million.

Individual Defendants

21.30.  Defendant **WILLIAM W. LOVETTE** is and was at all times during the Class Period Pilgrim's CEO and President.  Prior to arriving at Pilgrim, Defendant Lovette spent 25 years working at Tyson in various roles in senior management, including President of Tyson's International Business Unit, President of its Foodservice Business Unit, and Senior Vice President of Poultry and Prepared Foods.  While at Tyson, Defendant Lovette also served on the boards of Tyson de Mexico, Cobb-Vantress, Inc. ("Cobb-Vantress"), and EFS Network, Inc. During the Class Period, Defendant Lovette signed and certified the Company's quarterly and annual financial reports filed with the SEC on Forms 10-Q and 10-K, regularly spoke during Pilgrim earnings calls with financial analysts, and given his senior position within the Company, possessed the power and authority to control the contents of Pilgrim's press releases, investor and media presentations, SEC filings, and other public statements.   Defendant Lovette abruptly retired from his position at Pilgrim in March 2019, and was succeeded by current CEO Jayson Penn, who had previously served as \ Executive Vice President of Sales & Operations and directly reported to Lovette.  Penn was indicted by a grand jury on June 2, 2020 on charges of conspiracy to restrain trade.

22.31.  Defendant **FABIO SANDRI** is and was at all times during the Class Period Pilgrim's CFO.  During the Class Period, Defendant Sandri signed and certified the Company's quarterly and annual financial reports filed with the SEC on Forms 10-Q and 10-K, regularly spoke during Pilgrim earnings calls with financial analysts, and given his senior position within the Company, possessed the power and authority to control the contents of Pilgrim's press releases, investor and media presentations, SEC filings, and other public statements.

V.   **CONFIDENTIAL WITNESSES**

23.32.  Witnesses referred to herein as Confidential Witnesses ("CWs") corroborate and support the detailed allegations set forth in this Complaint, including the material falsity of Defendants' Class Period statements and omissions and Defendants' scienter.  These witnesses with knowledge are described as follows:

- CW1 – Pilgrim's Director of Foodservice Marketing from 2005 to April 2014.

- CW2 – Pilgrim's Director of Retail Marketing from September 2014 to December 2016.

- CW3 – Pilgrim's Director of Project Management and Retail Marketing for Fresh Chicken from October 2012 to December 2015.

- CW4 – Pilgrim's Production Specialist/Business Analyst from April 2015 to August 2015.

- CW5 – Pilgrim's Internal Auditor from June 2010 to July 2014.

- CW6 – Pilgrim's Pricing Coordinator from May 2013 to March 2015.

- CW7 – Pilgrim's Executive Vice President of National Accounts from July 2010 to July 2013.

- CW8 – Pilgrim's Internal Audit Manager from September 2010 to March 2014.

- CW9 – Pilgrim's Director of Corporate Marketing from 1987 to March 2016.

- CW10 – Pilgrim's Director of National Foodservice Sales from July 2012 to August 2015.

- CW11 – Pilgrim's Live Operations Manager from September 2015 to August 2016.

- CW12 – Agri Stats Statistical Analyst from April 2008 to May 2012.

- CW13 – Agri Stats Office Manager from July 1996 to July 2013.

## VI.   SUBSTANTIVE ALLEGATIONS OF PILGRIM'S FRAUD

### A.   Background of Pilgrim and the Poultry Industry

24.33.  Incorporated in 1986, Pilgrim is one of the largest producers and sellers of chicken in the United States, currently accounting for approximately 16.6% of the domestic

market for chicken products, second only to Tyson, which accounts for 21% of the market.  In fact, the top three poultry companies, Pilgrim, Tyson and Sanderson, collectively account for nearly half of the chicken sold in this country.  In fiscal year 2016, the last year covered in the Class Period, chicken sales accounted for approximately $7.5 billion of the Company's $7.9 billion in net sales, 75.4% coming from fresh chicken, 20.7% from prepared chicken, and 3.9% from exports and other chicken.

25.34.  Pilgrim's business focuses on the production and sale of Boilers, chicken under 13 weeks of age that are the standard, non-organic, non-kosher chicken that makes up 98% or more of the chicken sold in the United States.  With little or nothing to distinguish a Broiler sold by Pilgrim from one by Tyson or by Sanderson Farms, Broilers are considered a commodity.  Indeed, Defendant Lovette himself acknowledged in February 2014, "our business…the [Broiler] chicken business per se is a commodity business."  The USDA also treats Broilers as a commodity product.

26.35.  Because Broilers are a commodity for which demand has generally grown slowly but steadily since the 1950's, the market for Broilers is characterized by inelastic demand.  In other words, the demand for Broilers does *not* meaningfully increase or decrease with changes in its price; however, a decrease in supply will increase prices.  The correlation between supply and price is predictable and calculable.  A 2008 study by The Hudson River Group, a consultant for Pilgrim, found that a one percent decrease in the supply of Broilers leads to a 0.8% increase in the price of Broilers.  Thus, from Pilgrim's and other chicken producers' standpoint, keeping a low Broiler supply keeps prices high, and works to the benefit of all.

27.36.  Prior to 2008, when Pilgrim and other Broiler companies first began coordinating supply cuts, the price and supply for Broilers would follow a "boom and bust" cycle.  When

prices for Broilers would rise, the chicken producers would ramp up production to capture more revenue, and the resulting oversaturation of the market would cause prices to fall, in turn causing production to decline as it became less profitable to produce more chicken, and the cycle would start anew.   The financial health of industry participants, therefore, followed a pattern of volatility.   For example, between 2000 and 2008, Pilgrim's profit margins swung from as low as -5.3% to as high as 13.8%, averaging about 6.1% per year.   Other companies had similar upswings and downswings.   Tyson's margins fluctuated between 1.2% and 7% in the decade prior to 2008 and could not sustain a margin increase for more than two years during that time.

28.37.   This ebb and flow was the natural economic product of a competitive landscape. Even though the industry knew that lower supply would beget higher prices, chicken producers could not unilaterally lower supply by cutting their own production, because if they did, they would lose out on the revenues from the high Broiler prices while other producers would pick up the slack and gain market share.

29.38.   As discussed below, a number of different traits of the Broiler industry and conditions leading up to 2008 provided Pilgrim and other Broiler producers with the opportunity and means to perpetrate a collusive scheme to fix the price of Broilers in the United States.

0.1. The Broiler Industry is Vertically Integrated

30.39.   To understand how Pilgrim and other companies could cut or ramp up production, it is necessary to understand the production cycle of a Broiler chicken, and how poultry companies are designed to maximize their profit margins in this cycle.

31.40.   The Broiler industry is nearly 100% vertically integrated, meaning that the Companies that produce and process Broilers, such as Pilgrim, Tyson, Sanderson, and others, own or tightly control almost all aspects of Broiler production from breeding, hatching, rearing,

feeding, processing, and selling.

32.41.  At the top of the production cycle, most Broiler producers rely on only a handful of unique Broiler breed lines to mass produce nearly identical chickens with desirable genetic traits for yielding meat.  The genetics companies—also known as primary breeders—develop the strains for grandparent and great-grandparent breeding stock, and then sell the young breeder hens ("breeder pullets") with these ideal characteristics to integrated Broiler producers, who then raise the pullets to lay eggs to be taken to producer-owned hatcheries.  There are only three global genetics conglomerates that produce these grandparent and great-grandparent strains, the largest of which, Cobb-Vantress, is owned by Tyson.

33.42.  The only stage in the production cycle that Broiler producers do not perform themselves is growing the chickens.  Over time, Broiler producers realized that using contractors to grow chicks into full size Broilers is more economically favorable than doing it on their own, so they developed a system of production-contract farming that allows them to maintain ownership of the chickens and periodically monitor them, while a contract farmer actually grows them for 6-7 weeks.  Once fully grown, the Broilers are picked up by the producer, and brought to a producer-owned processing plant (slaughterhouse).  From there, some Broilers are sold without further processing (whole chicken or parts), and some are taken for further processing into "value-added" products, such as chicken nuggets.

34.43.  The flow chart below, published by the National Chicken Counsel ("NCC"), illustrates the basic stages of Broiler production.



35.44.   Control over the various stages of production not only allows vertically integrated companies to control costs, quality and uniformity, it also gives them complete control over the supply.   According to materials prepared by Michael R. Dicks, a professor of agricultural economics at Oklahoma State University and former expert witness[4] for Tyson for testimony before Congress May 21, 2010, entitled "Concentration and Competition in the Poultry Industry," Professor Dicks stated: "[i]n the poultry industry vertical coordination allows integrators to manage excess capacity to manage price.  Integrators can minimize the effect on

_____

[4] Professor Dicks served as a defense expert in *State of Oklahoma v. Tyson Foods, Inc., et al.*, No. 4:05-cv-00329-GKF-SAJ (D. Okla.) (expert report prepared in 2008 and testimony given in 2008, 2009 and 2010), an action involving wrongful waste disposal practices, and also *Armstrong v. Tyson Foods, Inc., et al.*, CJ-2008-23t (McCurtain County District Court, Oklahoma) (expert reports prepared in 2009 and 2010), an action brought by Tyson's contract growers alleging that Tyson supplied them with unhealthy birds and inferior feed.

producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year rather than terminating grower contracts in much the same way the USDA requires all commodity program recipients to adhere to acreage reduction program guidelines and grower associations require members to cut back marketable output."  Thus, in a vertically integrated system, Broiler producers have a number of levers they can pull to decrease their own production.

### 2.  The Poultry Industry is Highly Concentrated and Familial

36.45.  Due to the vertically integrated nature of Broiler producers, only a small number of poultry companies exist today.  A November 2013 USDA report stated, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing.  According to the NCC, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010."  By 2014, that number was down to just 35; of those companies, three—Tyson, Pilgrim, and Sanderson—occupy roughly 46% of the total market share, and the top five companies control over 65% of the market.

37.46.  Given that there are relatively few companies that dominate the Broiler industry, (many, if not all, of which operate in close proximity to one another) employees—including executives—will often leave one company to go work for a competitor.  Most notably, Defendant Lovette worked at Tyson for 25 years before becoming the President and Chief Operating Officer ("COO") of Case Foods, another fully integrated poultry farming company, which then led him to the CEO position at Pilgrim.  According to CW7, Pilgrim's Executive Vice President of National Accounts from July 2010 to July 2013 and who had also worked for Tyson between 1989 and 2005, one of Defendant Lovette's best friends is Devin Cole, who was

the Chief Commercial Officer of Tyson until December 2014.  CW7 stated that Lovette and Cole both live in Colorado, golf and ski together, and attributed their strong relationship to the similarity in business models between Pilgrim and Tyson.

38.47.  CW7 stated that these relationships between industry employees and executives were not limited to the golf course and ski slopes.  According to CW7, people would regularly call old colleagues regarding business.  In one instance, CW7 recalled being in a meeting when a high-ranking executive of Pilgrim called the CEO of another company, at which point CW7 stated that he/she would not be a part of such unethically collusive conduct and walked out of the room.

39.48.  CW2, Pilgrim's Director of Retail Marketing from September 2014 to December 2016, described the poultry industry as "a close knit family" and "cliquish," because everyone knows each other from their time working at competitor companies.  Like many others, CW2 worked for Tyson before working at Pilgrim.  CW2 said that many of Pilgrim's employees had worked for the Company's competitors, so each understood not only Pilgrim's plants and operations, but also those of the competitors.

40.49.  The cliquish nature of the Broiler business is evident in the various industry associations and committees in which the Broiler executives participate.  The various meetings and retreats of these organizations provide Broiler executives with opportunities for personal interaction in order to build relationships and discuss business matters.  For example, the main industry lobby is the NCC, which represents approximately 40 member companies that, according to the NCC's website, "account for approximately 95% of the chicken sold in the United States."  The NCC holds around ten meetings a year.  NCC board meetings, which occur three times a year, typically take place over three days in resort locations such as Hilton Head,

South Carolina, Jackson Hole, Wyoming, and Sea Island, Georgia. The agenda for these meetings devotes substantial time to personal interaction between the board members. The 2017 summer board meeting in Sea Island, Georgia, for example, includes numerous cocktail receptions, group meals (Tyson's Cobb-Vantress sponsors all the breakfasts), a golf tournament, clay target shooting, and a yacht cruise.

41.50. Defendant Lovette served as Secretary Treasurer, Vice Chairman and then Chairman of the NCC, along with other high ranking executives of in the Poultry industry between 2010-13, which was a critical time period where the Broiler industry was coordinating supply cuts:

> 2010-11
> Chairman: Bernard Leonard, Tyson Group VP/Food Service
> Vice Chairman: Lampkin Butts, Sanderson Farms President and CEO
> Secretary Treasurer: **Bill Lovette**, then-President and CEO of Case Foods
>
> 2011-12
> Chairman: Lampkin Butts, Sanderson Farms President and CEO
> Vice Chairman: **Bill Lovette**, Pilgrim President and CEO
> Secretary Treasurer: Mike Helgeson, GNP Company CEO
>
> 2012-13
> Chairman: **Bill Lovette**, Pilgrim President and CEO
> Vice Chairman: Mike Helgeson, GNP Company CEO
> Secretary Treasurer: Jerry Lane, Claxton Poultry GM and Vice President

42.51. Another such organization is the U.S. Poultry & Egg Association, based out of Tucker, Georgia, the board of which lists, among others, Defendant Lovette (who has served as chairman) and senior executives from Tyson, Sanderson, Perdue, Cobb-Vantress (current chairman), Wayne Farms, Claxton Farms, and others. Another is the United States Poultry & Egg Export Council ("USAPEEC"), based in Stone Mountain, Georgia. Like the NCC, the USAPEEC holds annual meetings in desirable resort locations such as Cancun, Mexico, and facilitates personal member interaction with golf and tennis tournaments, receptions, and other

group activities.  Board members include Defendant Sandri, and a number of top executives from Tyson, Sanderson, Perdue, Koch Foods, Wayne Farms, and other lead Broiler producers.

43.52.  Pilgrim and Broiler producers including Tyson, Sanderson, Perdue and others are also members of various state and regional poultry organizations, such as The Poultry Federation (representing poultry and egg industries in Arkansas, Missouri and Oklahoma), the Georgia Poultry Federation, and the North Carolina Poultry Federation.  Each of these organizations holds regular meetings, which high-ranking Broiler producer executives attend.  Another such organization, which is discussed further below, is the Georgia Dock Advisory Committee, which includes as one of its committee members Jayson Penn, Pilgrim's Executive Vice President of Sales & Operations, as well as other high ranking executives from each of the major poultry producers in the state of Georgia.

44.53.  As discussed in detail in Section XIXII at pp. 117-132130-150 below, the major rounds of coordinated production cuts between 2008 and 2016 occurred immediately after important industry meetings, where senior executives of Pilgrim and other Broiler companies would have interacted, providing telling evidence of industry collusion and communication.

3.    A History of Industry Collaboration

45.54.  Broiler producers have a long history of trying to stabilize their industry with cooperative behavior, and the United States Department of Justice ("DOJ") has already prosecuted the poultry industry under federal antitrust laws.  In April 1973, the DOJ filed an antitrust action against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its members (vertically integrated Broiler producers) conspired to fix Broiler prices and restrict Broiler production in violation of Section 1 of the Sherman Act.  The DOJ targeted a program by NBMA members in which they would hold conference calls to coordinate the

pricing and supply of Broilers.  Numerous private civil antitrust actions were filed in response to the DOJ action in the *In re Chicken Antitrust Litigation*, which settled in 1977 for about $30 million.  The NBMA members also agreed to dissolve and end their practices that facilitated collusion, including their conference call program.

46.55.  In recent years, however, a lack of government antitrust enforcement against the Broiler industry provided Pilgrim and other Broiler producers with the opportunity to engage in impermissible anticompetitive behavior.  According to author Christopher Leonard, the Grain Inspection, Packers and Stockyards Administration ("GIPSA"), the agency responsible for regulation of the meat (including poultry) industry, had become so "weak and incompetent," that by 2008, its "guiding doctrine . . . seemed to be to sit on the sidelines and do nothing."  He further stated that within GIPSA, "there was…no internal system to track investigations, a problem that had been identified years before," and "staff members…seemed to have the mentality that it was best not to make waves and best not to antagonize the meat companies."

47.56.  Recognizing the impotency of GIPSA and the opportunity its inaction provided for companies to engage in anticompetitive behavior with impunity, the Obama Administration pressed the USDA and GIPSA in early 2009 to increase their regulatory activities.  Thereafter, GIPSA sought to introduce rules to make it easier for contract growers to sue Broiler producers for antitrust violations, and reduce the disproportionate bargaining power the producers had in their price negotiations.  GIPSA, along with the USDA, also held a series of workshops in 2010 to listen to public input on the proposed rules.

48.57.  But GIPSA's efforts were met with a swift and firm response by the Broiler industry, which, together with industry lobbyists, worked to oppose GIPSA regulatory expansion throughout 2010.  The Broiler industry successfully thwarted the Obama administration's push to

expand GIPSA's antitrust enforcement and, in November 2011, Congress passed a spending bill that prevented GIPSA from using any money to finalize its new antitrust regulations. As a result, GIPSA has not taken a single antitrust enforcement action against any company in the Broiler industry, nor has it issued any new policy recommendation to date.

49.58.  Despite the lack of federal enforcement, a number of private lawsuits have been filed in the past ten years documenting the lack of competition in the contract-farmer Broiler market, arguing that integrated producers coordinate and collude in an anticompetitive manner. For example, in *Adams v. Pilgrim's Pride*, 09-cv-397 (E.D. Tex.), *Been v. O.K. Industries*, No. 08-7078 (E.D. Okla.), and *Wheeler v. Pilgrim's Pride Corp.*, 06-cv-4 (E.D. Tex.), contract-farmers alleged violations of the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 193(a), § 209.[5] In September 2011, after a one-month bench trial in *Adams*, U.S. Magistrate Judge Charles Everingham IV found that Pilgrim had violated federal antitrust law when it suspended operations at the Company's El Dorado plant in an effort to raise Broiler prices, and ordered over $25.8 million in damages to more than 90 former poultry contract growers for the company. In August 2013, the Fifth Circuit vacated the penalty, explaining that the Packers and Stockyards Act, as an antitrust statute, is intended to ensure market competition, not to necessarily just protect low prices. In other words, the Fifth Circuit determined that the plaintiffs' evidence that Pilgrim attempted to raise Broiler prices by cutting its own production, by itself was not an antitrust violation.

50.59.  The private antitrust class action complaint filed in September 2016 (and amended in November 2016) by food distributor Maplevale Farms in the Northern District of

---

[5] Congress passed the PSA in response to a Federal Trade Commission investigation in 1919, which found anti-competitive monopolistic behavior in the meat packing industry. The law was amended in 1935 to include the poultry industry.

Illinois, however, contains such evidence of collusion, and sheds light on the manner in which the poultry industry conspired to fix chicken prices from 2008 to 2016. The pending action alleges that the 27 defendants, including Pilgrim, Tyson, Sanderson Farms, and others, manipulated the price of Broilers by limiting production and exchanging detailed information about prices, capacity, and sales through Agri Stats (a co-conspirator defendant in that suit), through interaction in industry associations, and by manipulating the Georgia Dock pricing index published by the Georgia Department of Agriculture. The allegations in the *Maplevale* complaint, as well as subsequent news and analyst reports expanding on the complaint's allegations, provide strong support for the falsity and misleading nature of statements made by Pilgrim during the Class Period (from February 21, 2014 through November 17, 2016, inclusive) regarding its financial results, business operations, competition with other poultry companies, and its successful efforts to transform the Company since its bankruptcy.

      **B.**      **Pilgrim, in Financial Distress, Colludes with Its Competitors to Reduce Broiler Production and Manipulate Broiler Prices**

                ~~0.1.~~<u>Pilgrim and Other Broiler Producers Used Agri Stats to Both Monitor and Discipline Competitors' Supply Restraining Conduct</u>

~~51.~~<u>60.</u>  As Peter Carstensen, a former antitrust lawyer for the DOJ and law professor at the University of Wisconsin, explained to *Bloomberg* in connection with an article written about the poultry industry's supply and price-fixing scheme, "[i]t only makes sense to cut production if, and only if, your competitors cut back, too." Until 2008, if one company decreased its Broiler production, another would fill the gap to the reducing company's disadvantage. Moreover, previous attempts to conduct roundtable discussions or conference calls among poultry producers to discuss each company's production and pricing intentions and to ensure that others committed to the same practices drew scrutiny from the DOJ and other federal regulators as improperly

collusive and anticompetitive.  In the throes of the 2008 recession and amid soaring feed prices, however, Pilgrim and other poultry producers found a new way to communicate their operations and supply-reducing commitments with one another: Agri Stats.

52.61.  Agri Stats is a private service that gathers data from poultry processors, produces confidential weekly and monthly reports, and disseminates them back to companies that pay for subscriptions, including Pilgrim.  Subscribing companies pay hundreds of thousands of dollars annually to subscribe to this service, as it provides subscribers with near-instant and exceptionally transparent visibility into highly proprietary production metrics of 95% of U.S. poultry processors.  Indeed, the enormous profits Agri Stats garnered from its subscription service led Eli Lilly and Company to acquire Agri Stats in 2013.

53.62.  Agri Stats reports are not publicly available.  The enormous subscription costs, along with confidentiality and non-disclosure agreements, ensure that only Agri Stats and the Broiler producers are privy to the data and types of data the reports provide.  Former employees of Pilgrim and Agri Stats with firsthand knowledge of the reports, public reports, filings and investigations, paint a detailed picture of the extensive data both provided to and disclosed by Agri Stats.

54.63.  CW12, a former Agri Stats Accounting and Statistical Analyst from 2008 to 2012, confirmed the following categories of information contained within Agri Stats reports, for both the industry as a whole as well as for individual producers:

- Inventory levels of Broilers.

- Detailed production statistics by participating company, including the number of Broilers placed with grower farms, mortality, days between flock deliveries, fee-to-meat conversion rate by pounds of feed per pound of Broiler, average Broiler daily weight gain, live pounds of feed per pound of Broiler, average Broiler daily weight gain, live pounds produced per square foot of grower house, breed composition, etc.

- Sales organized by Broiler production complex and type of product produced at the complex, including types of cut produced, packaging, and channel segmentation (*i.e.*, retail vs. export).

- Hatchery statistics, including population and age of Broiler breeder flocks (the egg laying parent flocks of Broilers grown for consumption), which allows recipients to determine the maximum number of Broilers each producer can deliver to growing operations in the coming months.

- Financial information, such as monthly operating profit, sales, and costs.

- Feed data, including manufacturing cost and source material costs.

- Processing information, including total volume from processing plants, age and weight of processed Broilers and processing speed.

55.64.  CWs 1, 2, 3, 4, 7, 8, 12, and 13 all confirm that Pilgrim exchanged extensive information with Agri Stats.   In Pilgrim's answer to the Antitrust Complaint, the Company "admits it has contracted with Agri Stats during the Plaintiffs' Class Period…." According to CW 3, Pilgrim's Director of Project Management and Retail Marketing from October 2012 to December 2015, Pilgrim would receive huge books from Agri Stats each month with the data. CW3 stated that marketing had to make sure that Agri Stats analysts had all the SKUs (stock keeping units – unique identifiers for products that help keep track of inventory) that Pilgrim produced, which were both generic and customer specific.  CW3 confirmed that Agri Stats data covered numerous different metrics, including production of Broilers by pound, by cut (whole chicken, wings, tenders, breast, thigh, and split breast), and plant capacity.

56.65.  According to a former Agri Stats Accounting Data Analyst who was employed at the company headquarters from mid-2012 to late 2013 ("Tyson CW1")[6] and was interviewed in connection with a securities fraud action against Tyson, accountants and controllers at each

---

[6] Tyson CW1 is cited in the Consolidated Class Action Complaint in *In re Tyson Foods, Inc., Secs. Litig.*, 5:16-cv-05340-TLB (W.D. Ark. Mar. 22, 2017) (the "*Tyson* Complaint") and was not independently contacted by Lead Counsel or its representatives.

participating producer's plants would use a direct link to upload all the compiled data directly to Agri Stats. A February 15, 2017 article written by Christopher Leonard, a former national business reporter for the *Associated Press* and author of *The Meat Racket*, states that "[a]ccording to [Agri Stats founder Jim] Cox, clients submit their sales invoices in real time— when someone sells a truck of chicken to the Kroger grocery chain, for example, the invoice goes to Agri Stats soon after."

57.66.  A May 19, 2010 report by industry consulting firm FarmEcon LLC, entitled "Competition in the U.S. Chicken Sector" described Agri Stats' pricing data as "considerably more detailed than the USDA reports," such that Agri Stats:

> [C]ollects their data from actual sales of chicken companies that represent the vast majority (about 95%) of sales. Their daily report currently includes more than 75 items at the wholesale level. Reported data include weighted average price, top third average, bottom third average and volume traded. Reports are available on a daily, weekly and monthly basis. Prices reported include both spot market and contract sales, and reflect actual transaction pricing and volume.

58.67.  Despite the efforts of Agri Stats and the Boiler industry to maintain the confidentiality and inaccessibility of the Agri Stats reports, *Bloomberg Businessweek* obtained a Report from 2014, which is described in Christopher Leonard's February 15, 2017 article, "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," as 500 pages or more and including "an extensive breakdown for 33 poultry plants, covering granular data in a number of areas, including product mixes—something most companies would characterize as proprietary."

59.68.  The vast universe of information and extreme level of detail contained in these reports demonstrates Broiler producers' collusion and anticompetitive behavior. This operational information is highly confidential and proprietary, and under any other circumstances—but-for the purpose of collusion and cooperation—would be a closely-guarded

secret.  In fact, in the 2005-2010 environmental litigation discussed in footnote 2 above, the State of Oklahoma requested production of Agri Stats reports from George's Inc., a fully integrated poultry company headquartered in Arkansas, to which George's Inc. responded that Agri Stats "information is proprietary, privileged, and is also confidential business/financial information not subject to disclosure." While Agri Stats and the poultry industry maintain that the information conveyed in the reports does not run afoul of antitrust laws because no company names are used, former Pilgrim, Tyson, and Agri Stats employees explain that such anonymity is a fiction, because industry insiders can easily ascertain the identities of the companies based on the information provided.

60.69.  For example, CW13, a former Agri Stats employee who served as Office Manager at the company's headquarters from July 1996 to July 2013, explained that Broiler producers could easily identify the different companies and production plants listed in Agri Stats' reports. According to CW13, the reports ranked each producer by various metrics, and producers could identify one another by production size alone.  The regional reports were exceptionally detailed and voluminous, as they contained granular data for nearly every one of the major production complexes in the industry, including production levels, breed, bird size, type, etc.  Participating producers would receive a number of different books from Agri Stats (red for sales, tan for profit, ivory for bottom line, light blue for processing, light green for live, golden rod for rendering), and in the front of each book would list all competitors who were in the book by location (around 70 locations).  CW13 explained that Agri Stats reports listed industry Broiler complexes by numbers that never changed from report to report, meaning that a participant would only need to identify the complex once to understand its number designation for the future.

61.70.  CW13 also explained that producers could figure out the identities of companies and complexes in the reports because, not only did people in the poultry industry switch from company to company, but Agri Stats employees would also often go work for poultry producers after Agri Stats.  Specifically, Larry Higdem, who worked at Agri Stats on the Pilgrim account, later took a job at Pilgrim.  CW13 said that Higdem knew all of the numbers for all of Pilgrim's competitors and their complexes, and may have even taken the master list with him over to Pilgrim.  Again, because those identifying numbers never changed, Higdem would always know the competitors' numbers.  CW13 gave another example, which was that of a former Agri Stats Vice President who later went to work for Wayne Farms, a large Broiler producer, who knew all the competitors' identification numbers as well.

62.71.  CW12, a former Agri Stats Accounting and Statistical Analyst from April 2008 to May 2012, confirmed CW13's assessment that clients who had been in the industry for a long time could figure out the names of the producers, especially if the information pertained to reports based on volume.  Tyson CW1 mentioned above confirmed the statements of CW12 and CW13 in connection with the Tyson securities fraud action, noting that participants were easily identifiable because the Agri Stats reports ranked each producer by various metrics and producers could identify one another by production size alone.

63.72.  At Pilgrim, CW2 also explained that because many of Pilgrim's employees had worked for its competitors in the past, they understood their own plants as well as their competitor's plants.  CW2, who previously worked for Tyson, said that he/she understood the numbers provided by Agri Stats and it was "fairly easy" to figure out what competitors were doing.  CW2 also stated that while the Agri Stats data did not have company names on it, it showed the top 10% for each region, which made it easy to narrow down.  CW8, Pilgrim's

30

Internal Audit Manager from September 2010 to March 2014, also remembered the metrics breaking out the top 10%. For other, less readily identifiable metrics, CW8 stated that Pilgrim employed one person who was an "expert" in evaluating Agri Stats data. CW2 confirmed that Pilgrim had an "Agri Stat wizard" on staff to pore over the data. Christopher Leonard, author of *The Meat Racket* and "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," and one of the few individuals outside of poultry industry insiders who has actually seen an Agri Stats report, explained during an interview with NBC News on February 21, 2017 that identifying the companies through the anonymous data requires some "industry knowledge [and] a lot of math," but "definitely can be done."

64.73. But beyond the ability to discern company identities from the data itself, Agri Stats employees would meet with its clients and, in some cases, help them unveil the companies in the reports. CW13 said that Agri Stats representatives would frequently meet with Broiler producer executives and make detailed presentations on a quarterly basis. CW13 prepared many of the graphs and demonstratives used in these presentations. CW13 stated that Agri Stats representatives would provide the names of companies to executives if pressed, noting that "sales people would have given up their first born to keep a subscriber." Confirming CW13's account, Tyson CW1 met with Tyson accounting staff on a quarterly basis and recalled Tyson employees picking up the reports, pointing at them, and identifying individual producers simply by eyeballing the data. A former Tyson Production Manager at Tyson's Temperanceville, Virginia production plant from mid-2009 to early 2010 ("Tyson CW2"),[7] also remembered attending quarterly meetings with Agri Stats personnel. In one meeting in particular, Tyson CW2 recalled Tyson employees pressing the Agri Stats representative for company names in the reports, and

---

[7] Like Tyson CW1, Tyson CW2 also appears in the *Tyson* Complaint, and was not independently contacted by Lead Counsel or its representatives.

while at first the Agri Stats representative only gave hints as to their identities, eventually the Agri Stats employee told everyone at the meeting the names of the companies in the report, saying, "this is Pilgrim's, this is Tyson, this is Perdue."

65.74.  Agri Stats employees would also give guidance to its subscribers' executives as to just how much the market was over or undersupplied with chicken, which allowed the companies to adjust their production output.  In *Adams v. Pilgrim's Pride*, one of the Company's experts testified that Agri Stats personnel told Pilgrim's in 2008 that "the industry [was] approximately 5 percent over supplied [and that Pilgrim's] production account[ed] for approximately 50% of this oversupply."  Furthermore, when asked how much Agri Stats understood about the poultry industry's supply and production dynamics and specifically whether the Broiler industry would seek to capture the market share lost by Pilgrim as a result of its bankruptcy in 2009, the expert responded: "[p]robably no one in the industry would know better than Agri Stats Vice President and economist Mike Donohue because . . . Agri Stats . . .  is the company that gathers operating statistics from virtually every company in the chicken industry.  And they know definitively how many breeders are out there, how many pullets are out there, how many Broilers are produced every week, and head count and pounds, everything else.  They have massive amounts of statistics.  And that's why they're so effective at reporting all of this [product information]."

66.75.  The enormous universe of company-specific information received in near real-time by Pilgrim and other industry participants (including, at minimum, Tyson and Sanderson) from Agri Stats, enabled these companies to constantly monitor almost every aspect of one another's business and ensure that no company was "cheating" on their agreement to limit production.  According to Professor Carstensen, the Agri Stats information sharing service effectively created a cartel in allowing the Broiler producers to make sure everyone was

following through on the agreement: "[t]his is one of the ways you do it.  You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them.  That is what creates stability for a cartel."

67.76.  In essence, Agri Stats created a new forum for the industry's old roundtable conference calls that were previously found violative of antitrust laws back in 1979.  Indeed, the FTC and DOJ's joint "Antitrust Guidelines For Collaborations Among Competitors," issued in April 2000 and still followed today, indicates that the information exchanged through Agri Stats reports is well-beyond the permissible scope of information shared between competitors. Specifically, the Guidelines discuss the following criteria for information sharing that raises serious antitrust concerns:

    i.    Competitor collaborations also may facilitate explicit or tacit collusion through facilitating practices such as the exchange or disclosure of ***competitively sensitive information*** or through ***increased market concentration***;

    ii.    The sharing of information ***relating to price, output, costs, or strategic planning*** is more likely to raise competitive concern that the sharing of information relating to less competitively sensitive variables;

    iii.    The sharing of information on ***current operating and future business plans*** is more likely to raise concerns that the sharing of historical information; and

    iv.    The sharing of ***individual company data*** is more likely to raise concern that the sharing of aggregated data that does not permit recipients to identify individual firm data.

[Emphasis added].

68.77.  The content of the Agri Stats reports, the manner in which they were shared, and the circumstances of the Broiler industry meet each of these criteria, strongly suggesting impermissibly anticompetitive behavior.  As to the first factor, the information exchanged through Agri Stats is competitively sensitive, and described as one Broiler producer as

33

"proprietary, privileged, and is also confidential business/financial information not subject to disclosure."  Moreover, the market for Broilers is highly concentrated, with Tyson, Pilgrim and Sanderson alone accounting for nearly half the country's production.  Second, as described by a former Agri Stats employee and confirmed by former Pilgrim employees and a *Bloomberg* reporter who had seen one of them, the Agri Stats reports cover nearly every conceivable metric in the Broiler industry, including information relating to price, output, costs, and strategic planning.  Third, the information contained in the Agri Stats reports is not only historical, but also current and forward-looking because it reports, among other things, information regarding breeder chickens and plant capacity, thereby enabling companies to project how much chicken their competitors will produce in the future.  Fourth, and finally, Agri Stats reports not only share individual company data versus aggregated industry data, but also make it possible for its subscribers to determine the identities of those individual companies (when, that is, Agri Stats employees do not simply tell their clients the company to which a set of data belongs).

69.78.  Because of the vital importance of this information-sharing service to the Broiler industry and the price-fixing scheme alleged herein, Agri Stats has assumed a prominent role in the Broiler industry, such that on at least two occasions in the last eight years, a representative from Agri Stats has been elected to the board of the NCC.

2.  Pilgrim and Other Broiler Producers Coordinate Production Cuts from 2008 through the Class Period to Raise Broiler Prices

70.79.  During the Class Period, between February 21, 2014 and November 17, 2016, Defendants convinced investors with materially false statements and assurances that, through implementation of company-specific operational improvements and a new business approach over the previous several years, Pilgrim had escaped the uncertain and risky boom and bust Broiler environment, and that sustained profitability was the new norm.  In reality, Pilgrim

colluded with other Broiler producers starting in 2008—when a particularly low trough in the ordinary business cycle brought industry participants together—to systematically reduce the supply of Broilers in order to increase and maintain high prices to increase profit margins.

71. 80. Pilgrim and other collaborating Broiler producers conducted two large coordinated production cuts: the first in 2008 to early 2009, and the second in 2011 through 2012. The production cuts by Pilgrim and other Broiler producers took a number of different forms, such as:

    i.   Reducing egg sets or egg placements (breaking eggs before placement in incubators);

    ii.   Reducing the size of broiler breeder flocks;

    iii.   Pulling eggs (destroying eggs already set in incubators);

    iv.   Destroying chicks;

    v.   Reducing chicks sent to contract farmers;

    vi.   Increasing pickup/delivery days between flocks;

    vii.   Changes to facility production, such as temporary or permanent shut-downs; and

    viii.   Exporting hatching eggs or chicks.

72. 81. Many of these methods of decreasing production cause short-term supply cuts, which would still allow a Broiler producer to quickly increase production to take advantage of a price spike. Pilgrim employees explained that during this time and throughout the Class Period the Company regularly used short-term methods to reduce the production of Broilers. CW7, Pilgrim's Executive Vice President of National Accounts from July 2010 to July 2013 (who had also worked for Tyson between 1989 and 2005), explained that Pilgrim would consistently break eggs to reduce supply. CW7 explained that to increase the price of Broilers, all companies had

to do was break eggs and reduce supply.  When eggs were broken it caused plants to not run at capacity, and through Agri Stats, other companies could see when plants were not running at capacity.  CW7 said that if plants were not running at capacity, they would have to be closed, so there was a correlation between breaking eggs and closing plants.

73.82.  CW11, who was a Live Operations Manager at Pilgrim from September 2015 to August 2016, confirmed that he was instructed by his superiors to have eggs broken.  The complex manager, Mickey Vaugher, would give him the order to break eggs.  Vaugher reported to Vice President Brent Glasgow, who reported to Senior Vice President Jayson Penn, Bill Lovette's right-hand man.

74.83.  The two large production cuts of 2008-09 and 2011-12 did not just reduce Broiler supply for the short term, however.  Facilitated by the industry transparency provided in Agri Stats reports, Pilgrim and other Broiler producers took the unprecedented step of reducing Broiler breeder flocks without replenishing them.  Historically, producers would avoid any actions that would impact future production, as that would leave them unable to capture the opportunity to sell Broilers at high margin when market conditions improved and therefore result in a competitive disadvantage.  Agri Stats gave Pilgrim and its co-conspirators the ability to monitor one another and be assured that none of their former competitors would surge production while prices were inflated.

75.84.  The efforts of Pilgrim and other Broiler producers to keep supply low and maintain high prices created an artificial stabilization in the industry even during a time of soaring feed costs.  During the Class Period, when Pilgrim's profit margins were consistently in double-figures—something that Pilgrim nor any other poultry producers could achieve in the past—Defendants falsely assured investors that this stabilization was attributable to the

implementation of its legitimate business strategy over the previous years, but this was not true.

76.85.   Additional allegations detailing Pilgrim's and other Broiler producers' manipulation of production and supply from 2008 and continuing through the end of the Class Period in November of 2016 and beyond is set forth in Section XIXII below at pp. 117-131130-150.

> 3.   Pilgrim and Other Broiler Companies Undertake Additional Efforts During the Class Period to Manipulate Broiler Prices

77.86.  Moving into the start of the Class Period, Pilgrim began reporting record earnings. For example, on the first day of the Class Period during a February 21, 2014 earnings call, Defendant Lovette provided investors and analysts with the following explanation of the abrupt turnaround:

> I think the one thing that creates…has created that stability is the discipline of the industry to not allow profitability in the past to drive supplies in the future.  I think we all have an understanding that our industry is mature, especially in the U.S. Consumption of total meat in the last five years has not grown and our growth in the future is going to come from markets outside the U.S.  And so, we have a different model today than we had 15…10 or 15 years ago in that consumption in this country is not growing as robustly as it used to.  And I think that discipline really, Ken, is the one ingredient that has made for more stable earnings that we have seen.

78.87.  At an industry conference a month later on March 12, 2014, Tyson CEO Donnie Smith stated that "[a] 'meaningful change' in bird production won't occur until the second half of 2015."  Like Defendant Lovette, Smith was able to confidently prognosticate the industry's future production because he knew that the drastic reductions in breeder flocks during 2011 and 2012 had long term effects that made it impossible for Tyson, Pilgrim, and the rest of the major Broiler producers to ramp up production for as much as another full year.  Indeed, Smith reiterated his confidence a few months later on July 28, 2014, when he said that it was "physiologically impossible to get a whole lot more supply on this market" before July of the

following year.

79.88.  On October 1, 2014, CoBank, a national cooperative bank serving rural industries

such as agribusiness, water, and rural power, published a report on the Broiler industry, which

confirmed that even in conditions that would ordinarily result in a production spike in Broilers,

the industry was maintaining low supply and the 2011-12 cuts made it impossible to increase

production for over a year:

> Broiler product demand should remain robust through the rest of this year and
> well into 2015, bolstered by a gradually improving domestic economy, continued
> strength in export demand, and the towering prices of beef and pork.  Broiler
> production, however, has been slow to respond … Broiler meat production is on
> track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest
> gain expected for 2015.  Producers have been somewhat constrained in their
> attempts to expand the nation's chicken flock by the limited supply of Broiler
> hatching eggs.  When the Broiler-producing industry reduced production in 2011
> and 2012, the hatchery supply flock was also reduced, and it has not yet been
> rebuilt to prior levels … significant growth in Broiler production will not
> materialize until late-2015 or early-2016.

80.89.  In fact, as market signs began to point towards the possibility of increased

production in 2014, and already constrained breeder flocks made it difficult to further reduce

breeder levels, Pilgrim and other industry participants undertook additional measures to keep

Broiler prices high, such as by increasing exports to Mexico and manipulating the Georgia Dock

pricing index.

a)      Pilgrim and Other Broiler Companies React to Avian Flu With
        Increased Exports

81.90.  During the Class Period, Broiler producers, especially Pilgrim and Tyson, used

the avian flu as a pretext to further decrease supply in the United States by exporting hatchery

flock Broilers to Mexico and other locations in lieu of using them to increase production levels

domestically.

82.91.  First, Pilgrim and its competitors justified exports due to a 2013-14 avian flu

outbreak in Mexico, where they exported hatchery flocks purportedly to repopulate Mexican flocks.  For example, soon after executives from Pilgrim, Tyson and other companies attended the Urner Barry Executive Conference at Caesar's Palace in Las Vegas on April 26-28, 2015, on May 4, 2015, Tyson noted that it was sending 3% of its eggs to Mexico to "fill incubators."  In an earnings call on July 28, 2016, Defendant Lovette explained that Pilgrim also exported eggs for the specific purpose of limiting domestic production, noting his "confidence that we're going to do the right thing with respect to maintaining [] discipline.  We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs.  I think in May we exported 81 million hatching eggs or so outside of the country.  The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made.  And so again that gives us confidence that we're going to continue to be disciplined as an industry."

83.92.  In 2015, the avian flu moved its way into the United States.  While the turkey and table egg industries were both heavily impacted by the U.S. avian flu, the Broiler industry was largely unaffected; however, it did cause temporary bans on exports of Broilers to certain countries including China and Korea.  As a result of the export limitations, frozen Broiler inventories in the U.S. began to build up, which in turn, began to threaten the stability of Broiler prices that Pilgrim and its peers had collaboratively worked so hard to maintain since 2008.

84.93.  In response, the industry again cut production.  Broiler industry analyst Heather Jones of BB&T Capital Markets noted in late 2015 that, to limit supply in the wake of the avian flu outbreak, producers would have to break eggs rather than set them.  According to CW11, Pilgrim's Live Operations Manager from September 2015 to August 2016, he was instructed by his complex manager—who in turn reported to Pilgrim's Executive Vice President of Sales and Operations Jayson Penn—to break eggs specifically during this time period.

85.94.  Tyson also joined in the efforts to limit production during mid-late 2015, announcing in May 2015 the closure of its Buena Vista, Georgia Broiler plant, that it would eliminate a shift at its Dawson, Georgia plant, and that it would further reduce its production after July 2015 and keep it flat through 2016 by increasing purchases from competitors using its Buy vs. Grow strategy.

86.95.  In addition to these production cuts, Pilgrim and other producers worked in concert to dump excess inventories of Broilers in foreign markets such as Vietnam in an effort to keep Broiler prices high in the U.S.  As a result, in October 2015, Vietnam launched an inquiry into US Broiler company dumping practices, which Vietnamese Broiler producers determined cost their industry over $120 million in the preceding 16 months.  In fact, a September 2015 report by Vietnam's Southeast Livestock Association stated that U.S. Broiler companies were selling chicken thighs in Vietnam for 29% of the price they were sold in the US market.

b)  Pilgrim and Other Broiler Companies Manipulated the Georgia Dock Pricing Index During the Class Period

87.96.  In addition to using Agri Stats and other methods to coordinate reductions in Broiler production to raise prices, Pilgrim and other industry participants kept prices high by manipulating the GDA Georgia Dock Broiler pricing index.

88.97.  There are three primary indices that track Broiler prices: Urner Barry, the USDA, and the Georgia Dock.  Agri Stats also collects detailed pricing information through its subsidiary, Express Markets, Inc.

89.98.  Urner Barry collects and publishes daily price information for Broilers, while the USDA does it on a weekly basis.  Both of these pricing indices are based on a system of double verification, which includes telephonic and written pricing surveys from all or nearly all Broiler producers, and then a verification of the reported prices from brokers and customers.

99.     Published prices for Broilers from Urner Barry, the USDA and Georgia Dock relate to the spot market price for Broilers.  However, prices for Broilers, whether sold under contract or on the spot market, generally move with spot market process as reported by the Georgia Dock or Urner Barry.

100.    Broiler company executives and industry experts confirm that Broiler sales are tied to spot pricing.  Notably, expert economist Dr. Colin A. Carter from the University of California (Davis) testified during *Adams v. Pilgrim's Pride*, 09-cv-397 (E.D. Tex.) that "internal Pilgrim documents show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices. . . . 83 percent of Pilgrim's chicken sales are reflecting the spot price within a given year. So there's only about 16 percent of their sales that are not tied to the spot market over a relatively short period of time."  And because half of "fixed contracts" actually had terms tied to Broiler spot prices, Dr. Carter concluded that 92% of Pilgrim's Broiler sales were tied to spot prices such as the Georgia Dock.  Sanderson Farms CEO Joe Sanderson also confirmed in a May 2008 speech that Sanderson Farms' contract sales to retail customers have prices tied to the Georgia Dock.

90.101.        In contrast to Urner Barry and the USDA indices, the Georgia Dock does not require verification of the pricing figures that Broiler producers report to the GDA.  The Georgia Dock, compiled since 1966, has been used by producers and others for decades as a benchmark to set Broiler prices and is considered the most influential of all the indices as it directly influences prices for roughly 25% of the entire U.S. Broiler market.  When Broiler buyers—such as grocery store chains—and Broiler producers—such as Pilgrim—negotiate their contracts for Broilers, the Georgia Dock is usually the first place they start for pricing.  For Pilgrim, who has told financial analysts that about 50% of its Broiler production sales go to

41

grocery stores, the Georgia Dock price is critically important.  Cameron Bruett, a spokesperson for JBS, Pilgrim's parent company, stated to the *New York Times*: "Given the scale and obvious importance of the poultry industry in the state of Georgia, the poultry market data provided by the Georgia Department of Agriculture has long served as a critical price discovery tool for producers, processors, distributors and retailers in Georgia and nationwide."  CW6, Pilgrim's Pricing Coordinator from May 2013 to March 2015, stated that she would personally go to the Georgia Dock every Wednesday and get the price for people in sales.  CWs 1 and 4 confirmed Pilgrim's use of Georgia Dock pricing for fresh Broilers.

91.102.        According to an internal GDA document provided to the *New York Times* through an open records request for the November 3, 2016 article, "You Might Be Paying Too Much for Your Chicken," the Georgia Dock price index is compiled through weekly telephone calls from the GDA to the top nine to ten Broiler producers in the state, including Pilgrim, during which time the Broiler producers report the price offered to companies, such as grocery stores, with whom they have contracts.  Indeed, "each participating [Broiler producer] company is called [by the GDA] on Wednesday every week to report the price offered to companies in which they have contracts with." The single price reported by the Broiler producer company is accepted without any verification of actual invoices or any verification with purchasers.

103.    The Broiler companies that participated in the Georgia Dock survey during the Class Period and the relevant years before—Pilgrim, Tyson, Fieldale Farms, Perdue, Sanderson Farms, Koch Foods, Wayne Farms, Claxton Poultry, Mar-Jac Poultry, and Harrison Poultry—all owned at least one Broiler processing facility within the State of Georgia.  According to the GDA (find exact source), each weekly price report from these companies was weighted to account for the particular company's market share of Broilers processed in Georgia (referred to

by the GDA as that company's "voice").  According to GDA documents, the companies with the largest "voice" during the relevant period were Pilgrim and Tyson.  A preliminary calculation was made based on the single price quotation from each company, then, "any company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week.  Its voice is taken out of the formula and the dock price is recalculated without it" (the "One Cent Rule").

104.   According to data published by WATTPoultryUSA, Tyson and Pilgrim together control nearly 50% of Georgia's poultry production, and by extension, had by far the most "weight" of prices submitted to the Georgia Dock. According to a November 2016 article by Seeking Alpha, "the manipulation of the Georgia Dock index would require coordination….As a producer, your high price quote doesn't work unless others go along because it will be an outlier that gets thrown out per the Georgia Department of Agriculture's methodology. However, if the two big players were to work together … that could be enough to sway the index without cooperation from the others."

92.105.     While the Georgia Dock and USDA prices are publicly available, the Urner Barry is private and subscription based.  The chart below illustrates Broiler prices from 2007 through 2016 according to the three indices.



93.106.        As shown above, the Urner Berry and USDA indices—which both require secondary verification through sales receipts or discussions with purchasers—follow the same peaks and valleys from 2007 through 2016, and nearly mirror each other from 2013 through 2016.  By contrast, the Georgia Dock price, which is higher than the other two indices for nearly every day during this 9 to 10 year span, diverges sharply in 2011-2012 and during the Class Period, from 2014 through the end of 2016.  The low prices on the USDA and Urner Berry indices during this latter period, especially during the latter half of 2015 and the beginning of 2016, make perfect sense as feed prices during this time were the lowest seen in a decade (according to Pilgrim's quarterly filings, during the fourth quarter of 2015 and first quarter of 2016, the highest Pilgrim paid for a bushel of corn was $3.98 and $3.73, respectively, as compared with the first quarter of 2013, when Pilgrim paid as much as $7.41 per bushel).

44

107.    Importantly, the significant difference between the Georgia Dock price and the other indices in recent years cannot be explained by only one or two culpable parties reporting artificially higher Broiler prices to the GDA, because the One Cent Rule requires that outlier prices deviating by more than one cent from the initial dock price be excluded from the final Georgia Dock price.  Rather, the deviation of the Georgia Dock from other indices – which are based on verified sales by Defendants – can only be attributed to a concerted effort by all participating producers to collectively submit artificially high and nearly identical Broiler prices to the GDA.

94.108.        The high prices exhibited in the Georgia Dock raised many questions regarding the accuracy of numbers being reported to the Georgia Department of Agriculture, and which, again, were not subject to secondary verification.

i.    A Georgia Dock Insider Reveals Inaccuracy and Lack of Independence

95.109.        On November 3, 2016, a New York Times article entitled "You Might Be Paying Too Much for Your Chicken" drew attention to the price discrepancy between the Georgia Dock and other two indices, noting that "[t]his week, the market price of a 2½- to 3½-pound Broiler on the Georgia dock was $1.10 per pound" while "[t]he Urner Barry index, as it is called, priced the same size chicken at 72 cents a pound," and according to the USDA, the "price this week was 71 cents a pound, nearly matching the price set by Urner Barry."  The article also describes communications from the USDA to Arty Schronce, the director of the Georgia Dock for the GDA's Poultry Market News division, who was tasked with calling Broiler company facility managers to calculate the price for 2½- to 3½-pound Broilers on the Georgia Dock.  The USDA informed Mr. Schronce that, in order for the Georgia Dock price to remain on the USDA's weekly report, the Georgia Dock needed to start verifying the prices producers were

giving them.  In a subsequent email sent to Gary Black, Georgia's agriculture commissioner, the Georgia Dock department admitted that it could not verify the pricing numbers being used to compile the Georgia Dock index, and that the Georgia Dock department "is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported."

96.110.        A November 17, 2016 Washington Post article entitled "If You Thought You Were Paying Fair Prices For Chicken At The Supermarket, Think Again" shed further light on the inaccuracy of the Georgia Dock and the manner in which the Broiler industry was manipulating it.  The article included a link to a September 2016 internal memorandum prepared by Mr. Schronce (the "Schronce Memo"), which is reproduced below, in pertinent part.

Notes for meeting
Problems with Georgia Poultry Market News

**I continue to have concerns about the Poultry Market News (PMN). I voiced concerns in the past. However, I think it is time to reevaluate and examine PMN and to consider eliminating it. I see it as a flawed product that is a liability to the Georgia Department of Agriculture.**

There has been an unacceptable decrease of knowledge and experience in the Georgia Department of Agriculture Poultry Market News Office.

Background
The office went from four employees to two employees, one of which was a clerk who never received any actual training regarding markets, prices or the poultry industry. At this point, duties and procedures were streamlined to allow only two people to continue to put out the reports. This streamlining took away some of the precision and accuracy of the reports. After the unexpected death of Greg Pilowicz, the clerk handled the office duties and to put out reports for months using what knowledge she had. I was brought in to fill the empty spot while continuing to handle most previous responsibilities. My training was inadequate, inconsistent and sometimes in error. A former employee who had retired many years ago was brought in to teach me. His attendance was sporadic at best. The only thing consistent about his instruction was that the PMN needed at least two more people and everything needed to be done the way it was 20 years earlier. He was unwilling to accept that both poultry companies and the Georgia Poultry Market News had changed.

Diminished knowledge, experience and concern among poultry companies

46

I saw there was a diminished knowledge among most poultry company representatives from what the former employee expected and continued to tell me I could receive.

**I often received lackadaisical and rude responses to my requests for information. (i.e. "just keep 'em the same," "hurry up, hurry up" and unreturned phone calls.)** I have noticed over the years I have been handling PMN that there seems to be a further diminishing knowledge-experience base among the poultry company representatives. Someone was laid off and no one was trained to take that person's place. The replacement is not as knowledgeable or reliable. On one occasion, the replacement has been replaced....

**In spite of these changes, people still look at the PMN as if it is the same as it was 20 years ago. Clearly, it is not.**

I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided. However, **I have come to question the validity of some of the information provided.** Some companies appear to be riding on the coattails of other companies. That is to say that the companies that are providing accurate and valid information are keeping PMN figures reasonable and explainable. At some point the iceberg is going to flip if has not already.

**As an example, I do not think I am getting actual weighted average prices from some companies.** Streamlining, lack of understanding, etc.

There is increased media, public and legal scrutiny of the PMN. Some of this was addressed in the Wall Street Journal (WSJ) article. A recent example is the call from the financial investigator and two of his "researchers" at the antitrust division of the Florida Attorney General's office.

**I think I have had more questions about PMN in the past 6 months than in all the previous time I have worked in this office.**

The purpose of the PMN and its numbers are not understood by the public or the media.

**After a request for all info supplied by poultry companies, the confidentiality agreement was discussed with poultry companies. Shortly thereafter, a major company ([REDACTED]) stopped participating in the PMN. The representative would not provide a reason and neither would the vice president. The president never returned my phone call. (However, I would be surprised if they are not still utilizing the PMN but now bear no responsibility and are not in danger of having company figures and strategy made public.)**

47

**After that WSJ article, another company appears to basically not take part in the Whole Bird Dock Price process. They seem to deliberately submit a low bid that they know will be kicked out. However, they can claim that they are submitting something lower. In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower.**

**[REDACTED] (the largest of the poultry companies) now has a larger, even outsized, role in determining the Georgia Whole Bird Dock Price. It also has the largest role in establishing the price of all the parts as it is the largest producer of all parts except thigh meat. On three parts it far outranks the other companies.**

**I have questions about the "Advisory Board" and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board.**

I have done my best to keep the PMN valid. I took and continue to take this job very seriously. However, my concern and my efforts can no longer overcome the diminished knowledge and experience and the inadequate staffing of both the Georgia Department of Agriculture and the reporting poultry companies.

In regard to the PMN, the poultry companies
1) Bear none of the costs
2) Do none of the work
3) Bear none of the responsibilities or scrutiny including answering questions from the public, food companies and the media
4) Get all the benefits from it as PMN prices are seen as more stable and higher than other markets.

Possible solutions:
1) **Shut down the PMN.**
2) Transfer the PMN to the Georgia Poultry Federation where economists and an independent auditor can give it the attention it deserves
3) Discontinue PMN except for the whole bird dock price. Let this also be handled by the Georgia Poultry Federation or an independent entity.

(Emphasis added).

~~97.~~111.        The Schronce Memo includes devastating revelations scrutinizing the

reliability of the Georgia Dock, its independence, and the manner in which he believed poultry

producers were manipulating the price and benefiting from the inflated values.  Mr. Schronce

wrote that he "continue[d] to have concerns" about the Georgia Dock, had "voiced concerns in

the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture."  He also stated: "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided.  However, I have come to question the validity of some of the information provided."  Mr. Schronce specifically pointed to the time during the Class Period when the price of the Georgia Dock diverged most sharply from the other indices, noting, "I think I have had more questions about PMN in the past 6 months than in all the previous time I have worked in this office."  Furthermore, Broiler companies reporting prices would give him "lackadaisical and rude responses to my requests for information," such as responding "just keep em' the same" when asked for a company's Broiler price.

98.112.        Mr. Schronce raises several issues regarding the purported independence of Georgia Dock's pricing procedures.  First, he draws attention to the independence of the Advisory Committee that oversees the Georgia Dock.  While the identities of members of this committee are not publicly disclosed, plaintiffs in the Maplevale Farms antitrust suit uncovered the following eight individuals who recently served on the board: Jayson Penn (Pilgrim's Executive Vice President of Sales & Operations), Vernon Owenby (Tyson's Plant Manager), Gus Arrendale (CEO of Fieldale Farms), Mike Welch (CEO and President of Harrison Poultry), Jerry Lane (Former CEO of Claxton Poultry), Pete Martin (Vice President of Operations at Mar-Jac), Steve Clever (Vice President of Fresh Sales at Wayne Farms), and Dale Tolbert (Vice President of Sales at Koch Foods).  CW2 reported that Jayson Penn was Lovette's "right hand man," and CW11, who was directed by his complex manager to break eggs, stated that his complex manager reported to Jayson Penn.

99.113.        Given that the Advisory Committee was comprised of industry insiders

49

who benefitted from a high Georgia Dock price, Schronce stated: "I have questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board." Moreover, all of the members were appointed by Gary Black, who, prior to his appointment as Georgia's Agriculture Commissioner, was a poultry industry lobbyist for decades.

~~100.~~114.      Further, the Schronce Memo reveals how at least one Broiler company was gaming the Georgia Dock's "One Cent Rule." To calculate the price used in the index, the GDA would make a preliminary calculation based on the single price quotation from each of the nine to ten companies participating in the survey, and then would "smooth" the results by eliminating the outliers: any responses that are either one cent per pound above or below the weighted average are removed from the index. According to the GDA, the One Cent Rule is meant "to shield [] one company having the ability to greatly influence the price up or down." Per Schronce, one "company appears to basically not take part in the Whole Bird Dock Price process. They seem to deliberately submit a low bid that they know will be kicked out. However, they can claim that they are submitting something lower. In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower." Additionally, despite the One Cent Rule's goal to ensure one company does not "greatly influence" the index, Schronce states that "(the largest of the poultry companies) [presumably Tyson] now has a larger, even outsized, role in determining the Georgia Whole Bird Dock Price. It also has the largest role in establishing the price of all the parts as it is the largest producer of all parts except thigh meat. On three parts it far outranks the other companies."

~~101.~~115.      Finally, the Schronce Memo indicates that Broiler companies were trying

to distance themselves from the Georgia Dock after the release of news reports questioning its accuracy, but, as Mr. Schronce noted, he "would be surprised if they are not still utilizing the PMN but now bear no responsibility and are not in danger of having company figures and strategy made public."

116.    Industry analysts also confirmed that the Georgia Dock was highly material to Pilgrim's and other major producers' bottom lines. According to two November 2016 articles analyzing the impact of the Georgia Dock on major Broiler producers' businesses, written by investing publication *Seeking Alpha*, "the Georgia Dock accounts for a material piece of earnings at [Pilgrim's Pride, Sanderson Farms, and Tyson.] We believe it has accounted for >100% of earnings for pure-play chicken companies recently. Before potential penalties, we see … 40% [stock price] downside for [Tyson due to the Georgia Dock's discontinuance]," and "the largest producers including Pilgrim's Pride [], Sanderson Farms [], and Tyson Foods [] have been significantly over-earning as a result of what may be a manipulated price index." According to the article, after "conversations with the chicken companies, buyers, and industry experts, we estimate about 25% of the entire US chicken market prices off of the Georgia Dock. This equates to roughly $11 billion a year in chicken that is sold off of the index."

117.    The articles also noted that "since the Schronce Memo, the chicken companies have pivoted from defending Georgia Dock as accurate to downplaying its importance. We believe [Pilgrim's] and [Tyson] have significantly [more] exposure than they claim." Pointing directly to Pilgrim and Tyson's public statements that "the Georgia Dock was never really important for chicken pricing all along," the *Seeking Alpha* articles stated that "we believe this new claim is inaccurate and misleading," and that "the Georgia Dock is the predominant index used in chicken price negotiations for retail-grocery channels.…Georgia Dock provides a broad

price umbrella for all chicken sold into the retail channel. We believe this based on our conversations with dozens of grocery store purchasers, all of whom seem to think they are buying off of the Georgia Dock when purchasing from Tyson [] or Pilgrim's Pride [] which have recently said they have little Georgia dock exposure."

118.   The articles provided further analysis on the import of heavy-retail-channel reliance on the Georgia Dock on Pilgrim's business, stating:

> We can debate the exact % of volume sold specifically off of Georgia Dock, but the reality is it doesn't matter. What matters is the % of volume that each company sells to grocery stores. For example, [Pilgrim's] may have a 'fixed-price contract' with a customer but that just means they are selling chicken to them at a price close to $1.10/lb for a fixed length of time. Technically, that's not a 'Georgia Dock contract' but we pelieve PPC is only able to charge that price because the buyer believes Georgia Dock is an accurate measure of real chicken prices.

119.   Documents produced in the Broiler Chickens action pending in the Northern District of Illinois confirm the manipulation of the Georgia Dock index by Pilgrim and its co-conspirators.   In that action, "Plaintiffs have discovered records of more than 500 price submissions made by five Georgia Dock RICO defendants [including Pilgrim] that total almost 67% of the market" and "the evidence cited in the complaint (both documentary and testimonial), shows that the five Georgia Dock RICO Defendants' price submissions were always within one cent of the previous week's price, and were very rarely lower than the previous week's price.   This evidence plausibly indicates an agreement among those five Georgia Dock RICO Defendants." *In re Broiler Chicken Antitrust Litig.*, 2020 U.S. Dist. LEXIS 36202, at *56-57 (N.D. Ill. Mar. 3, 2020).

120.   According to a hearing transcript in the case, the antitrust plaintiffs obtained evidence "showing the way in which they pulled the [Georgia Dock] price up week after week regardless of what the actual offering prices were."   The plaintiffs submitted a chart evidencing

all the pricing submissions from Pilgrim, Koch Foods, Mar-Jac, Harrison, and Fieldale, and every submission fell within an extremely narrow price band.

        ii.    The GDA Coordinated with the Poultry Industry to Respond to USDA Inquiry

~~102.~~121.      According to investigative reports by the New York Times on November 3, 2016 and Washington Post on November 8, 2016, which were based on documents received through Freedom of Information Act requests for USDA and GDA documents, the GDA worked in concert with the poultry industry to respond to a USDA inquiry into the verifiability of the Georgia Dock price index.  In the months before Schronce prepared his memorandum, the USDA had started to take a closer look at the Georgia Dock and the GDA's procedures used in compiling it.  On July 19-20, USDA officials met with GDA representatives in Atlanta to discuss price discrepancies between the Georgia Dock and its index and requested that the GDA provide them with actual data from the Broiler producers by August 5, 2016, so that they could "test and review" the Georgia Dock for accuracy.

~~103.~~122.      In response to the USDA inquiry, officials within the GDA started to raise antitrust concerns regarding the Georgia Dock.  A July 27, 2016 draft report from Alec Asbridge, GDA Director of Regulatory Compliance & Budget, to GDA Commissioner Gary Black concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output.  The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions.  These factors alone illicit [sic] anti-trust review."  Furthermore, the report noted that Broiler producers "report[] a weighted average price per pound on broilers based of contracts that have been determined at the private level and reported without regulatory oversight.  The formulas to calculate weighted average prices have been determined on the private level and

have not been standardized since the inception of the [Georgia Dock] in 1968, which there is no

written record of." In other words, the Broiler industry was unilaterally creating the formulas

and setting the price for the Georgia Dock, not the GDA.

104.123.    In conclusion, Director Asbridge determined that, given the prevailing use

of the Georgia Dock within the global poultry market, additional procedures would need to be

established in order to foster transparency and accuracy for the Georgia Dock index:

> The extent of the use of the [Georgia Dock] in price contract negotiations is
> presently unknown but inquiries made by media and other governmental entities
> indicate that it is utilized on a more regular basis than previously expected. If the
> global poultry industry has relied on the [Georgia Dock] as if it represents
> something similar to a contracts future price on a regulated market then the
> [Georgia Dock's] contribution to the global poultry market is more significant
> than thought. If GDA decides to continue with the publication of the PMN and
> continue with a calculation of the [Georgia Dock] it is necessary to come to a
> clear and justifiable formula in which individual companies can utilize to report
> their weighted average prices. This formula will need to use standard inputs for
> companies in order to output a standardized value that is representative of contract
> prices. Weighted average formulas will need to be transparent and verifiable
> based on overall slaughter volumes.

105.124.    The following week, on August 5, 2016, Asbridge sent a highly sanitized

version of his report to Commissioner Black with a cover email, stating: "I kept going back and

forth on particular wording to navigate what we talked about. I've also included a few

recommendations that you can choose to share with [Georgia Poultry Federation President] Mike

[Giles] if you want." The revised report deleted all references to factors in the Broiler industry

eliciting "antitrust review," and the significant fact that the Georgia Dock price had been

reported for decades by the GDA "without regulatory oversight."

106.125.    Asbridge then sent the sanitized version of the report to Poultry Federation

President Giles on August 12, 2016, allowing the Broiler industry to influence the GDA's

response to the USDA. The cover email stated:

> Thanks again for arranging everything last week. . . .If you could review [the attached] to ensure what I presented **is accurate and best represents industry's concern** with only reporting a spot price.  **Once you have reviewed we can move forward with sending to USDA** and take the next steps.

(Emphasis added).

Meanwhile, the GDA failed to comply by the USDA's August 5 deadline and the USDA pulled all Georgia Dock price information from its Broiler Market News Report.

~~107.~~126.       Another email from Asbridge to Giles that same day reiterated that the GDA "tried to capture the concerns the producers had when we met" and contained some "possible routes forward" for responding to the USDA.  In stark contrast to Asbridge's initial report that described various industry factors that elicited "anti-trust review" and concerns regarding the manner in which the GDA calculated its prices, including a need to be "transparent and verifiable," Asbridge now wrote that "**[t]he GDA is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported**," and that "the GDA does not wish to request any trade secrets," even though those trade secrets were currently being exchanged and verified with ease through Agri Stats. (Emphasis added). According to an email dated August 24, 2016, Giles left a message for Asbridge giving "his and industry's sign off on the dock price summary report.  We can move forward sending to the USDA."

~~108.~~127.       According to the November 8, 2016 article published by *The Washington Post*, the USDA commented that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'"  With public concern mounting due to *The New York Times* and *The Washington Post* articles reporting the Schronce Memo and GDA-poultry industry collusion, the GDA eventually broke with the Broiler industry in late 2016 and instituted a requirement that participating Broiler producers sign affidavits

certifying the prices quoted to Georgia state officials for the Georgia Dock.  Tellingly, the Broiler industry refused to comply.

109.128.        As a result, on December 21, 2016, the GDA announced that it would cease publication of the Georgia Dock "due to lack of submissions [to] the new requirements [for verification]" and because of a "significant reduction" in participation by poultry producers.  The GDA would later announce the launch of a new index called the "Georgia Premium Poultry Price Index" with a more transparent and verifiable reporting structure, but the new index failed to gain the necessary support within the industry.  On February 28, 2017, the GDA announced that, "[d]ue to a lack of available data, the Georgia Department of Agriculture will cease its efforts to publish the Georgia Premium Poultry Index."

## VII.  TIMELINE OF EVENTS

110.129.        The timeline on the following page sets forth a chronology of relevant events.



**2008**

Feed costs rise dramatically, and Pilgrim's gross profit margins decline from 7.9% in 2007 to -2.9%. Companies begin coordinating production cuts, but Pilgrim declares bankruptcy in December.

**2012**

Production cuts continue as price of corn reaches as high as $8.49 per bushel. Despite being more than $3 more than 2008 corn prices, Pilgrim posts 6.7% profit margin.

**2014**

As the Class Period begins, feed prices are falling and Broiler prices are increasing. Pilgrim and co-conspirators reduce production, export Broilers, and begin manipulating the Georgia Dock Index, which starts to diverge from other indices. Pilgrim reports record profit margins of 16.2%, and stock price doubles over previous year, reaching as high as $37.59.

**2016**

Georgia Dock exceeds the USDA by over 60%, leading to internal GDA memorandum that calls into question the integrity of the index. In September, the *Maplevale* action complaint is filed alleging Broiler industry collusion. In November, articles are published revealing Georgia Dock manipulation. Revelations at the end Class Period lead to $1.1 billion loss in Pilgrim's market capitalization.

**2010**

Reduced breeder stocks from 2008-09 cuts lead to increase in Broiler prices and increased margins.

1st Prod. Cuts (4/08 - 3/09)

2nd Prod. Cuts (2/11 - 8/12)

2007

Market becomes oversaturated with chicken.

2013

Reduced supply from 2011-12 cuts again lead to spike in Broiler prices.

CLASS PERIOD (2/21/14 – 11/17/16)

2009

Pilgrim stock hits a low of $0.14 per share. In December, Pilgrim emerges from bankruptcy.

2011

Elevated feed prices along with increasing egg sets cause Pilgrim and co-conspirators to begin a second round of coordinated production cuts. In January, Lovette becomes CEO and in June, Sandri becomes CFO.

2015

Corn prices continue to plummet, causing USDA and Urner Barry indices to fall, but Georgia Dock increases due to manipulation. Pilgrim again posts double-digit margins, which they falsely attribute to "diverse portfolio model" and "operational improvements."

## ~~.~~ VIII.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE BY DEFENDANTS DURING THE CLASS PERIOD

~~111.~~130.      Throughout the Class Period Defendants misled investors about the true reasons behind Pilgrim's outstanding results and margins. In regular press releases, conference calls, and filings made with the SEC, Defendants issued a series of materially false and misleading statement and omitted material information that generally fall into three categories, including:

(a)      Pilgrim's financial results, including income and margins;

(b)      Statements concerning how Pilgrim's financial results were achieved; and

(c)      Statements concerning Pilgrim's conduct of its business.

~~112.~~131.      The fact that the Company was engaged in the undisclosed price-fixing scheme alleged herein was especially important to investors because such conduct had the potential to artificially inflate Pilgrim's financial performance and, in turn, artificially inflate the value of its stock. Moreover, such conduct had the potential to run afoul of antitrust laws, which could subject the Company to substantial fines, penalties, and civil liability.

~~113.~~132.      Pilgrim was well aware of investors' attentiveness to the risk of collusion. Pilgrim's Code of Conduct states that "The Company is committed to a policy of lawful competition based on the merits of our products and services. We seek to satisfy our customers' needs rather than limit our competitors' opportunities." Pilgrim's Code of Conduct further prohibited employees from "discussing with competitors any matter directly involved in competition between us and the competitor (e.g., sales prices, marketing strategies, market shares, and sales policies)" and "[a]greeing with a competitor to restrict competition by fixing prices, allocating markets, or other means."

~~114.~~133.        These misrepresentations and omissions were materially false and misleading because Defendants engaged in a price-fixing scheme while failing to disclose it, and instead repeatedly and falsely represented to investors that its spectacular financial results were the consequence of operational and strategic improvements in its business.

### A.        Materially False and Misleading Statements and Omissions Concerning Fiscal Year 2013

Fiscal Year 2013 Press Release and Form 8-K

~~115.~~134.        The Class Period begins on February 21, 2014. After the market closed on February 20, 2014, Pilgrim issued a press release entitled "Pilgrim's Pride Reports EBITDA of $196.5 Million with a Margin of 9.6% for the Fourth Quarter of 2013, and EBITDA of $800.4 Million with a Margin of 9.5% for the Full Year" ("Fiscal Year 2013 Press Release"). That same day, the Company filed a Form 8-K ("Fiscal Year 2013 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting fourth quarter and full fiscal year 2013 financial results, including EBITA of $196.5 million, net income of $143.4 million, and diluted earnings of $0.55 per share for the quarter. In the press release, Defendant Lovette stated "[t]hree years ago our company began executing a strategy to create shareholder value and improve capital structure by partnering with key customers, relentless pursuit of operational excellence and growing our value added exports." Lovette also stated that "[d]uring this period, we grew our sales by 22% while increasing our profitability, clearly demonstrating that this strategy is working as evidenced by this year's strong free cash flow generation."

~~116.~~135.        The foregoing statements were materially false and misleading when made because Pilgrim's growing margins, earnings, and net income were not attributable to any legitimate business "strategy," or its purported "relentless pursuit of operational excellence."

Rather, the growth in Pilgrim's margins, earnings, and net income was a result of: (a) Pilgrim's undisclosed anticompetitive agreement with other Broiler producers to reduce Broiler production and raise prices; and (b) Pilgrim's manipulation and use of the Georgia Dock pricing index in price negotiations with customers.

Fiscal Year 2013 Form 10-K

117.136.    On February 21, 2014, Pilgrim's filed its Form 10-K for the fiscal year ended December 29, 2013 ("Fiscal Year 2013 Form 10-K"), signed by Defendants Lovette and Sandri, with the SEC. The Fiscal Year 2013 Form 10-K repeated the materially false and misleading financial results and margins reported in the Company's Fiscal Year 2013 Form 8-K.

118.137.    The Fiscal Year 2013 Form 10-K also stated:

> ***The chicken industry is highly competitive***. We are one of the largest chicken producers in the world and we believe our relationship with JBS USA enhances our competitive position. In the U.S. and Mexico, we compete principally with other vertically integrated poultry companies. However, there is some competition with non-vertically integrated further processors in the U.S. prepared chicken business. We believe vertical integration generally provides significant, long-term cost and quality advantages over non-vertically integrated further processors. ***In general, the competitive factors in the U.S. chicken industry include price***, product quality, product development, brand identification, breadth of product line and customer service....In Mexico, where product differentiation has traditionally been limited, we believe product quality and price have been the most critical competitive factors.

(Emphasis added).

119.138.    The foregoing statements were materially false and misleading when made. Specifically, it was false and misleading for Pilgrim to represent that the chicken industry was "highly competitive," especially with respect to "price," when, in truth, Pilgrim was participating in a collusive scheme with its competitors to inflate the price of Broiler chickens by, among other things, a coordinated reduction in production.

120.139.    The Fiscal Year 2013 Form 10-K also stated:

> ***Profitability in the chicken industry is materially affected by*** the commodity prices of feed ingredients and ***market prices of chicken, which are determined by supply and demand factors***. As a result, the chicken industry is subject to cyclical earnings fluctuations.

(Emphasis added).

~~121.~~140.     The foregoing statements were materially false and misleading when made because, as a result of the undisclosed price-fixing scheme alleged herein, the profitability of firms operating within the chicken industry was no longer "materially affected by the commodity prices of feed ingredients" as it had been in the past.  At the time this statement was made, feed prices were increasing, but not having a detrimental effect on Pilgrim's earnings because the Company was: (a) conspiring with other companies to increase prices by reducing supply, and (b) manipulating the price of the Georgia Dock index, which formed the basis of its contract negotiations with customers.

Fiscal Year 2013 Earnings Call

~~122.~~141.     That same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's reported fourth quarter and full fiscal year 2013 results (the "Fiscal Year 2013 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, Defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette touted the Company's "pricing strategy" and "spread business" as the bases of Pilgrim's growing margins:

> ***We continued our approach of creating pricing models specific to our customers' needs to ensure they have the committed volumes and quality essential to their success.***
>
> ….
>
> We stayed with the same strategy that we had for 2013 going into that year in late 2012 by not focusing on a fixed price, 12 month fixed price contracts. The percentage of those is about the same as 2013, which was less than 5%. ***Rather as we have said before [], we created a spread business, and I think the fourth***

61

*quarter was a great demonstration for that, the fourth quarter 2013 that is*, and I would remind you to look at what feed cost did. Feed cost was down in a significant way but also pricing was down as well.

So we kept our margin improving, as a result of that spread that we created. *We think that's the right strategy for our business and we'll continue to focus on our pricing strategy in that way.* So we feel like flowing through the P&L this year, if feed costs remain about where they are today and *pricing actually I think has a chance to be even stronger than it is today and I think that sets up a good environment for margin consideration through that spread.*

....

We stayed with the same pricing strategy as we had going into 2013 as I mentioned because *again we believe that pricing is going to get stronger, as we move into the summertime and we think it will be solid even in the back half of the year. And so again keeping with the idea that we run more of a spread business today, we kept our pricing strategy such that we could follow the chicken markets.*

*I still believe that the profitability of the chicken industry is based on the supply and demand of chicken, as opposed necessarily to the cost of feed.* I think 2013 was a great testament of that as we paid the highest prices for feed ingredients, as we have in a long time. Yet the profitability of the industry was as good or better than it's been in a long time.

....

As we said late last year, we don't believe that the breeder stock or the parent stock supply chain is - exist today to grow significantly - the number of breeders and therefore the number of hatching eggs that it would take to grow in '14 over '13 in a significant way. And so that's why *we believe that the supply side of chicken will be conducive to relatively strong pricing as we go through the year.*

(Emphasis added).

~~123.~~142.     The foregoing statements were materially false and misleading when made. First, Defendant Lovette misleadingly stated that Pilgrim's "pricing strategy" and "spread business" were the sources of Pilgrim's margin, earnings, and revenue growth when, in truth, that growth was driven by Pilgrim's participation in the undisclosed price-fixing scheme. It was likewise false and misleading for Lovette to state that Pilgrim created pricing models specific to its customers' needs when, in reality, Pilgrim and its co-conspirators were actively engaged in a scheme to fix prices to the *detriment* of Pilgrim's customers. Finally, Defendant Lovette's

statement that "the profitability of the chicken industry is based on the supply and demand for chicken, as opposed necessarily to the cost of feed" was false and misleading because the profitability of the industry, including Pilgrim, was predicated on the relative demand-inelasticity of Broiler chickens in conjunction with the undisclosed price-fixing scheme alleged herein.  In other words, Pilgrim and its co-conspirators altered the economics of the industry with their anticompetitive agreement to reduce supply and maintain high prices.  To this end, feed costs were no longer an important input because Pilgrim and other Broiler companies had fixed the price of chickens.  Finally, Defendant Lovette's statements were also misleading because in projecting future breeder and egg levels in the industry, he omitted the crucial fact that he knew what levels were going to be based on his detailed knowledge of other companies' intentions and operations, which knowledge he obtained through Agri Stats data and what other executives had personally told him.

124.143.       Defendant Sandri echoed Defendant Lovette's misrepresentations regarding Pilgrim's pricing strategy: "Our EBITDA margin [was] 9.6% for the quarter and 9.5% for the year, clearly demonstrating benefit of pricing strategy and the portfolio brand and mitigation effect against volatility in the chicken market."

125.144.       The foregoing statement was materially false when made because Pilgrim's "pricing strategy" and "portfolio brand" did not drive its fourth quarter and year end 2013 margins, but rather those margins were driven by Pilgrim's participation in the undisclosed price-fixing scheme.

**B.     Materially False and Misleading Statements and Omissions Concerning the First Quarter of 2014**

First Quarter 2014 Press Release and Form 8-K

126.145.       On April 30, 2014, Pilgrim issued a press release entitled "Pilgrim's Pride

Reports EBITDA of $203.5 Million and 10.1% EBITDA Margin for the First Quarter of 2014, An EBITDA Improvement of 87% Compared to 2013" ("First Quarter 2014 Press Release"). That same day, the Company filed a Form 8-K ("First Quarter 2014 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting first quarter 2014 financial results, including EBITDA of $203.5 million, net income of $98.1 million, and earnings of $0.38 per share for the quarter. Defendant Lovette stated that, "[c]onsistent with the progress we've made for the past three years, we remain committed to operational improvement year after year," Pilgrim "continue[s] to execute against our strategy that combines focusing on key customers, relentless pursuit of operational excellence and growing value added exports while rapidly adapting to changing market conditions," and "[o]ur teams continue to raise the standard and drive accountability deeper into the organization, from cost control through the implementation of zero based budgets to gains in efficiency and superior mix management, providing us with a competitive advantage in the market." Finally, Defendant Lovette stated that "[t]he current environment for the chicken industry indicates robust prospects for 2014, and with the improvements we've implemented, Pilgrim's is well positioned to reap the benefits."

127.146.     Defendant Lovette's statements were materially false and misleading when made. First, Lovette falsely stated that the "progress" Pilgrim had made was attributable to its "strategy" of "focusing on key customers, relentless pursuit of operational excellence and growing value added exports," among other things, when, in truth, Pilgrim's financial results were the direct consequence of the undisclosed price-fixing scheme alleged herein. Likewise, Lovette falsely stated that Pilgrim enjoyed "a competitive advantage in the market" because of "accountability…cost control…and superior mix management," when, in truth, Pilgrim enjoyed

no competitive advantage because the market for Broilers was not competitive as a result of the undisclosed price-fixing scheme alleged herein. Finally, Defendant Lovette failed to disclose that the "robust prospects for 2014" were driven in material part by the undisclosed price-fixing scheme and, moreover, that Pilgrim was not "well positioned to reap the benefits" of those prospects because of the Company's implementation of "improvements," but rather because it was a participant in the anticompetitive agreement to maintain high prices of chicken and knew that Pilgrim and its peers would not allow for those prices to materially decrease, whether by limiting production, manipulating the Georgia Dock, or by other means.

First Quarter 2014 Form 10-Q

128.147.     The following day, on May 1, 2014, Pilgrim filed its Form 10-Q for the quarterly period ended March 30, 2014 ("First Quarter 2014 Form 10-Q"), signed by Defendants Lovette and Sandri, with the SEC. The First Quarter 2014 Form 10-Q repeated the materially false and misleading financial results and margins reported in the Company's First Quarter 2014 Form 8-K.

129.148.     The First Quarter 2014 Form 10-Q also stated:

> **Despite strong demand in both the U.S. and Mexico for chicken products, our net sales were bridled by supply constraints caused by breeding flock reductions in prior years**. Based on current information available from the U.S. Department of Agriculture, supplies of all three major proteins—beef, pork and chicken—are currently constrained compared to prior years and we believe these conditions will continue until mid 2015. **We also believe the industry does not currently possess the physical capability to rapidly increase production**. Consumer demand for chicken products, especially for tenders, small whole chickens and boneless, skinless breast portions, was strong in the thirteen weeks ended March 30, 2014 when compared to the same period in the prior year and remains strong as of the date of this report. Leg quarter demand also remains well supported in the thirteen weeks ended March 30, 2014 when compared to the same period in the prior year as boneless dark meat consumption has grown in the U.S. over the past year. **The combination of strong demand and constrained supply has resulted in increased market prices for most chicken products**.

(Emphasis added).

~~130.~~149.       The foregoing statements were materially false and misleading when made. For example, it was false and misleading for Pilgrim to represent that "our net sales were bridled by supply constraints caused by breeding flock reductions in prior years" without disclosing that Pilgrim and its competitors were intentionally constraining the breeder flocks in a collusive scheme with its competitors to inflate prices. It was likewise false and misleading for Pilgrim to state that "the industry does not currently possess the physical capability to rapidly increase production," when Pilgrim and its co-conspirators reduced breeder flocks in concert for the exact purpose of inhibiting themselves from rapidly increasing the production of Broiler chickens. Finally, it was false and misleading for Pilgrim to state that the "strong demand and constrained supply has resulted in increased market prices for most chicken products" when, in truth, the artificially-inflated prices were the direct result of the undisclosed price-fixing scheme alleged herein.

First Quarter 2014 Earnings Call

~~131.~~150.       That same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's reported first quarter 2014 results (the "First Quarter 2014 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, Defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. Defendant Lovette repeated Pilgrim's representations regarding supply:

> **As we've been saying for several quarters now, the entire supply chain of the U.S. industry has been constrained for a while**. Starting with breeders, due to the reduction in supply chain in previous years, we will continue to see some restrained supply, likely through to about mid-2015.
> ….
> At the same time, **we've experienced a strong price increase in breast meat, and even a shortage of product in the specific case of tenders.** Our net dock is now

higher than at the same time last year, and *Georgia dock reached $1.08 per pound for the first time*. On that front, current demand is strong and shows no signs of letting up, especially for tenders, small wads and bone and skinless breast portions. Leg quarter demand remains well supported, with boneless dark meat consumption growing in the U.S. year-over-year. *Chicken remains the most competitively priced protein*, especially when compared to surging prices and lack of availability for other meats. The supply cycle for all 3 major proteins is strained now, and we anticipate this will continue until mid-2015.

(Emphasis added).

132.151.    The foregoing statements were materially false and misleading when made for several reasons.  First, Defendant Lovette's statement that "the entire supply chain of the U.S. industry" was constrained and likely would be constrained up to mid-2015 was materially false and misleading when made because Lovette failed to disclose that Pilgrim and its co-conspirators purposefully reduced breeder flocks to ensure they could not ramp up production as part of their undisclosed illegal agreement to maintain artificially-inflated Broiler prices. Second, in emphasizing that the "Georgia Dock reached $1.08 per pound for the first time," Defendant Lovette failed to disclose the material fact that Pilgrim and other Broiler companies had manipulated the Georgia Dock index by reporting false contract prices to the GDA.  Finally, it was also false and misleading for Lovette to state that chicken was "the most competitively priced protein," when in truth, Pilgrim was actively participating in a collusive, anti-competitive scheme to inflate the price of Broiler chickens.

133.152.    On the same call, Defendant Sandri stated that Pilgrim's "revenues of $2 billion were a product of our increasing strength over the course of the quarter. Despite market prices lower than last year, our mix and operational improvements, combined with the lower cost of input, allow us to significantly improve our grow margins."

134.153.    The foregoing statement was materially false and misleading when made because Pilgrim's increased revenues were not the product of its "mix and operational

improvements," but rather were the direct result of the undisclosed price-fixing scheme alleged herein, along with their manipulation of the Georgia Dock index.

### C.   Materially False and Misleading Statements and Omissions Concerning the Second Quarter of 2014

Second Quarter 2014 Press Release and Form 8-K

~~135.~~154.   On July 30, 2014, Pilgrim issued a press release entitled "Pilgrim's Pride Reports EBITDA of $338.6 Million and 15.5% EBITDA Margin, or 28% Growth Year over Year" ("Second Quarter 2014 Press Release"). That same day, the Company filed a Form 8-K ("Second Quarter 2014 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting second quarter 2014 financial results, including EBITDA of $338.6 million, net income of $190.4 million, and earnings of $0.73 per share for the quarter. Defendant Lovette stated that "[t]he margin strength we've demonstrated has been generated by capturing improvements in cost and sales mix, all rooted in operational excellence. This year we have found significant savings through our zero based budgeting process….Our team members are driven to be the best in class and produce results that will result in long term, profitable growth."

~~136.~~155.   Defendant Lovette's representation to investors that Pilgrim's margin strength was attributable to "improvements in cost and sales mix" and "rooted in operational excellence" was materially false and misleading when made, because, in reality, Pilgrim's margins were driven by: (1) the undisclosed anticompetitive agreement with other Broiler companies to reduce supply and maintain high Broiler prices; and (2) Pilgrim and other Broiler producers' manipulation of the Georgia Dock. Finally, Lovette's statement that Pilgrim was driven to produce results that would "result in long term, profitable growth" was materially false

and misleading when made because, in truth, Pilgrim was driven to maximize short term profits

by participating in the undisclosed price-fixing scheme alleged herein.

Second Quarter 2014 Form 10-Q

137.156.    The following day, on July 31, 2014, Pilgrim filed its Form 10-Q for the

quarterly period ended June 29, 2014 ("Second Quarter 2014 Form 10-Q"), signed by

Defendants Lovette and Sandri, with the SEC. The Second Quarter 2014 Form 10-Q repeated the

Company's financial results and margins reported in the Company's Second Quarter 2014 Form

8-K.

137.156.    The Second Quarter 2014 Form 10-Q also stated:

Net sales generated in the thirteen weeks ended June 29, 2014 increased $2.7
million, or 0.1%, from net sales generated in the thirteen weeks ended June 30,
2013 primarily because of an increase in sales volume partially offset by a
decrease in net sales per pound and the impact of foreign currency translation
associated with our Mexico operations. ***The increase in sales volume***, which
***resulted from strong demand in both the U.S. and Mexico for chicken products***,
contributed $59.1 million, or 2.7 percentage points, to the increase in net sales.

(Emphasis added).

139.158.    The foregoing statements were materially false and misleading when made

because "strong demand in both the U.S. and Mexico" was, in material part, the consequence of

the undisclosed price fixing scheme alleged herein. In reality, Pilgrim and its co-conspirators

were artificially constraining the supply of Broilers in order to increase demand.

140.159.    The Second Quarter 2014 Form 10-Q also stated:

***Despite strong demand in both the U.S. and Mexico for chicken products, our
net sales were hampered by supply constraints caused by breeding flock
reductions in prior years***. Based on current information available from the U.S.
Department of Agriculture, supplies of all three major proteins—beef, pork and
chicken—are currently constrained compared to prior years and we believe these
conditions will continue until mid-2015. ***We also believe the industry does not
currently possess the physical capability to rapidly increase production***.
Consumer demand for chicken products, especially for tenders, small whole
chickens and boneless, skinless breast portions, was strong in the twenty-six

weeks ended June 29, 2014 when compared to the same period in the prior year and remains strong as of the date of this report. Leg quarter demand also remains well supported in the twenty-six weeks ended June 29, 2014 when compared to the same period in the prior year as boneless dark meat consumption has grown in the U.S. over the past year. ***The combination of strong demand and constrained supply has resulted in increased market prices for most chicken products***.

(Emphasis added).

~~141.~~160.      The foregoing statements, nearly identical to the statements made in the previous quarter's financial report, were also materially false and misleading when made. First, it was false and misleading for Pilgrim to represent that "our net sales were hampered by supply constraints caused by breeding flock reductions in prior years" without disclosing that Pilgrim and its competitors were intentionally constraining the breeder flocks in a collusive scheme with its competitors to inflate prices.  It was likewise false and misleading for Pilgrim to state that "the industry does not currently possess the physical capability to rapidly increase production" when Pilgrim and its co-conspirators reduced breeder flocks in concert for the exact purpose of inhibiting themselves from rapidly increasing the production of Broiler chickens. Lastly, it was false and misleading for Pilgrim to state that the "strong demand and constrained supply has resulted in increased market prices for most chicken products" when, in truth, the artificially-inflated prices were the direct result of the undisclosed price-fixing scheme alleged herein along with their manipulation of the Georgia Dock.

Second Quarter 2014 Earnings Call

~~142.~~161.      The same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's reported second quarter 2014 results (the "Second Quarter 2014 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, Defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette stated that "[*o*]*ur consistent margin performance*

70

*is a direct result of the discipline we've demonstrated in applying our strategy*." (Emphasis added).

~~143.~~ 162.      Defendant Lovette's statement that Pilgrim's consistent margin performance was the "direct result" of its pricing strategy was materially false and misleading when made because, in truth, the Company's consistently high margins were driven by: (1) Pilgrim's participation in the undisclosed scheme to reduce production and maintain high Broiler alleged herein; and (2) the manipulation of the Georgia Dock index.

~~144.~~ 163.      Defendant Lovette also stated:

> Chicken markets have shown continued strength in the whole bird, with the second quarter reflective of healthy pricing across the board. *Demand pressures have held prices relatively strong* and we believe this will continue well into 2015. After a period where wings had a somewhat tepid pricing environment, we're seeing them strengthen once again. *Adding to that, the George Dock whole bird market continues to be at record levels.* It's important to recognize here that *Pilgrim's results don't just follow the full peaks and troughs of pricing trends. Our portfolio effect shields us from some of the lower prices, and the same time means we don't have the volatile spikes in pricing either. The overall impact should be a more stable margin structure over time.*

(Emphasis added).

~~145.~~ 164.      The foregoing statements were materially false and misleading when made. First, Defendant Lovette's statement that "[d]emand pressures have held prices relatively strong" was materially false and misleading when made because the artificially-inflated prices for Broiler chickens were the direct result of the undisclosed price-fixing agreement amongst Broiler companies, not "demand pressures."   Second, Defendant Lovette's statement that "the George Dock whole bird market continues to be at record levels" was materially false and misleading because, Defendant Lovette failed to disclose that Pilgrim and other companies were manipulating the Georgia Dock by providing the GDA with inaccurate prices from its transactions with grocery stores, which inflated the index price.   It was also false and misleading

for Lovette to represent that Pilgrim was somehow insulated from the "peaks and troughs of pricing trends" in the chicken industry by means of its "portfolio," when in truth, Pilgrim and its co-conspirators were shielded from peaks and troughs in pricing because of: (1) their participation in the undisclosed price-fixing scheme; and (2) the manipulation of the Georgia Dock index.

146.165.     Finally, Defendant Lovette stated: "It's hard to tell from year-to-year what feed ingredient costs are going to be, and separately, what the demand and supply for chickens are and, therefore, what prices are going to be."

147.166.     The foregoing statement was materially false and misleading when made because Pilgrim, via its participation in the undisclosed price-fixing scheme, could readily anticipate the supply and prices of Broiler chickens.  In addition, Pilgrim and other companies had effectively untethered the industry's economics from feed ingredient costs by fixing Broiler prices at a high level through, among other things, collectively reducing production.

    D.    **Materially False and Misleading Statements and Omissions Concerning the Third Quarter of 2014**

Third Quarter 2014 Press Release and Form 8-K

148.167.     On October 29, 2014, Pilgrim issued a press release entitled "Pilgrim's Pride Reports EBITDA of $435 Million and 19.2% EBITDA Margin for the Third Quarter" ("Third Quarter 2014 Press Release"). That same day, the Company filed a Form 8-K ("Third Quarter 2014 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting third quarter 2014 financial results, including EBITDA of $435 million, net income of $256.0 million, and earnings of $0.99 per share for the quarter. Defendant Lovette stated that the "third quarter results reflect the discipline that Pilgrim's has demonstrated in managing the variables within our control as well as the strength we've seen in the chicken

markets." Lovette continued to state that Pilgrim's"focus has been, and continues to be, the consistent execution of our strategy to be a valued partner to our key customers, relentless pursuit of operational excellence and value-added export growth." Finally, Defendant Lovette stated Pilgrim was "optimistic that we will continue to be one of the more profitable operators with our management philosophy conducive to continually operating at the top of our industry, even with varying levels of strength in chicken markets."

149.168.     Defendant Lovette's statements were materially false and misleading because Pilgrim's third quarter results did not reflect the management of variables within the Company's control, nor did Pilgrim's financial results reflect the strength of the chicken markets. In truth, Pilgrim's strong financial results were the product of a collaborative anticompetitive effort to reduce the volume of Broilers in the market to raise prices and further efforts to inflate the prices received for Broilers through manipulation of the Georgia Dock index. Lovette's statements that Pilgrim was focused on the "consistent execution [its] strategy" and that, combined with its "management philosophy," Pilgrim was "optimistic" it would remain a "profitable operator[]" "even with varying levels of strength in chicken markets" were materially false and misleading when made because, in truth, neither Pilgrim's strategy nor its management philosophy were determinative of its performance, which was the direct consequence of the undisclosed price-fixing scheme alleged herein, and "levels of strength in chicken markets" did not vary, but were controlled by Pilgrim and its co-conspirators by means of the undisclosed price-fixing scheme.

Third Quarter 2014 Form 10-Q

150.169.     The following day, on October 30, 2014, Pilgrim filed its Form 10-Q for the quarterly period ended September 28, 2014 ("Third Quarter 2014 Form 10-Q"), signed by

Defendants Lovette and Sandri, with the SEC. The Third Quarter 2014 Form 10-Q repeated the financial results and margins reported in the Company's Third Quarter 2014 Form 8-K.

151.170.        The Third Quarter 2014 Form 10-Q also stated:

Higher net sales per pound, which resulted from a slight shift in product mix toward higher-priced chicken products when compared to the same period in the prior year as well as the impact of Marek's disease on breeder flocks in Mexico, contributed $87.6 million, or 4.1% , to the increase in net sales. ***The increase in sales volume,*** which ***resulted from strong demand in the U.S. for chicken products***, contributed $41.5 million, or 1.9 percentage points, to the increase in net sales.

(Emphasis added).

152.171.        The foregoing statements were materially false and misleading when made because "strong demand in both the U.S." was, in material part, the consequence of the undisclosed price fixing scheme alleged herein. In reality, Pilgrim and its co-conspirators were artificially constraining the supply of Broilers in order to increase demand.

153.172.        The Third Quarter 2014 Form 10-Q also stated:

***Despite strong demand in both the U.S. and Mexico for chicken products, our net sales were hampered by supply constraints caused by breeding flock reductions in prior years.*** Based on current information available from the U.S. Department of Agriculture, supplies of all three major proteins—beef, pork and chicken—are currently constrained compared to prior years, and we believe these conditions will continue until mid-2015. ***We also believe the industry does not currently possess the physical capability to rapidly increase production.*** Consumer demand for chicken products, especially for tenders, small whole chickens and boneless, skinless breast portions, was strong in the thirty-nine weeks ended September 28, 2014, when compared to the same period in the prior year and remains strong as of the date of this report. Leg quarter demand also remains well supported in the thirty-nine weeks ended September 28, 2014, when compared to the same period in the prior year as boneless dark meat consumption has grown in the U.S. over the past year. ***The combination of strong demand and constrained supply has resulted in increased market prices for most chicken products.***

(Emphasis added).

154.173.      The foregoing statements were materially false and misleading when made.  First, it was false and misleading for Pilgrim to represent that "our net sales were hampered by supply constraints caused by breeding flock reductions in prior years" without disclosing that Pilgrim and its competitors were intentionally constraining the breeder flocks in a collusive scheme with its competitors to inflate prices.  It was likewise false and misleading for Pilgrim to state that "the industry does not currently possess the physical capability to rapidly increase production" when Pilgrim and its co-conspirators reduced breeder flocks in concert for the exact purpose of inhibiting themselves from rapidly increasing the production of Broiler chickens. Lastly, it was false and misleading for Pilgrim to state that the "strong demand and constrained supply has resulted in increased market prices for most chicken products" when, in truth, the artificially-inflated prices were the direct result of the undisclosed price-fixing scheme alleged herein along with the manipulation of the Georgia Dock.

Third Quarter 2014 Earnings Call

155.174.      The same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's reported third quarter 2014 results (the "Third Quarter 2014 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income.  During the call, Defendants made materially false and misleading statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette stated:

> Our business model is designed to ensure reliable supply of the quality products our customers expect, while creating an environment rewarding that consistency. ***Our portfolio model yields a diversified sales mix, ensuring we can adapt quickly to changes in market supply and mitigate market volatility***, while high spot prices to parts such as boneless skinless breast and wings benefit our large bird debone business. Some of our other businesses such as Prepared Foods benefit when those prices decline. ***We have given much critical thought in constructing our broad segment and product portfolio to yield a more consistent***

> *earnings stream as chicken supply and demand ebb and flow over long periods of time.*

(Emphasis added).

156.175.    Defendant Lovette's statement that Pilgrim's "diversified sales mix" allowed the Company to "adapt quickly to changes in market supply and mitigate market volatility" was materially false and misleading.  In reality, Pilgrim and other Broiler producers mitigated market volatility by entering an agreement to jointly reduce production and maintain high Broiler prices.   It was similarly false and misleading for Lovette to state that Pilgrim's "broad segment and product portfolio" yielded the Company "a more consistent earnings stream" when, in truth, Pilgrim's consistent earnings were the direct result of the undisclosed price-fixing scheme and manipulation of the Georgia Dock to ensure high Broiler prices.

157.176.    During the Third Quarter 2014 Earnings Call Defendant Lovette also stated:

> *Supplies remain very tight.* We don't see that changing in 2015, even though, as I said in the remarks, there could be up to a 3% increase and we think that's back half loaded. *We see demand staying very firm….So we see the same thing, strong environment for pricing, great demand for chicken now continuing in 2015 and we think that set's up for a great pricing environment*, coupled with what we see as declining feed cost going forward.
>
> ….
>
> *What I do know is I think our industry has come to realize that the profitability in the chicken business is driven by supply and demand of chicken.* In the past, we talked a lot about cost of corn and soy. We've talked about the changing from small birds to big birds. But *at the end of the day, I think we have full realization that supply and demand for chicken is going to be the determining factor of pricing and ultimately profitability.* I don't see that changing any time soon.

(Emphasis added).

158.177.    The foregoing statements were materially false and misleading when made. First, in emphasizing that "[s]upplies remain very tight," Defendant Lovette failed to disclose the material fact that Pilgrim and other Broiler producers were intentionally restricting

the supply of Broilers through their anticompetitive price-fixing scheme.  To that end, it was materially false and misleading for Defendant Lovette to represent that an increase in demand for chicken, coupled with a "very tight" supply, were the reasons Pilgrim experienced "a great pricing environment" when, in truth, the artificially-inflated prices for Broiler chickens were the direct result of the undisclosed price-fixing scheme alleged herein as well as their manipulation of the Georgia Dock. Furthermore, Lovette's statement that the "industry has come to realize that the profitability in the chicken business is driven by supply and demand of chicken," rather than the "cost of corn and soy," was materially false and misleading because Pilgrim and other Broiler producers artificially decoupled the industry economics from feed prices through the undisclosed supply and price-fixing scheme.  Finally, it was materially false and misleading for Lovette to state that supply and demand were the determinative factors affecting "pricing and ultimately profitability" when, in truth, the determinative factors influencing both pricing and profitability were the undisclosed price-fixing scheme and Georgia Dock manipulation.

> **E.    Materially False and Misleading Statements and Omissions Concerning the Fiscal Year 2014**

Fiscal Year 2014 Press Release and Form 8-K

159.178.    On February 11, 2015, Pilgrim issued a press release entitled "Pilgrim's Pride Reports Operating Income of $329 Million with a Margin of 15.5% for the Fourth Quarter of 2014, and $1,203 Million with a Margin of 14.0% for the Full Year" ("Fiscal Year 2014 Press Release"). The next day, the Company filed a Form 8-K ("Fiscal Year 2014 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting fiscal year 2014 financial results, including EBITDA of $ 367.8 billion, net income of $167.2 million, and earnings of $0.83 per share for the quarter. Defendant Lovette stated that, "[t]hough pleased with our results for 2014 and our team members deserve full credit, we will not be

complacent. We continue driving ownership and accountability deeper in our company, and we are developing new tools and methods to improve our efficiency, sales mix, and margin." Finally, Defendant Lovette stated "[w]e see 2015 as yet another opportunity for our team to create shareholder value through serving our key customers, relentless pursuit of operational excellence, and growing value added exports. As we begin the year, demand for chicken continues to be strong, outpacing supply, and with the improvements we've implemented, Pilgrim's is ideally situated to reap the benefits."

160.179.    The foregoing statements were materially false and misleading when made. Defendant Lovette represented that continued "ownership and accountability" in addition to improvements in "efficiency, sales mix, and margin" would contribute to financial results better than those Pilgrim realized in 2014 when, in truth, Pilgrim's future success was driven in material part by the undisclosed price-fixing scheme alleged herein. Likewise, Defendant Lovette represented to investors that Pilgrim's implementation of certain "improvements," including its purported "relentless pursuit of operational excellence," situated the Company for success in fiscal year 2015 when, in truth, Pilgrim's future success was driven in material part by the undisclosed price-fixing scheme. Finally, it was materially false and misleading for Lovette to suggest that demand for chicken was "outpacing supply" when, in truth, Pilgrim and its co-conspirators were artificially constraining the supply of Broiler chickens in a collusive scheme to inflate prices.

Fiscal Year 2014 Form 10-K

161.180.    The same day, on February 12, 2015, Pilgrim filed its Form 10-K for the fiscal year ended 2014 ("Fiscal Year 2014 Form 10-K"), signed by Defendants Lovette and

Sandri, with the SEC. The Fiscal Year 2014 Form 10-K repeated the materially false and misleading financial results and margins reported in the Company's Fiscal Year 2014 Form 8-K.

162.181.        The Fiscal Year 2014 Form 10-K also stated:

> *Items that influence chicken pricing in the U.S. include international demand, changes in production by other broiler producing countries, input costs and the demand associated with substitute products such as beef and pork.* We believe our focus on sales mix enables us to adapt to changing supply-demand dynamics by adjusting our production to maximize value.

(Emphasis added).

163.182.        The foregoing statements were materially false and misleading when made because Pilgrim failed to state that primary factors influencing chicken pricing in the U.S. were the undisclosed collusive price-fixing scheme as well as the Broiler industry's manipulation of the Georgia Dock pricing index.

164.183.        The Fiscal Year 2014 Form 10-K also stated:

> We believe we are well positioned to be the primary chicken supplier for large customers *due to our ability to provide consistent supply*, innovate and develop new products to address consumer desires and provide competitive pricing across a diverse product portfolio. *Our balanced portfolio of fresh, prepared and value-added chicken products yields a diversified sales mix, mitigating supply and market volatility and creating more consistent gross margins*.

(Emphasis added).

165.184.        The foregoing statements were materially false and misleading when made. It was materially false and misleading for Pilgrim to state it was capable of providing its customers with "consistent" supply when, in truth, Pilgrim and its co-conspirators were artificially constraining the supply of Broiler chickens in order to inflate prices. It was also false and misleading for Pilgrim to state that "diversified sales mix" allowed it achieve "more consistent gross margins" and "mitigat[e] supply and market volatility" when, in truth, the determinative factor influencing Pilgrim's profitability was the undisclosed price-fixing scheme

79

alleged herein, which effectively ended supply and market volatility of the past through the anticompetitive agreement to limit production.

166.185.        The Fiscal Year 2014 Form 10-K also stated:

> ***Most fresh chicken products are sold to established customers, based upon certain weekly or monthly market prices reported by the USDA and other public price reporting services, plus a markup, which is dependent upon the customer's location, volume, product specifications and other factors.*** We believe our practices with respect to sales of fresh chicken are generally consistent with those of our competitors. The majority of these products are sold pursuant to agreements with varying terms that set a price according to formulas based on underlying chicken price markets, subject in many cases to minimum and maximum prices….***We establish prices for our prepared chicken products based primarily upon perceived value to the customer, production costs and prices of competing products.***

(Emphasis added).

167.186.        The foregoing statements were materially false and misleading when made because Pilgrim failed to disclose that the Company used the Georgia Dock to negotiate prices with its customers, and that the Company, along with other Broiler producers, manipulated the Georgia Dock by reporting false prices to the GDA.   Similarly, it was materially false and misleading of Pilgrim to state that the prices of its fresh chicken products were dependent on "market prices" when, in truth, Pilgrim and its co-conspirators were artificially constraining supply of Broiler chickens in order to inflate prices and the Georgia Dock did not reflect actual market prices, but rather inaccurate inflated prices provided to the GDA by Broiler producers.

168.187.        The Fiscal Year 2014 Form 10-K also stated:

> ***The chicken industry is highly competitive.*** We are one of the largest chicken producers in the world and we believe our relationship with JBS USA enhances our competitive position. ***In the U.S. and Mexico, we compete principally with other vertically integrated poultry companies.*** However, there is some competition with non-vertically integrated further processors in the U.S. prepared chicken business. We believe vertical integration generally provides significant, long-term cost and quality advantages over non-vertically integrated further processors. ***In general, the competitive factors in the U.S. chicken industry include price, product quality, product development, brand identification,***

80

***breadth of product line and customer service.*** Competitive factors vary by major market. ***In the U.S. retail market, we believe that product quality, brand awareness, customer service and price are the primary bases of competition.*** In the foodservice market, competition is based on consistent quality, product development, service and price. ***The export market is competitive on a global level based on price, product quality, product tailoring, brand identification and customer service.***

(Emphasis added).

~~169.~~188.      The foregoing statements were materially false and misleading when made because, as discussed thoroughly herein, the chicken industry was not "highly competitive" and Pilgrim did not compete with other vertically integrated poultry companies.  In reality, Pilgrim and its co-conspirators were actively cooperating in an anti-competitive scheme to inflate the prices of Broiler chickens.  Thus, "price" was not a "competitive factor" at all.

~~170.~~189.      The Fiscal Year 2014 Form 10-K also stated:

> ***Profitability in the chicken industry is materially affected by the commodity prices of feed ingredients and market prices of chicken, which are determined by supply and demand factors.*** As a result, the chicken industry is subject to cyclical earnings fluctuations.
>
> ....
>
> Our customers, such as supermarkets, warehouse clubs and food distributors, have consolidated in recent years, and consolidation is expected to continue throughout the U.S. and in other major markets. These consolidations have produced ***large, sophisticated customers with increased buying power who are more capable of operating with reduced inventories, opposing price increases, and demanding lower pricing,*** increased promotional programs and specifically tailored products…. ***Because of these trends, our volume growth could slow or we may need to lower prices*** or increase promotional spending for our products, any of which would adversely affect our financial results.

(Emphasis added).

~~171.~~190.      The foregoing statements were materially false and misleading when made.  First, "[p]rofitability in the chicken industry" was not "materially affected by the commodity prices of feed ingredients," as Pilgrim stated, because the Company and other Broiler producers untethered the industry's profitability from feed costs through their collusive

81

agreement to reduce supply at any time prices started to increase.  Furthermore, it was materially false and misleading for Pilgrim to state that its customers could demand lower pricing when, in truth, Pilgrim's customers heavily relied on the Georgia Dock to accurately represent the negotiated contract prices in the industry, and Pilgrim and other Broiler producers were falsely reporting prices to the GDA and thereby manipulating the index price.

> ~~172.~~191.    The Fiscal Year 2014 Form 10-K also stated:

> U.S. sales generated in 2014 increased $146.8 million, or 2.0%, from U.S. sales generated in 2013, primarily because of an increase in the net revenue per pound sold that was partially offset by a decrease in pounds sold. ***Increased net revenue per pound sold, which resulted primarily from an increase in market prices due to continued healthy demand for chicken products in combination with constrained supply, contributed $217.8 million, or 2.9 percentage points, to the revenue increase.***

(Emphasis added).

> ~~173.~~192.    The foregoing statements were materially false and misleading when made because "increased net revenue" was not the result of "continued healthy demand for chicken products in combination with constrained supply," but rather due to the efforts of Pilgrim and its co-conspirators to artificially constrain the supply of Broiler chickens in a collusive scheme to inflate prices and manipulate the price of the Georgia Dock index.

Fiscal Year 2014 Earnings Call

> ~~174.~~193.    The same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's reported fourth quarter and full fiscal year 2014 results (the "Fiscal Year 2014 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, Defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette stated:

> ***Demand continues outpace supply and our pricing and the industry pricing is***

*reflective of that*…. So on the demand side, it looks very favorable for this year. On the supply side, one of the leading indicators that we always look at is our breeder supply….And then I looked at some numbers supplied by AgriStats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. *So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies.*

(Emphasis added).

~~175.~~194.        The foregoing statements were materially false and misleading when made. It was materially false and misleading for Lovette to state that industry Broiler prices were high because "demand continues to outpace supply" when, in truth, Pilgrim and its co-conspirators were artificially constraining the supply of Broiler chickens in a collusive scheme to inflate prices.   Similarly, Defendant Lovette materially misled investors by saying that "the industry remains fairly disciplined on the supply side" without disclosing the critical fact that Pilgrim and other companies were colluding to systematically reduce the Broiler supply.

~~176.~~195.        During the Fiscal Year 2014 Earnings Call Defendant Lovette also stated:

We think about [] '15 as another great opportunity as fundamentals so far are shaping up to provide another positive economic environment for poultry suppliers. *As we begin the year, demand for chicken has remained strong, outpacing supply. And with these improvements we've implemented, Pilgrim's is well positioned to reap the benefits. Thank you, all, for joining us today.*

(Emphasis added).

~~177.~~196.        The foregoing statements were materially false and misleading when made. It was materially false and misleading for Lovette to state that demand was outpacing

supply when, in truth, Pilgrim and its co-conspirators were artificially constraining the supply of Broiler chickens in a collusive scheme to inflate prices.

**F.    Materially False and Misleading Statements and Omissions Concerning the First Quarter of 2015**

First Quarter 2015 Press Release and Form 8-K

178.197.        On April 29, 2015, Pilgrim issued a press release entitled "Pilgrim's Pride Reports Operating Income of $328 Million with a Margin of 16.0% for the First Quarter of 2015, a Significant 95% Improvement Compared to 2014" ("First Quarter 2015 Press Release"). The next day, the Company filed a Form 8-K ("First Quarter 2015 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting first quarter 2015 financial results, including EBITDA of $363.5 million, net income of $204.2 million, and earnings of $0.82 per share for the quarter. Defendant Lovette stated the he was "pleased to report we are off to a strong start in 2015….We continue to execute well agains tour goals of focusing on key customers, relentless pursuit of operational excellence and growing value added exports. Our strong results are a testament to the benefits of our portfolio model, which we believe provide superior results with lower volatility than our peers over time." Defendant Lovette also stated that, "[d]espite certain challenging market conditions for some cuts, overall cutout pricing has remained strong as consumer demands more chicken since it continues to be the most competitive protein." Finally, Defendant Lovette stated that Pilgrim was "continuing our work on zero based budgeting and are on track to capture the identified operational improvements for 2015, which will strengthen our competitive advantage."

179.198.        Defendant Lovette represented that Pilgrim's "strong results [we]re a testament" to its focus on key customers, relentless pursuit of operational excellence, growing of value added exports, and portfolio model when, in truth, Pilgrim's financial results were, in

material part, attributable to the undisclosed price-fixing scheme alleged herein. Defendant Lovette's representation that "pricing remained strong as consumer demands more chicken" was materially false and misleading because, in fact, pricing was strong due to the fact that Pilgrim and its co-conspirators in the chicken industry were actively engaged in a collusive price-fixing scheme to reduce production and artificially inflate the price of Broiler chickens. Defendant Lovette's statement that "zero based budgeting" and "operational improvements" would strengthen Pilgrim's competitive advantage was materially false and misleading when made because, in truth, Pilgrim and its co-conspirators were actively engaged in the undisclosed price-fixing scheme alleged herein in order to curb competition and increase market-wide profitability. In other words, Pilgrim's improved financial results were not driven by "zero based budgeting" and "operational improvements" as Defendant Lovette stated, but rather by the increase Broiler prices Pilgrim and its so-called 'competitors' were actively conspiring to manipulate.

First Quarter 2015 Form 10-Q

180.199.    The same day, on April 30, 2015, Pilgrim filed its Form 10-Q for the quarterly period ended March 29, 2015 ("First Quarter 2015 Form 10-Q"), signed by Defendants Lovette and Sandri, with the SEC. The First Quarter 2015 Form 10-Q repeated the financial results and margins reported in the Company's First Quarter 2015 Form 8-K.  The First Quarter 2015 Form 10-Q also included the following statements:

> Market prices for feed ingredients remain volatile. Consequently, ***there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.***
>
> ....
>
> ***Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.***

(Emphasis added).

~~181.~~200.     The foregoing statements were materially false and misleading when made because the cost of feed ingredients was no longer "negatively impact[ing]" Pilgrim's financial position due to Pilgrim's agreement with other Broiler companies to further reduce supply whenever other market factors would make the industry unprofitable.  To that end, it was also materially false and misleading for Defendants to state that "there can be no assurance that chicken prices will not decrease" due to a variety of factors when, in fact, Pilgrim and other companies were collaborating to fix Broiler prices at an artificial prices through reductions of supply and by manipulating the Georgia Dock index.

First Quarter 2015 Earnings Call

~~182.~~201.     The same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's first quarter 2015 results (the "First Quarter 2015 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, Defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette stated:

> ***And we also think that the pricing from demand is going to be very strong, too.*** And the reason is, as I said before, from a supply standpoint, not much of the supply growth is coming from the growth in hen. And as there's only 2 wings on each bird, it's a piece count issue. And as wings continue to be well supported and demanded, the price continues to be very well supported. Tenders are the same way. There's only 2 tenders per head. And the same math works there in terms of price and demand. And we're seeing tremendous strength for tenders so far this year. And breast meat right now is very strong. We've seen, I think, $0.08 a pound increase just this week in Urner Barry quote. And the trading levels are at a basis that indicates that demand is very, very strong for breast meat. And we think that breast meat will continue to go up through Memorial Day. And as seasonally expected, maybe weaken a little bit in June before it starts making another run towards the 4th of July. ***So we see the patterns, at least, for breast meat, wings and tenders very similar to what happened last year. And we believe that that's***

*good news from a margin standpoint for chicken producers and us as well.*

....

*Whole birds are very, very in demand and supported. I think the Georgia Dock is at an all-time high right now.* It went up another 1/4 yesterday at 115.75. And we don't see any reason for demand for whole birds to trail off, at least, through Labor Day. And then as is normal, we see a seasonal decline. But as of right now, whole birds are stronger than they've been really in quite a while. We don't -- our outlook is that's not going to change.

(Emphasis added).

~~183.~~202.        The foregoing statements were materially false and misleading when made because demand was not driving strong pricing, but rather, Pilgrim and its co-conspirators were inflating prices of chicken by collectively constraining the supply of Broiler chickens. Furthermore, Defendant Lovette's statements that "[w]hole birds are very, very in demand" and connecting that demand to "all-time high" Georgia Dock pricing was materially false and misleading because it was the Broiler industry's manipulation of the Georgia Dock that brought it to all-time highs, not the demand for whole chickens.  Indeed, at this time, the Urner Barry and USDA price indices were both declining rapidly in response to lower feed costs.

### G.    Materially False and Misleading Statements and Omissions Concerning the Second Quarter of 2015

Second Quarter 2015 Press Release and Form 8-K

~~184.~~203.        On July 29, 2015, Pilgrim issued a press release entitled "Pilgrim's Pride Reports Operating Income of $378 Million with a Margin of 18.4% for the Second Quarter of 2015, for a 26% Improvement Compared to 2014" ("Second Quarter 2015 Press Release"). The next day, the Company filed a Form 8-K ("Second Quarter 2015 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting second quarter 2015 financial results, including EBITDA of $425.8 million, net income of $241.5 million, and earnings of $0.94 per share for the quarter. Defendant Lovette stated that Pilgrim

"remain[ed] very committed to our goals of joint value creation with key customers, relentless pursuit of operational excellence and growing value added exports, and despite ongoing challenges during Q2, out team has once again delivered solid results." Defendant Lovette also stated that "[t]he business continues to generate strong cash flows and our team remains relentless in finding additional opportunities to improve our operations and build competitive advantages." Finally, Defendant Lovette stated that "[t]he vision and diversification strategy that we have implemented over the past few years are creating an opportunity for us to keep our strong performance in different market conditions and with lower volatility than any specific segment."

185.204.    Defendant Lovette's representation that Pilgrim's "solid results" in Q2 were attributable to "joint value creation with key customers, relentless pursuit of operational excellence and growing value added exports" was materially false and misleading when made because, in truth, Pilgrim's Q2 financial results were in material part predicated on the undisclosed price-fixing scheme alleged herein. Defendant Lovette's representation that Pilgrim was "relentless" in finding opportunities to "build competitive advantages" was materially false and misleading when made because, in truth, Pilgrim and its co-conspirators were actively engaged in the undisclosed price-fixing scheme alleged herein in order to curb competition and increase market-wide profitability. Defendant Lovette's representation that Pilgrim's implementation of a "vision and diversification strategy" were the factors accountable for its "strong performance," was materially false and misleading when made because, in truth, Pilgrim's performance was materially predicated on the undisclosed price-fixing scheme alleged herein, as well as the manipulation of the Georgia Dock pricing index.

Second Quarter 2015 Form 10-Q

~~186.~~205.        The same day, on July 30, 2015, Pilgrim filed its Form 10-Q for the quarterly period ended June 28, 2015 ("Second Quarter 2015 Form 10-Q"), signed by Defendants Lovette and Sandri, with the SEC. The Second Quarter 2015 Form 10-Q repeated the materially false and misleading financial results and margins reported in the Company's Second Quarter 2015 Form 8-K.   The Second Quarter 2015 Form 10-Q also contained the following language:

> Market prices for feed ingredients remain volatile. ***Consequently, there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.***
>
> ....
>
> ***Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.***

(Emphasis added).

~~187.~~206.        The foregoing statements, like statements made regarding feed costs in the Company's previous quarterly filing, were materially false and misleading when made because the cost of feed ingredients was no longer "negatively impact[ing]" Pilgrim's financial position due to Pilgrim's agreement with other Broiler companies to further reduce supply whenever other market factors would make the industry unprofitable.   Thus, it was also materially false and misleading for Defendants to state that "there can be no assurance that chicken prices will not decrease" due to a variety of factors when, in fact, Pilgrim and other companies were collaborating to fix Broiler prices at an artificial prices through reductions of supply and by manipulating the Georgia Dock index.

Second Quarter 2015 Earnings Call

~~188.~~207.       The same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's second quarter 2015 results (the "Second Quarter 2015 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, Defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette stated:

> As a reminder, *the industry is currently capacity-constrained by slaughter facilities since producers are already operating at a very high utilization rate, which limits the ability to process a large increase in supply of birds within the short term to medium term without significant investment in the whole value chain.* We're continuing to see solid demand from our customers particularly at quick-service restaurants. *And assuming current supply growth rates, we believe supply and demand to remain in balance*….Overall, we continue to see positive signs for demand and chicken continues to be the most attractive protein option available for retail and food service.

(Emphasis added).

~~189.~~208.       The foregoing statements were materially false and misleading when made. It was false and misleading for Defendant Lovette to state that the industry was "capacity-constrained" and operating "at a very high utilization rate" when, in truth, Pilgrim and its co-conspirators were artificially constraining the supply of Broiler chickens in a collusive scheme to inflate prices.  Moreover, Defendant Lovette materially misrepresented that he was "assuming" supply growth rates to same when, in fact, Pilgrim and its co-conspirators in the industry were working cooperatively to keep supply growth in check.

~~190.~~209.       During the Second Quarter 2015 Earnings Call Defendant Lovette also stated:

> *It is a cyclical business.* We have a lot of factors beyond our control. Input cost, spot markets, high-path avian flu. And all of that combined makes it extremely difficult to tell you specifically what normalized margins could or should be in

our industry. I would point out though that given what's happened the last two years to three years with competing meat prices with *our own industry showing discipline in matching supply and demand*, we believe that normalized margins, whatever they maybe, are structurally higher than they were 10 years ago or even seven years ago. And in addition to that, *whatever the average margin is for the industry, I believe, we've demonstrated the last few quarters that our business model close off better margins than the average company.* And we believe that spread should continue to grow in time as we get better with zero-based budgeting execution, as we get better with our management method. And also I'd point to the agility in our pricing strategy. We look to the future, we form a point of view about what we believe supply and demand will be in the next six months to 18 months and we change our pricing strategy commensurate with what we believe will happen and we've done that so far this year, and we believe that will continue to be constructive for us as well.

(Emphasis added).

191.210.    The foregoing statements were materially false and misleading when made for several reasons.  First, Defendant Lovette materially misrepresented that the Broiler market was still "cyclical" when, in fact, by collaborating with other Broiler companies to restrict supply, the industry created an artificially stable Broiler industry.  To that end, it was also misleading for Defendant Lovette to discuss supply "discipline" while failing to disclose the anticompetitive agreement amongst the industry to limit supply in order to maintain high prices. Furthermore, Defendant Lovette materially misrepresented to investors that credit Pilgrim's agile "pricing strategy" for its improved margins when, in truth, Pilgrim and its co-conspirators were actively engaged in a collusive scheme to inflate prices and manipulating the Georgia Dock to achieve those margins.

192.211.    Inquiring about the strength and consistency of chicken prices as published on the Georgia Dock, an analyst for KeyBanc Capital Markets asked the following question of Defendant Lovette during the Second Quarter 2015 Earnings Call:

[M]y second question is just in terms of pricing, so there's been some softness, as you alluded to earlier. But *Georgia Dock prices seem to have held up pretty well. So I'm just curious if you could talk a little bit about maybe what's driving that.* And then, in your view, do you see some risk to Georgia Dock prices as – with

the potential of pork prices coming down further at retail? Thank you.

Lovette responded in part as follows:

> ***So Georgia Dock market is reflective of whole birds. And you have a mix of small whole birds and medium sized whole birds in that mix. And we believe that it's the value of all those birds combined that it has been supported for keeping that price relatively high.*** And we believe especially given the actual decline in the number head of small bird production this year over last and we don't see that's going to grow significantly in the future. ***We believe that's Georgia Dock will continue to be supportive by the demand for that product.***

(Emphasis added).

~~193.~~212.    The foregoing statements were materially false and misleading when made. It was materially false and misleading for Lovette to state that the mix of small and medium sized birds buoyed the Georgia Dock prices when, in truth, the Georgia Dock prices were inflated due to Pilgrim and other Broiler companies reporting false prices to the GDA, which, unlike the Urner Barry and USDA indices, did not have a secondary verification procedure.

### H.    Materially False and Misleading Statements and Omissions Concerning the Third Quarter of 2015

Third Quarter 2015 Press Release and Form 8-K

~~194.~~213.    On October 28, 2015, Pilgrim issued a press release entitled "Pilgrim's Pride Reports Operating Income of $231 Million with a Margin of 10.9% for the Third Quarter of 2015" ("Third Quarter 2015 Press Release"). The next day, the Company filed a Form 8-K ("Third Quarter 2015 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting third quarter 2015 financial results, including EBITDA of $274.3 million, net income of $137.1 million, and earnings of $0.58 per share for the quarter. Defendant Lovette stated "[t]he Q3 results are a strong validation of our portfolio model, and the strategy we have pursued and implemented over the past four years is fundamental in improving

our ability to maintain strong performance, minimize the impact of different market conditions, and give us more consistent financial results." Finally, Defendant Lovette stated that, "[i]n spite of the tough environment last quarter, our cash flow generation continues to be strong and our team remains relentless in uncovering additional methods to increase operational efficiencies, enhance relationships with key customers, and build competitive advantages."

195.214.   Defendant Lovette's representation that Pilgrim's third quarter results validated Pilgrim's "portfolio model" and "strategy" was materially false and misleading because, in truth, those results were predicated on the undisclosed price-fixing scheme alleged herein as well as their manipulation of the Georgia Dock index. Defendant Lovette's representation that Pilgrim remained "relentless" in finding opportunities to "build competitive advantages" was materially false and misleading when made because, in truth, Pilgrim and its co-conspirators were actively engaged in the undisclosed price-fixing scheme alleged herein in order to curb competition and increase market-wide profitability. In other words, Pilgrim's strong "cash flow generation" was not driven by an "increase [in] operational efficiencies" or "enhance[d] relationships with key customers," as Defendant Lovette stated, but rather by the Broiler prices Pilgrim and its so-called 'competitors' were actively conspiring to manipulate.

Third Quarter 2015 Form 10-Q

196.215.   The same day, on October 29, 2015, Pilgrim filed its Form 10-Q for the quarterly period ended September 27, 2015 ("Third Quarter 2015 Form 10-Q"), signed by Defendants Lovette and Sandri, with the SEC. The Third Quarter 2015 Form 10-Q repeated the financial results and margins reported in the Company's Third Quarter 2015 Form 8-K.  The Third Quarter 2015 Form 10-Q also contained the following statements:

> Market prices for feed ingredients remain volatile. ***Consequently, there can be no assurance that our feed ingredients prices will not increase materially and that***

*such increases would not negatively impact our financial position, results of operations and cash flow.*

....

*Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.*

(Emphasis added).

~~197.~~216.      The foregoing statements were materially false and misleading when made because the cost of feed ingredients was no longer "negatively impact[ing]" Pilgrim's financial position due to Pilgrim's agreement with other Broiler companies to further reduce supply whenever other market factors would make the industry unprofitable.  Furthermore, it was also materially false and misleading for Defendants to state that "there can be no assurance that chicken prices will not decrease" due to a variety of factors when, in fact, Pilgrim and other companies were collaborating to fix Broiler prices at an artificial prices through reductions of supply and by manipulating the Georgia Dock index.

Third Quarter 2015 Earnings Call

~~198.~~217.      The same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's third quarter 2015 results (the "Third Quarter 2015 Earnings Call"), during which they spoke in detail about Pilgrim's materially misleading margins, earnings, and net income. During the call, Defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette stated:

[I]n the face of the lowest cutout value seen over the last five years and ongoing challenges in major export markets coupled with a pricing environment comparable to 2011, *our operations continued to produce respectable margins last quarter. This is a validation of the benefit of our diverse portfolio model and all the operational improvements we've have achieved in the past four*

*years,* giving us confidence that we are on the right track in implementing and executing our strategy. As we said many times before, our well-balanced portfolio and approach to bird sizes, customers, end markets and geographies reduces the impact of individual segments and gives us lower overall volatility and much more consistent performance over an extended period of time.

(Emphasis added).

199.218.    Defendant Lovette's foregoing statements were materially false and misleading to attribute Pilgrim's "respectable margins" to the Company's "diverse portfolio model" and "operational improvements" when, in truth, Pilgrim's margins were in substantial part predicated on the undisclosed price-fixing scheme alleged herein.

200.219.    During the Third Quarter 2015 Earnings Call Defendant Lovette also stated:

[T]he industry is showing discipline. As you mentioned earlier, pricing has receded and we're still focused on the fact that the *profitability of this industry depends on the supply and demand of chicken and really little from many other factors.*

(Emphasis added).

201.220.    The foregoing statements were materially false and misleading when made. It was false and misleading for Lovette to state that profitability in the chicken industry depended "on the supply and demand of chicken and really little from many other factors" when, in truth, Lovette failed to disclose that Pilgrim and its co-conspirators decoupled the Broiler industry from historical market forces with their undisclosed scheme to collectively reduce supply whenever the industry was facing market pressures, thereby raising Broiler prices.

202.221.    Seeking an explanation for a dip in pricing, an analyst from BMO Capital Markets asked the following of Defendants Lovette and Sandri during the Third Quarter 2015 Earnings Call:

My second question is you said that the – just in terms of the pricing environment, you said that the supply is constrained, which we agree with you but you said the

demand is strong. So which part is creating the weakness in the pricing? I'm just trying to figure – kind of figure out which side of it is both. The supply seems contained and you said the demand still seems robust. So – but yet the pricing has come in. So just trying to, again, figure out what exactly is causing the pricing. Is it just simply the export markets and if that cleans up, we would be off to the races?

Sandri responded in part as follows:

When you look at the price environment on the big bird market compared by the cutout is what we are seeing. But *when we look at Urner Barry or when we look at Georgia Dock, which is more reflective of the small bird market, we can see that the market is still strong and demand and supply are more in balance.*

(Emphasis added).

~~203.~~222.    The foregoing statements were materially false and misleading when made, as it was false and misleading for Defendant Sandri to state that the Georgia Dock reflected a strong pricing environment and one in which "demand and supply were in balance" when, in truth, Pilgrim and other poultry producers were manipulating the Georgia Dock index by reporting false contract prices to the GDA.

~~204.~~223.    Responding to Defendant Lovette's comments regarding the chicken industry being at or near full production capacity, a Barclays Capital analyst asked the following of Lovette during the Third Quarter 2015 Earnings call:

And then, Bill, on your comments on the industry kind of being at full production capacity with no production coming over the next two years to three years, or it would take a while to get new plants up to make a difference. How do you view PPC's role in that? Is it something that you would think about to increase capacity? Or would you let others in the industry do it?

Lovette responded as follows:

We're focused on our key customers. *If we see some of our key customers needing more product then we're going to do what's best for taking care of those customers and taking care of our business.*

(Emphasis added).

205.224.        Defendant Lovette's response stating that Pilgrim would increase production if its key customers needed more product was materially false and misleading because, in truth, Pilgrim had agreed with its co-conspirators limit the supply of Broiler chickens, regardless of customer demand, in order to inflate and maintain high Broiler prices for the entire industry.

## I.   Materially False and Misleading Statements and Omissions Concerning the Fiscal Year 2015

Fiscal Year 2015 Press Release and Form 8-K

206.225.        On February 10, 2016, Pilgrim issued a press release entitled "Pilgrim's Pride Closes Fiscal Year 2015 with an Operating Income of $1.04 Billion and a Margin of 12.8%, Confirmign Benefits of Portfolio Strategy" ("Fiscal Year 2015 Press Release"). The next day, the Company filed a Form 8-K ("Fiscal Year 2015 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting fourth quarter 2015 financial results, including EBITDA of $150.0 million, net income of $63.1 million, and earnings of $0.26 per share for the quarter. Defendant Lovette stated that "[d]espite the headwinds, our team managed to deliver margins that are above periods when prices were at similar levels. Our performance is commendable and strongly validates the benefits of our strategy." Defendant Lovette also stated "[t]he implementation and execution of our portfolio model over the past five years are critical in supporting our ability to deliver stronger profitability while giving more consistent financial results, as we minimize the impact of specific market conditions in any given segment or geography." Finally, Defendant Lovette stated that Pilgrim's "cash flow generation was strong and our team remained relentless in identifying additional methods to increase operational efficiencies, enhace relationsihps with key customers, and build competitive advantages."

207.226.    Defendant Lovette's statement that Pilgrim's ability to deliver higher margins than when prices were at similar levels "validates the benefits of our strategy" was materially false and misleading when made because, in truth, Pilgrims' historically favorable margins were attributable, in material part, to the undisclosed price fixing scheme alleged herein and were wholly unrelated to Pilgrim's purported "strategy." Defendant Lovette's statements representing that Pilgrim's "implementation and execution" of its "portfolio model" was the reason the Company had experienced and was experiencing "stronger profitability" were materially false and misleading because, in truth, the determinative factors influencing Pilgrim's profitability were: (1) the undisclosed price-fixing scheme amongst Pilgrim and its competitors; and (2) the manipulation of the Georgia Dock index.

Fiscal Year 2015 Form 10-K

208.227.    The following day, on February 12, 2016, Pilgrim filed its Form 10-K for the fiscal year ended December 27, 2015 ("Fiscal Year 2015 Form 10-K"), signed by Defendants Lovette and Sandri, with the SEC. The Fiscal Year 2015 Form 10-K repeated the financial results and margins reported in the Company's Fiscal Year 2015 Form 8-K.

209.228.    The Fiscal Year 2015 Form 10-K also stated:

> ***Items that influence chicken pricing in the U.S. include international demand, changes in production by other broiler producing countries, input costs and the demand associated with substitute products such as beef and pork. We believe our focus on sales mix enables us to adapt to changing supply-demand dynamics by adjusting our production to maximize value.***
> ….
>
> We believe we are well positioned to be the primary chicken supplier for large customers due to our ability to provide consistent supply, innovate and develop new products to address consumer desires and provide competitive pricing across a diverse product portfolio. ***Our balanced portfolio of fresh, prepared and value-added chicken products yields a diversified sales mix, mitigating supply and market volatility and creating more consistent gross margins.***
> ….

> ***In the U.S., prices of these products are negotiated daily or weekly and are generally related to market prices quoted by the USDA or other public price reporting services.***

(Emphasis added).

210.229.     The foregoing statements were materially false and misleading when made for several reasons. First, in discussing the "items that influence chicken pricing in the U.S.," Pilgrim failed to disclose that the two largest factors influencing chicken prices were: (1) the undisclosed price-fixing scheme amongst Pilgrim and its competitors; and (2) the manipulation of the Georgia Dock index.  Next, it was false and misleading for Pilgrim to state that its "focus on sales mix" allowed it to adjust its "production to maximize value" when, in truth, Pilgrim and its co-conspirators were artificially constraining the supply of Broiler chickens in a collusive scheme to inflate prices. It was also false and misleading for Pilgrim to state that it was capable of providing its customers with "consistent supply" and "competitive pricing when, in truth, Pilgrim and its co-conspirators were artificially constraining the supply of Broiler chickens in a collusive scheme to inflate prices.  Moreover, Pilgrim falsely stated that it sold its products pursuant to "market prices quoted by the USDA" and "determined by supply and demand" when, in truth, Pilgrim and its co-conspirators were selling its products at inflated prices due to the anticompetitive scheme and Georgia Dock manipulation.

211.230.     The Fiscal year 2015 Form 10-K also stated:

> ***Most fresh chicken products are sold to established customers, based upon certain weekly or monthly market prices reported by the USDA and other public price reporting services, plus a markup, which is dependent upon the customer's location, volume, product specifications and other factors.*** We believe our practices with respect to sales of fresh chicken are generally consistent with those of our competitors. ***The majority of these products are sold pursuant to agreements with varying terms that set a price according to formulas based on underlying chicken price markets, subject in many cases to minimum and maximum prices….We establish prices for our prepared chicken products based primarily upon perceived value to the customer, production costs and prices of competing products.*** The majority of these products are sold pursuant to

agreements with varying terms that either set a fixed price for short-term periods or set a price according to formulas based on an underlying commodity market such as corn and chicken price forecasts, subject in many cases to minimum and maximum prices. ***Many times, these prices are dependent upon the customer's location, volume, product specifications and other factors.***

(Emphasis added).

~~212.~~231.        The foregoing statements were materially false and misleading when made. It was false and misleading for Pilgrim to state that it sold its products pursuant to "market prices," "perceived value to the customer," and other factors when, in truth, Pilgrim's pricing was influenced in large part by: (1) the collusive scheme to reduce supply thereby inflating prices; and (2) the manipulation of the Georgia Dock index, which Pilgrim failed to disclose that it used in its price negotiations with customers.

~~213.~~232.        The Fiscal Year 2015 Form 10-K also stated:

***The chicken industry is highly competitive.*** We are one of the largest chicken producers in the world and we believe our relationship with JBS enhances our competitive position. In the U.S. and Mexico, we compete principally with other vertically integrated poultry companies. However, there is some competition with non-vertically integrated further processors in the U.S. prepared chicken business. We believe vertical integration generally provides significant, long-term cost and quality advantages over non-vertically integrated further processors. ***In general, the competitive factors in the U.S. chicken industry include price, product quality, product development, brand identification, breadth of product line and customer service.*** Competitive factors vary by major market. ***In the U.S. retail market, we believe that product quality, brand awareness, customer service and price are the primary bases of competition. In the foodservice market, competition is based on consistent quality, product development, service and price. The export market is competitive on a global level based on price, product quality, product tailoring, brand identification and customer service.***

(Emphasis added).

~~214.~~233.        The foregoing statements were materially false and misleading when made because, as discussed thoroughly herein, the chicken industry was not "highly competitive" and Pilgrim did not compete with other vertically integrated poultry companies.  In reality, Pilgrim

and its co-conspirators were actively cooperating in an anti-competitive scheme to inflate the prices of Broiler chickens.  Thus, "price" was not a "competitive factor" at all.

215.234.        The Fiscal Year 2015 Form 10-K also stated:

U.S. sales generated in 2014 increased $146.8 million, or 2.0%, from U.S. sales generated in 2013, primarily because of an increase in the net revenue per pound sold that was partially offset by a decrease in pounds sold. ***Increased net revenue per pound sold, which resulted primarily from an increase in market prices due to continued healthy demand for chicken products in combination with constrained supply, contributed $217.8 million, or 2.9 percentage points, to the revenue increase.***

(Emphasis added).

216.235.        The foregoing statement Pilgrim's increase in net revenue was the consequence of "continued healthy demand for chicken products in combination with constrained supply" was materially false and misleading when made because, in truth, Pilgrim's increased net revenues during 2014 were due in large part to the efforts of Pilgrim and its co-conspirators to artificially constrain the supply of Broiler chickens in a collusive scheme to inflate prices, and also as a result of their manipulation of the Georgia Dock pricing index.

Fiscal Year 2015 Earnings Call

217.236.        The same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's fourth quarter and full fiscal year 2015 results (the "Fiscal Year 2015 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, Defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette stated:

***We believe this performance is a validation of the effectiveness of our portfolio strategy. We do not expect to follow the full peaks and troughs of broader industry pricing trends; instead, the diversity of our product and customer mix means that we will benefit from strong markets, and at the same time be cushioned from some of the impacts of lower pricing giving us an overall***

*volatility, lower volatility and higher margins.* Rather, our broad mix strategy gives us the potential to outperform others over an extended period of time. Despite what we have achieved so far we are not complacent as we believe there are still more work to be done.

(Emphasis added).

218.237.    Defendant Lovette's statements were materially false and misleading when made. First, Pilgrim's improved financial performance for the year was not the product of the "effectiveness of [Pilgrim's] portfolio strategy," but rather because prices of Broilers had been artificially inflated as a result of anticompetitive conduct and manipulation of the Georgia Dock.   Furthermore, it was false and misleading for Lovette to state that the "diversity" of Pilgrim's "product and customer mix" resulted in "lower volatility and higher margins" when, in truth, the undisclosed price-fixing scheme alleged herein removed the volatility from the market and increased margins for Pilgrim as well as other Broiler companies.

219.238.    During the Fiscal Year 2015 Earnings Call Defendant Lovette also stated:

*The industry continues to be disciplined in terms of U.S. supply.* Although, monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits and chick placements as a positive. *We believe that at least part of the reason is because chicken producers are being disciplined and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions.*

....

*Therefore, assuming existing supply growth rates, we believe that this year's supply and demand to remain roughly in balance. Although cold storage inventories remain high compared to last year, we've already seen some reduction and expect greater stability in 2016, since it's due primarily to the export situation and not a general lack of demand.* Overall, we continue to see positive signs for demand and chicken continues to be the most attractive protein option available for retail and foodservice.

(Emphasis added).

220.239.    The foregoing statements were materially false and misleading when made for several reasons. As an initial matter, it was materially false and misleading for Lovette to

state that the chicken market was "disciplined in terms of U.S. supply" because it was now "adjusting supply growth to the actual market conditions" when, in truth, Pilgrim and its co-conspirators were artificially constraining the supply of Broiler chickens in a collusive scheme to inflate prices. Similarly, it was false and misleading for Lovette to state that chicken "supply and demand" remained "roughly in balance" when, in truth, Pilgrim and its co-conspirators materially influenced the supply of Broiler chickens by means of the undisclosed price-fixing scheme alleged herein.  Moreover, Defendant Lovette's discussion regarding cold storage and noting that "we've already seen some reduction and expect greater stability in 2016" was materially false and misleading because it failed to disclose that Pilgrim would export that frozen meat to Vietnam and other places for bargain prices in order to mitigate its effect on rising Broiler prices.

221.240.    During the Fiscal Year 2015 Earnings Call Defendant Sandri also stated:

> In our U.S. operations, margins were slightly higher in contrast to previous year. For context, we delivered such margin performance in an environment that was significantly weaker in compared to 2014 which was one of the best years ever for the industry. ***These results reflect the cumulative work we have done to create the portfolio strategy that will resist better to volatility specific markets.***

(Emphasis added).

222.241.    Sandri's statement that Pilgrim's favorable 2015 results were the consequence of the Company's "cumulative work" and "portfolio strategy" was materially false and misleading because, in reality, Pilgrim's financial results were materially influenced by the undisclosed price-fixing scheme and Georgia Dock manipulation.

223.242.    During the Fiscal year 2015 Earnings Call, an analyst from BMO Capital Markets questioned Defendant Lovette about Pilgrim's pricing strategy:

> Can you talk about your pricing strategy, because there is a competitor out there that is seemingly changing how they are doing their pricing and kind of moving more to a structural margin structure rather than ebbing and flowing with Urner

Barry and Georgia Dock prices. Can you talk about if there is [sic] opportunities for that?

Lovette responded in part as follows:

> ***On the pricing front, we've not significantly changed our strategy from where it's been the last two years.*** I will tell you, we've added some more cost plus profit component not in a material way or significant way, but we have added to that; and we believe that's going to serve us well as we go into the future. And we never expected prices to remain as high as they were in 2014. ***We knew that at some point pricing would be weaker as we saw in 2015, and I believe our pricing strategy and operational strategy really served us well when you compare the margins that we generated in 2015 relative to the cutout in 2015 as compared to 2014. I think that validates, as we said, the balanced portfolio that we've created over the last five years.***

(Emphasis added).

~~224.~~243.    Lovette's foregoing statement that Pilgrim's "pricing strategy and operational strategy" were responsible for the Company's margins was materially false and misleading because, in truth, Pilgrim's margins were materially influenced by the undisclosed price-fixing scheme and Georgia Dock manipulation.

### J.    Materially False and Misleading Statements and Omissions Concerning the First Quarter of 2016

First Quarter 2016 Press Release and Form 8-K

~~225.~~244.    On April 27, 2016, Pilgrim issued a press release entitled "Pilgrim's Pride Reports Operating Income of $189 Million with a Margin of 9.6% for the First Quarter of 2016" ("First Quarter 2016 Press Release"). The next day, the Company filed a Form 8-K ("First Quarter 2016 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting first quarter 2016 financial results, including EBITDA of $233.5 million, net income of $118.4 million, and earnings of $0.46 per share for the quarter. Defendant Lovette stated that "[w]hile market conditions contributed to the improvement, our well-balanced portfolio played a key factor in delivering the improved Q1 performance since we were able to

leverage the strength in specific market segments while minimizing the impact of the others." Lovette added that Pilgrim's "portfolio strategy, combined with our approach of being a valued partner with key customers and pursuing operational excellence while strategically growing value-added exports, will allow us to deliver less volatility and higher earnings to our shareholders over time."

226.245.    Defendant Lovette's statement that Pilgrim's "well-balanced portfolio played a key factor" in its positive Q1 performance was materially false and misleading when made because, in truth, Pilgrim's financial results were the product of the collusive supply reduction scheme and Georgia Dock manipulation.  Furthermore, Defendant Lovette's statement that Pilgrim would deliver "less volatility and higher earnings" to its shareholders due to its "portfolio strategy" and pursuit of "operational excellence" was materially false and misleading because, in actuality, decreased volatility and higher earnings were likewise the product of the collusive supply reduction practices and Georgia Dock manipulation.

First Quarter 2016 Form 10-Q

227.246.    The next day, on April 28, 2016, Pilgrim filed its Form 10-Q for the quarterly period ended March 27, 2016 ("First Quarter 2016 Form 10-Q"), signed by Defendants Lovette and Sandri, with the SEC. The First Quarter 2016 Form 10-Q repeated the financial results and margins reported in the Company's First Quarter 2016 Form 8-K.  Like previous quarterly filings, the First Quarter 2016 Form 10-Q contained the following statements:

> Market prices for feed ingredients remain volatile. Consequently, ***there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.***
>
> ….
>
> ***Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins***

*and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.*

(Emphasis added).

~~228.~~247.      The foregoing statements were materially false and misleading because the cost of feed ingredients was no longer "negatively impact[ing]" Pilgrim's financial position due to Pilgrim's agreement with other Broiler companies to further reduce supply whenever other market factors would make the industry unprofitable.  Furthermore, it was also materially false and misleading for Defendants to state that "there can be no assurance that chicken prices will not decrease" due to a variety of factors when, in fact, Pilgrim and other companies were collaborating to fix Broiler prices at an artificial prices through reductions of supply and by manipulating the Georgia Dock index.

First Quarter 2016 Earnings Call

~~229.~~248.      The same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's first quarter 2016 results (the "First Quarter 2016 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, Defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette stated:

> *U.S. industry players have remained disciplined in terms of adding new supplies as* evidenced by the significant growth in the greater block so far this year and while egg set and chick placements data on top of that are flat to up slightly year-to-date are *reflected of the balanced supply-demand scenario. We believe chicken producers are much quicker to react then in the past in adjusting supply growth to actual market conditions* have seen in the larger and seasonal production cuts late last year while being much more deliberate in adding new capacities than before, all positives for the industry.

(Emphasis added).

230.249.      Defendant Lovette's statement that the state of the chicken industry reflected a "balanced supply-demand scenario" where producers quickly adjusted "supply growth to actual market conditions" was materially false and misleading because, in truth, Pilgrim and its co-conspirators in the chicken industry were artificially constraining the supply of Broiler chickens in a collusive scheme with its competitors to inflate prices.

231.250.      During the First Quarter 2016 Earnings Call Defendant Sandri also stated:

> *On leg quarters, during last quarter, the US industry diversified their exports as mentioned due to the trade barriers and challenges on international economies and that's helped maintain the inventories at very low levels.*

(Emphasis added).

232.251.      Defendant Sandri's foregoing statement was materially false and misleading when made, because the poultry industry did not diversify their exports "due to the trade barriers and challenges on international economies," but rather for the purpose of lowering US inventory levels to maintain high prices in accordance with the industry's collusive price-fixing agreement.

### K.    Materially False and Misleading Statements and Omissions Concerning the Second Quarter of 2016

Second Quarter 2016 Press Release and Form 8-K

233.252.      On July 27, 2016, Pilgrim issued a press release entitled "Pilgrim's Pride Reports Operating Income of $237 Million with an Operating Margin of 11.7% for the Second Quarter of 2016" ("Second Quarter 2016 Press Release"). The next day, the Company filed a Form 8-K ("Second Quarter 2016 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting second quarter 2016 financial results, including EBITDA of $282.7 million, net income of $152.9 million, and earnings of $0.60 per share for the quarter. Defendant Lovette stated that "[d]uring Q2, our results further improved

sequentially compared to the last two quarters. While our portfolio strategy of a well-balanced exposure to different bird sizes was an important factor, the diversity of our product and broad customer mix, as well as geographic exposure were also important contributors." Defendant Lovette also stated that Pilgrim's portfolio strategy was "generating the intended results and created a unique and meaningful advantage over competitors with less breadth in their portfolio." Finally, Defendant Lovette stated that Pilgrim's "operations in Mexico were a strong contributor to the Q2 results driven by an improved supply/demand environment, better operating performance, and increased synergies with newly acquired assets."

234.253.    It was materially false and misleading for Defendant Lovette to represent that the Company's second quarter financial results were buoyed by its "portfolio strategy," "improved supply/demand environment, better operating performance, and increased synergies" when, in fact, Pilgrim's financial results were predicated on the undisclosed price-fixing scheme and the Georgia Dock manipulation alleged herein. Defendant Lovette's statement that Pilgrim's portfolio strategy "created a unique and meaningful advantage over competitors" was materially falase and misleading when made because, in truth, Pilgrim and its co-conspirators were actively engaged in the undisclosed price-fixing scheme alleged herein in order to curb competition and increase market-wide profitability. In other words, Pilgrim's "intended results" were not driven by its "portfolio strategy," as Defendant Lovette stated, but rather by the increase Broiler prices Pilgrim and its so-called 'competitors' were actively conspiring to manipulate. Defendant Lovette's statement that Pilgrim's Q2 performance was attributable to "an improved supply/demand environment, better operating performance, and increased synergies with newly acquired assets" in its Mexico market was materially false and misleading when made because, in truth, Pilgrim's Q2 financial results were driven by the undisclosed price-fixing scheme

108

alleged herein and Pilgrim's Mexico operations did not benefit from "an improved supply/demand environment," as Pilgrim and its co-conspirators distorted the supply-demand environment for Broilers.

Second Quarter 2016 Form 10-Q

235.254.    The same day, on July 28, 2016, Pilgrim filed its Form 10-Q for the quarterly period ended June 26, 2016 ("Second Quarter 2016 Form 10-Q"), signed by Defendants Lovette and Sandri, with the SEC. The Second Quarter 2016 Form 10-Q repeated the financial results and margins reported in the Company's Second Quarter 2016 Form 8-K.

236.255.    The Second Quarter 2016 Form 10-Q also stated:

> Market prices for feed ingredients remain volatile. Consequently, *there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.*
> ….
> *Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.*

(Emphasis added).

237.256.    The foregoing statements were materially false and misleading because the cost of feed ingredients was no longer "negatively impact[ing]" Pilgrim's financial position due to Pilgrim's agreement with other Broiler companies to further reduce supply whenever other market factors would make the industry unprofitable.  Furthermore, it was also materially false and misleading for Defendants to state that "there can be no assurance that chicken prices will not decrease" due to a variety of factors when, in fact, Pilgrim and other companies were collaborating to fix Broiler prices at an artificial prices through reductions of supply and by manipulating the Georgia Dock index.

238.257.        The Second Quarter 2016 Form 10-Q also stated:

U.S. net sales generated in the thirteen weeks ended June 26, 2016 decreased $161.4 million, or 8.8%, from U.S. net sales generated in the thirteen weeks ended June 28, 2015 primarily because of decreased sales volume. The decrease in sales volume contributed $101.3 million, or 5.5 percentage points, to the net sales decrease. ***The decrease in sales volume was partially due to production limitations caused by operational improvements in one of our prepared foods facilities during the period.*** Lower net sales per pound, which reflects a slight shift in product mix toward lower-priced fresh chicken products when compared to the same period in the prior year, contributed $60.2 million, or 3.2 percentage points, to the net sales decrease.

….

U.S. net sales generated in the twenty-six weeks ended June 26, 2016 decreased $333.9 million, or 9.1% , from U.S. net sales generated in the twenty-six weeks ended June 28, 2015 primarily because of decrease in sales volume and a decrease net sales per pound. The decrease in sales volume contributed $170.3 million, or 4.6 percentage points, to the decrease in net sales. ***The decrease in sales volume was partially due to production limitations caused by operational improvements in one of our prepared foods facilities during the period.*** Lower net sales per pound, which reflects a slight shift in product mix toward lower-priced fresh chicken products when compared to the same period in the prior year, contributed $163.6 million, or 4.4 percentage points, to the net sales decrease.

(Emphasis added).

239.258.        The foregoing statements were materially false and misleading when made.  It was false and misleading for Pilgrim to state that its decreased sales volume was attributable to "production limitations caused by operations improvements" when, in truth, Pilgrim artificially constrained its production of Broiler chickens in order to artificially inflate prices in satisfaction of the undisclosed price-fixing scheme alleged herein.

Second Quarter 2016 Earnings Call

240.259.        The same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's second quarter 2016 results (the "Second Quarter 2016 Earnings Call"), during which they spoke in detail about Pilgrim's materially misleading margins, earnings, and net income. During the call, Defendants made false statements regarding both

Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette stated:

> ***Producers have been very deliberate about adding new supplies compared to the past as indicated by the marginal growth in the breeder flock so far this year while egg sets and chick placements data are flat to up slightly year-to-date are reflecting a balanced supply-demand environment.***

(Emphasis added).

241.260.     Lovette's foregoing statements were materially false and misleading when made in that the state of the chicken industry did not reflect a "balanced supply-demand environment," but rather Pilgrim and its co-conspirators in the chicken industry were artificially constraining the supply of Broiler chickens in a collusive scheme to inflate prices.  Similarly, the statement that "[p]roducers have been very deliberate about adding new supplies" was misleading in that it failed to disclose that the industry was purposefully limiting production as part of an anticompetitive scheme.

## L.     Materially False and Misleading Statements and Omissions Concerning the Third Quarter of 2016

Third Quarter 2016 Press Release and Form 8-K

242.261.     On October 26, 2016, Pilgrim issued a press release entitled "Pilgrim's Pride Reports Operating Income of $164 Million with an Operating Margin of 8.1% for the Third Quarter of 2016" ("Third Quarter 2016 Press Release"). The next day, the Company filed a Form 8-K ("Third Quarter 2016 Form 8-K") with the SEC, which Defendant Sandri signed, that included the press release as an exhibit, reporting third quarter 2016 financial results, including EBITDA of $210.8 million, net income of $98.7 million, and earnings of $0.39 per share for the quarter. Defendant Lovette stated that "[d]uring Q3, our Fresh business continued to perform well driven by our differentiated portfolio strategy of having presence in all three bird sizes and

111

strong relationships with key customers. Retail demand for our birds remained robust despite concerns about greater availability of other competing proteins."

243.262.    Defendant Lovette's foregoing statement that Pilgrim's third quarter financial results were driven by its "differentiated portfolio strategy" was materially false and misleading when made because, in truth, Pilgrim's financial results were predicated on the undisclosed price-fixing scheme and Georgia Dock manipulation alleged herein. Defendant Lovette's statement that "[r]etail demand for our birds remained robust" was also materially false and misleading when made because Lovette failed to disclose that the demand and prices for Broilers "remained robust" as a direct consequence of the price-fixing scheme alleged herein.

Third Quarter 2016 Form 10-Q

244.263.    The same day, on October 27, 2016, Pilgrim filed its Form 10-Q for the quarterly period ended September 25, 2016 ("Third Quarter 2016 Form 10-Q"), signed by Defendants Lovette and Sandri, with the SEC. The Third Quarter 2016 Form 10-Q repeated the financial results and margins reported in the Company's Third Quarter 2016 Form 8-K.

245.264.    The Third Quarter 2016 Form 10-Q also stated:

> Market prices for feed ingredients remain volatile. Consequently, *there can be no assurance that our feed ingredients prices will not increase materially and that such increases would not negatively impact our financial position, results of operations and cash flow.*
> ….
> *Market prices for chicken products are currently at levels sufficient to offset the costs of feed ingredients. However, there can be no assurance that chicken prices will not decrease due to such factors as competition from other proteins and substitutions by consumers of non-protein foods because of uncertainty surrounding the general economy and unemployment.*

(Emphasis added).

246.265.     The foregoing statements were materially false and misleading because the cost of feed ingredients was no longer "negatively impact[ing]" Pilgrim's financial position due to Pilgrim's agreement with other Broiler companies to further reduce supply whenever other market factors would make the industry unprofitable.  Furthermore, it was also materially false and misleading for Defendants to state that "there can be no assurance that chicken prices will not decrease" due to a variety of factors when, in fact, Pilgrim and other companies were collaborating to fix Broiler prices at an artificial prices through reductions of supply and by manipulating the Georgia Dock index.

247.266.     The Third Quarter 2016 Form 10-Q also stated:

U.S. net sales generated in the thirteen weeks ended September 25, 2016 decreased $73.8 million, or 4.1%, from U.S. net sales generated in the thirteen weeks ended September 27, 2015 primarily because of decreased sales volume. ***The decrease in sales volume, which resulted from the unfavorable impact that ongoing operational improvements in one of our prepared foods facilities had on production during the period*** and lower product demand from our commercial customers, contributed $94.3 million, or 5.2 percentage points, to the net sales decrease.
                                       ….
U.S. net sales generated in the thirty-nine weeks ended September 25, 2016 decreased $407.6 million, or 7.4% , from U.S. net sales generated in the thirty-nine weeks ended September 27, 2015 primarily because of a decrease in sales volume and a decrease in net sales per pound. ***The decrease in sales volume, which resulted from the unfavorable impact that ongoing operational improvements in one of our prepared foods facilities had on production during the period and lower product demand from our commercial customers, contributed $264.***9 million, or 4.8 percentage points, to the decrease in U.S. net sales.

(Emphasis added).

248.267.     The foregoing statements were materially false and misleading when made. It was false and misleading for Pilgrim to state that "ongoing operational improvements" in one of its facilities contributed to its decreased in production when, in truth, Pilgrim

artificially constrained its production of Broiler chickens in order to artificially inflate prices in satisfaction of the undisclosed price-fixing scheme alleged herein.

Third Quarter 2016 Earnings Call

249.268.    The same day, Defendants Lovette and Sandri held a conference call with investors to discuss Pilgrim's third quarter 2016 results (the "Third Quarter 2016 Earnings Call"), during which they spoke in detail about Pilgrim's margins, earnings, and net income. During the call, Defendants made false statements regarding both Pilgrim's performance and the chicken industry in general, as well as the factors that contributed to Pilgrim's performance. For example, Defendant Lovette stated:

> We believe our portfolio strategy of having presence in all bird sizes small, medium and large is differentiated and gives us a powerful platform over our peers that have a narrower focus. *As each bird market has its own distinct supply-demand dynamics, our broad portfolio gives us potential to leverage and balance the strength of specific markets to deliver better total performance.*

(Emphasis added).

250.269.    Defendant Lovette's foregoing statement that Pilgrim's "broad portfolio" allowed it to experience "better performance" was materially false and misleading because, in truth, Pilgrim's performance was materially influenced by the undisclosed price-fixing scheme and Georgia Dock price index manipulation.

IX.    THE TRUTH EMERGES

251.270.    Investors learned of Pilgrim's participation in the price-fixing scheme and the truth behind Defendants' misleading statements and omissions through a series of partial disclosures beginning on September 2, 2016 when a group of wholesaler customers of Pilgrim and numerous other Broiler producers filed the *Maplevale* antitrust class action complaint in the Northern District of Illinois, after the close of the market, alleging that the defendants

participated in an anticompetitive scheme to fix the prices of Broilers.  The *Maplevale* complaint contained many of the same factual allegations as the action here. After its filing, the market for Pilgrim stock swiftly reacted to the previously undisclosed truth.  The price of Pilgrim's stock fell nearly 3% on above-average trading volume, from $23.54 at close on September 2, 2016 to $22.87 per share at close of the next trading day, and continued to slide over the following week on heavy volume.

~~252.~~271.        But it was not until approximately one month later, on October 7, 2016, when Timothy Ramey, a veteran industry analyst at Pivotal Research Group, issued a report downgrading Tyson from "Hold" to "Sell," that news and analysts began picking up on the veracity of the antitrust allegations.  Explaining the downgrade, Ramey cited the "powerfully convincing" allegations of price manipulation by the defendants named in the *Maplevale* complaint, which included Pilgrim.  Ramey drew attention to the fact that industry analysts "have long wondered how an industry marked by such volatility and lack of discipline, could morph to a highly disciplined industry where production remains constrained and pricing remains high."  But after review of the antitrust allegations, Ramey stated that "the evidence is quite chilling.  There is no easy way to explain the perfect harmony that the industry has operated in since 2009…."

~~253.~~272.        More specifically, Ramey's report explained that feed prices had decreased considerably between 2014 and 2016—a condition that historically would "encourage producers to add capacity to Broilers and would sow the seeds of a cyclical margin collapse"— but those predictable market reactions did not occur during the Class Period, which he attributed to "the invisible hand of Agri Stats."

~~254.~~273.        As a result of the revelations of fact in the Pivotal Research Report,

Pilgrim's stock price immediately declined, falling from $21.11 at close on October 6, 2016 to $20.16 at close on October 7, 2016, an over 4% market capitalization loss on heavy trading volume.

255.274.    While the *Maplevale* complaint and the Pivotal Research Report brought to light previously undisclosed facts regarding certain collusive behavior by Pilgrim and other industry participants, the manipulation of the Georgia Dock index was unknown to the market until November 2016 through the publication of two articles: one by *The New York Times*, and the other by *The Washington Post*.

256.275.    *The New York Times* published the first of the two articles entitled, "You Might Be Paying Too Much for Your Chicken" on November 3, 2016.  Written by Stephanie Strom, the article reported for the first time, based on documents that *The New York Times* received pursuant to a Freedom of Information Act request, that the USDA initiated an inquiry into the Georgia Dock index, questioning the accuracy of unverified data that Pilgrim and other chicken producers provided to the GDA for compilation of the index.  Citing emails obtained through the FOIA request, the article indicated that the GDA "is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported."  The article pointed to the price discrepancy between the Georgia Dock and the Urner Barry index and also noted that the price of beef and pork had recently fallen due to lower corn and soybean prices, "[b]ut chicken?  Steady as she goes."

257.276.    Following publication of *The New York Times* article, Pilgrim stock dropped from $21.02 at close on November 3, 2016, to $19.31 at close on November 4, 2016, a decline of over 8% on exceptionally high trading volume.

258.277.    The second article, "If You Thought You Were Paying Fair Prices for

Chicken at the Supermarket, Think Again," published by *The Washington Post* on November 17, 2016, revealed further information about the relevance of Georgia Dock manipulation to the Broiler industry, and provided further color from GDA director Arty Schronce.  First, the article explained the potential price impact for consumers, noting that "[o]ver the past two years, the … Georgia Dock [] has drifted significantly upward from other chicken price averages, rising about 20 percent or more out of line with a separate but lesser known index maintained by the USDA. A deviation in supermarket chicken prices of that magnitude would have cost U.S. grocery shoppers billions of dollars in recent years." The Georgia Dock was so influential, according to the article, "because so many grocery chains use it in their contracts with chicken companies" and "some very large players have acknowledged that the Georgia Dock is the basis of, or a factor in, the price they pay for chicken."

259.278.    The article also provided a link to an internal memorandum prepared and circulated by Mr. Schronce that explained that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock was a "flawed product that is a liability to the Georgia Department of Agriculture."  More specifically, Mr. Schronce wrote that "I have come to question the validity of the information provided" to the GDA from poultry producers, and that they would give him "lackadaisical and rude responses to my requests for information," such as responding "just keep em' the same" when he would ask for a company's updated broiler price.

260.279.    Furthermore, the Schronce Memo brought attention to the Advisory Board, made up largely of executives from Broiler producing companies, writing, "I have questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent.  I was told I could not make any changes without clearing them

with the Advisory Board."

261.280.       In response to these revelations, Pilgrim's stock again fell, dropping from $19.64 at close on November 16, 2016 to $18.61 at close on November 17, 2016, and continued to slide for the next several trading days on high trading volume as the market absorbed the information.

## X.   POST CLASS PERIOD EVENTS

262.281.       A number of events occurring after the Class Period further confirm the allegations of collusion and price manipulation herein.  For example, as discussed above, the GDA officially suspended the Georgia Dock pricing index on December 21, 2016 after Broiler producers refused to sign affidavits certifying the prices quoted to state officials.  In a research note published that same day, an analyst for J.P. Morgan wrote, "for years we were told by almost every processor that GA Dock accurately reflected supply/demand; today we are told the opposite."  Thereafter, attempts by the GDA to refurbish its index with verification requirements and a new reporting structure failed, as the Georgia Premium Poultry Price Index could not garner the necessary support within the Broiler industry.  As such, on February 28, 2017, the GDA announced that it was abandoning the new index and has not included a chicken pricing index on its website since.

263.282.       On February 6, 2017, Tyson filed its first quarter 2017 Form 10-Q with the SEC, which disclosed that on January 20, 2017, Tyson received a subpoena from the SEC in connection with an investigation into potential wrongdoing associated with the price-fixing scheme between the major Broiler industry participants.

264.283.       Then, on February 22, 2017, Sanderson Farms filed a Form 8-K with the SEC, which stated that Sanderson had "received an antitrust civil investigative demand from the

Office of the Attorney General, Department of Legal Affairs, of the State of Florida" and that "[a]mong other things, the demand seeks information related to the Georgia Dock Index and other information on poultry and poultry products published by the GDA and its Poultry Market News division.-

284.    On February 21, 2017, the Office of the Attorney General, Department of Legal Affairs, State of Florida ("Florida AG") sent an "Antitrust Civil Investigative Demand" ("CID") to Pilgrim c/o its outside counsel Weil, Gotshal & Manges, LLP.  The CID was "issued pursuant to the Florida Antitrust Act of 1980, Section 542.28, Florida Statutes, in the course of an official investigation" into violations of Florida and Federal antitrust law, and required Pilgrim to "produce all documentary material and other tangible evidence described in the Attachment" for the time period of January 1, 2007 until the date of production that was in Pilgrim's possession. The Florida AG ordered Pilgrim to produce the following:

a.   All Documents Relating to any internal investigations conducted by Your Company of potential anticompetitive conduct within the Broiler industry.

b.   All Documents furnished, or to be furnished, by You or any governmental entity, including but not limited to the U.S. Securities and Exchange Commission, Relating to potential manipulation of the GDI [Georgia Dock Index] or to potential anticompetitive conduct in the Broiler industry, excluding review of mergers and acquisitions.

c.   All Documents Relating to any Communications, including but not limited to text messages, emails, expense reports, notes or memoranda, and phone records, between You and any GDI Contributor or competitor within the Broiler industry Relating to any of the following: 1) the GDI, GDI Submissions, GDI Calculations; 2) the price, supply, or production of Broilers; 3) Broiler production cuts; or 4) the reduction in or liquidation of Broiler breeder flocks.

d.   All Documents Relating to any Agreements between You and any GDI Contributor or competitor within the Broiler industry Relating to any of the following: 1) the GDI, GDI Submissions, GDI Calculations; 2) the price, supply, or production of Broilers; 3) Broiler production cuts; or 4) the reduction in or liquidation of Broiler breeder flocks.

e.   All Documents Relating to any Communications between You and any trade association or trade association member Relating to any of the following: 1) the GDI, GDI Submissions, GDI Calculations; 2) the price, supply, or production of Broilers; 3) Broiler production cuts; or 4) the reduction in or liquidation of Broiler breeder flocks.

f.   All of Your internal Communications Relating to the GDI, GDI Submissions, or GDI Calculations.

g.   Documents sufficient to show all of Your GDI Submissions.

h.   All Documents Relating to any differences between Your GDI Calculations and Your GDI Submissions.

i.   All Documents relating to Your methodology for providing, compiling, calculating, and verifying the accuracy of GDI Submissions and GDI Calculations.

j.   Documents sufficient to identify each employee in Your Company having any responsibilities with respect to each of the following: 1) determining pricing or production levels of Broilers; 2) GDI Submissions or GDI Calculations; 3) market intelligence or competitor analysis.

k.   All Documents, including transactional data, setting forth Your annual, monthly, and quarterly sales of Broilers to Florida Purchasers.

l.   Documents sufficient to identify each of Your transactions with Florida Purchasers affected by or linked to the GDI.

m.  Documents sufficient to show each contract, with a Florida Purchaser, whose terms were based upon or linked to the GDI.

n.   All Documents Relating to any of Your negotiations with Florida Purchasers Relating to GDI.

o.   Documents sufficient to show Your technology use policies and document retention policies during the Relevant Period, including, but not limited to retention of emails and text messages, and any changes to such policies or practices during the Relevant Period.

285.   Similar CIDs were sent on February 21, 2017 to Fieldale Farms and Sanderson Farms, Koch Foods, Inc. on February 24, 2017, and Tyson Foods on February 28, 2017.[8]

---

[8] Copies of the CIDs were made available to Plaintiff through a public records request made to the Florida AG.

265.286.        On April 25, 2017, Timothy Ramey of Pivotal Research Group published a report on Tyson, after the company was hit with the SEC subpoena, explaining: "The SEC Subpoena is troubling – 'subpoena' generally is not the first thing we hear in an inquiry.  The risk of a major finding of industry collusion is top of mind.  Damages could be very substantial and the DOJ or FTC could get involved."

287.    Finally, onOn May 8, 2017, the fraudulent price-fixing scheme was further confirmed by announcements from Pilgrim spokesman Cameron Bruett and Tyson spokesman Gary Mickelson that Florida Attorney General Pam Bondi's office has opened an investigation into the price-fixing allegations and sought information from both Pilgrim and Tyson regarding possible anticompetitive behavior through a "civil investigative demand."–

288.   On July 27, 2017, co-conspirator and antitrust co-defendant Fieldale Farms— which is one of the handful of poultry producers that participated in the Georgia Dock and was subject to a CID from the Florida AG—entered into an "ice breaker" settlement agreement with plaintiffs in the antitrust action pending in the Northern District of Illinois.  Pursuant to the terms of the Settlement Agreement, which was publicly filed in the antitrust action, Fieldale Farms agreed to pay $2.25 million and provide ongoing "cooperation in [plaintiffs'] continued prosecution of the Action against the remaining Defendants," including Pilgrim.  According to the motion for approval of the settlement filed on August 4, 2017:

> Fieldale Farms' cooperation includes providing [plaintiffs] documents it produced to the Office of the Florida Attorney General in a related inquiry into the Broiler industry; producing Agri-Stats reports, phone records, ESI, and other documents; making five current or former employees available for interviews and depositions; and an attorney proffer to provide a description of the principal facts known to Fieldale Farms that are relevant to the conduct at issue in the litigation.

---

Other documents possessed by the Florida AG's office were not obtainable, because "[i]t is the duty of the Attorney General to maintain the secrecy of all evidence, testimony, documents, work product, or other results of civil investigative demands pursuant to section 542.28(9), Florida Statutes."

289.    Furthermore, the settlement agreement provided that Fieldale would produce "For Gus Arrendale [Fieldale CEO, and Georgia Dock Committee Member], Sammy Franklin, Joe Hatfield, and Tom Hensley, any hard copy or electronic contact information for individuals who worked at other Defendants or Co-Conspirators between 2007 and the present."  Arrendale, Franklin, Hatfield and Hensley would also be required to produce signed authorizations for "any phone number used … for the period from January 1, 2007 through September 2, 2016, to communicate with employees of other Defendants or Co-Conspirators, including cellphones, office phones, and if applicable, home phones."

290.    The Fieldale Farms settlement was preliminarily approved by Judge Durkin on August 18, 2017.

291.    Several other defendants, Peco Foods, Inc., George's, Inc., George's Farms, Inc., and Amick Farms, LLC, have similarly agreed to settle their claims, and those settlements were preliminarily approved in December, 2019.

292.    On October 17, 2017, the antitrust plaintiffs filed a Motion to Expedite the Briefing Schedule and Memorandum of Law in Opposition to Defendants' Motion to Stay Production Obligations Imposed by Plaintiffs' Subpoenas Served on Third Parties.  According to their brief, the "production subpoenas to phone carriers s[ought] highly relevant evidence of direct communications among Defendants' employees who participated on the Georgia Dock Advisory Committee ("Advisory Committee") based on evidence of such communications obtained to date, in part through Rule 45 subpoenas for phone records of Settling Defendant Fieldale Farms, to which no party objected."  Moreover, "Plaintiffs' continuing investigation and analysis of documents from the Georgia Department of Agriculture and United States Department of Agriculture strongly support Plaintiffs' allegation that the Advisory Committee

was a vehicle for certain Defendants to facilitate the alleged conspiracy by communicating with one another to discuss Broiler prices."  More specifically, internal documents showed that "members of the Advisory Committee would hold conference calls to vote on whether the Georgia Dock price should be adjusted," and that "members of the Advisory Committee met with one another frequently and maintained phone directories of each member's contact information throughout the class period, dating back to at least February 6, 2007."

293.    Internal GDA documents attached to the brief show that as of May 23, 2014, the eight members of the Georgia Dock Advisory Committee were: Jayson Penn of Pilgrim[9], Gus Arrendale of Fieldale, Vernon Owenby of Tyson, Dave Tolbert of Koch Foods, Steve Clever of Wayne Farms, Jerry Lane of Claxton Poultry, Pete Martin of Mar-Jac Poultry, and Mike Welch of Harrison Poultry. A May 28, 2014 email from Arty Schronce to all Advisory Committee members explained that there was a request to re-evaluate the dock and submitted a call-in phone number "for a conference call to vote on this."  Later that evening, a subsequent email from Schronce to the Committee memorialized that the Advisory Committee "voted to re-evaluate the Georgia Dock Price on Whole Birds" and that Schronce "will be contacting [REDACTED] company representatives to get their offering prices."  These emails show parallel action by the Advisory Committee members to collectively set the Georgia Dock price.

294.    The antitrust plaintiffs' brief also explained that based on the "one year of records for a handful of Fieldale Farms phone numbers and a longer period of three Fieldale executives' cell phone records," which were obtained through the Fieldale settlement agreement, "it is clear that Advisory Committee members communicated directly with one another by telephone."  The brief points to nearly a full page worth of specific phone record detail, but that information is

_____

[9] GDA internal emails showed that Jayson Penn was also an Advisory Committee member as of September 7, 2012 and March 21, 2016.  Bill Kantola of Pilgrim was an Advisory Committee member from 2007 to 2008.

redacted.  These records show that high-level communication by and between senior executives of the eight participating members of the Advisory Committee.  Indeed, in ruling on the motion, Judge Durkin held that "[i]n light of the evidence cited by Plaintiffs regarding communication by telephone among the members of the Georgia Dock Advisory Committee, there is a benefit to ensuring all relevant phone numbers are identified in time to preserve discoverable records."

295.    Separately, the antitrust plaintiffs' brief states that antitrust defendants, including Pilgrim specifically, "allowed phone carriers to continue destroying their records," which are unquestionably relevant and would have potentially implicated them in the conspiracy. Specifically, "Pilgrim's Pride refused to take steps to preserve its CFO Fabio Sandri's cell phone records for a year, and only notified Plaintiffs of this fact a few weeks ago, which allowed a year of records to be destroyed by T-Mobile's rolling auto-deletion of records in the interim before Plaintiffs themselves could serve a preservation subpoena on the relevant phone carrier."  The brief attached as an exhibit a September 28, 2017 email noting Pilgrim's Pride's counsel's refusal to ensure preservation of Defendant Sandri's cell phone records.

296.    Finally, the antitrust plaintiffs' brief notes that "Plaintiffs have information that Mr. Pilgrim, a Board Member at Pilgrim's Pride during the early part of the class period [which begins in January 2008], made a statement concerning the scope of Defendants' agreement to illegally restrict Broiler Chicken supplies in the United States that was overheard by a witness previously subpoenaed by Plaintiffs." This information would support Pilgrim's participation in, and high level executive knowledge of, the conspiracy at the onset of the relevant period when Plaintiff alleges Pilgrim and its co-conspirators began restricting their production.

297.    On November 20, 2017, Judge Durkin entered a 92-page Memorandum Opinion and Order denying the antitrust defendants' motion to dismiss plaintiffs' Sherman Act claims.

Judge Durkin held "that Plaintiffs have plausibly alleged parallel conduct," and "reject[ed] Defendants' contention that the alleged conduct is too varied in the timing and methods."  The Judge Durkin also held "that the alleged factual circumstances plausibly demonstrate that the parallel conduct was a product of a conspiracy," and "reject[ed] Defendants' argument that the conspiracy as alleged would not be in the interests of all conspirators."  Moreover, Judge Durkin determined that "the facts included in the complaint are sufficient to plausibly infer formation and communication," and that "the extent of information sharing through Agri Stats is unusual, and plausibly amounts to a method of communication."  Additionally, "Defendants' public statements of intent to cut production are indicative of an agreement considering the commodity nature of Broilers."  Ultimately, Judge Durkin found that "[t]here is simply too much unusual market movement, unusual public statements, unusual information sharing through Agri Stats, and a coincidence of business strategies that make dismissal of Plaintiffs' claims at this point in the case inappropriate."

298.   Judge Durkin's opinion singled out Pilgrim and specifically rejected arguments that plaintiffs did not sufficiently allege that the Company reentered the conspiracy after emerged from bankruptcy:

> Pilgrim's argues that Plaintiffs have failed to plausibly allege that it reentered the conspiracy after its bankruptcy discharge.  The Court disagrees.  Plaintiffs allege that Pilgrims announced production cuts in February 2009; announced the closure of three processing plants in February 2009; attended various industry meetings and trade association meetings through the remainder of the relevant time period; joined the shift to variable price contracts; closed a plant in July 2011; made statements indicative of knowledge of an agreement; and closed another plant in June 2012. For reasons explained generally in addressing Defendants' argument against Plaintiffs' conspiracy allegations, these allegations are sufficient to allege that Pilgrim's rejoined the conspiracy after its discharge.

(citations omitted).

## XI.   ADDITIONAL INDICIA OF SCIENTER

267.299.     Numerous additional facts support the strong inference that Defendants made materially false and misleading statements and omissions, at minimum, with reckless disregard for the truth.

268.300.     First and foremost, the nature of the supply- and price-rigging scheme alleged supports a finding of scienter, in that it could not be orchestrated without the knowledge and approval of Defendants Lovette and Sandri and other high ranking Pilgrim executives.  In order to manipulate the price of a major commodity on a national scale, Pilgrim not only had to take many actions that, done unilaterally, ran contrary to mainstream economic theory—such as destroying inventory, limiting production through reduced breeder flocks, exporting at decreased profit margins—which could not have been done without approval of Defendants Lovette and Sandri, but to do these things in coordinated fashion with other Broiler producers required high-level executive interaction.  Furthermore, the stakes for engaging in this anticompetitive behavior were incredibly high, and could cost the Broiler industry an enormous sum in penalties.  Simply put, this is not the type of scheme that could have been carried out by a handful of rogue employees without the knowledge and approval of the Company's most senior officials.

269.301.     Second, Pilgrim's lightning-fast resurgence from its 2008-09 bankruptcy to achieve record profits in the Class Period, despite the fact that the single most devastating market condition to which the Company attributed its plunging revenues prior to the bankruptcy—soaring feed costs—did not improve until 2015, further supports a strong inference of scienter.  On a July 29, 2008 conference call, just months before the Company declared bankruptcy, Pilgrim's former CEO Clint Rivers stated that the Company's reported net loss of $48.3 million and "year-over-year decline in profitability can be attributed to two factors. Dramatically higher feed ingredient costs and sales prices that were insufficient to offset these

higher costs. . . . [A]t this time there is still too much breast meat available to drive marke[t] pricing significantly higher." Indeed, throughout 2008 and 2009, industry financial analysts and other company executives regularly attributed poor earnings and industry stress to high feed prices.

270.302.    But, as Pilgrim emerged from bankruptcy and immediately began posting better profit margins, feed ingredient prices had not gone down, but were actually increasing. For example, as feed ingredient prices rose by 40-50% between 2008 and 2014, Pilgrim's profit margins increased from a -5.3% loss in 2008 to a 16.2% record profit margin in 2014. Pilgrim did not change its business after the bankruptcy. Rather, the only change in the industry was a massive, coordinated cut in production, which Defendant Lovette and other poultry producer executives lauded during this time. Thereafter, even as feed prices fell between 2014 and 2016, Pilgrim did not ramp up production as it would have previously done, nor did other poultry producers. The manner in which Pilgrim's financial health decoupled from the single-most important cost input in the poultry industry, even after the Company had attributed its bankruptcy to that factor, lends further support to the finding that Pilgrim and its executives used anticompetitive methods to sustain low production levels and maintain high Broiler prices.

271.303.    Third, Defendants Lovette and Sandri, Pilgrim's two highest ranking executives, professed knowledge of the very information that is alleged herein to have been materially false and or misleadingly conveyed to the market. For example, both Lovette and Sandri fielded questions from analysts regarding the Company's new financial stability and both pointed to product "mix and operational improvements." Defendant Sandri also directly attributed the Company's improved financials to Pilgrim's "pricing strategy," without addressing the price-fixing scheme: "Our EBITDA margin [was] 9.6% for the quarter and 9.5% for the

year, clearly demonstrating benefit of pricing strategy and the portfolio brand and mitigation effect against volatility in the chicken market."   Furthermore, Defendant Lovette reassured the market that he could accurately forecast market conditions and the Company's financial position going forward, while publicly admitted that he reviewed Agri Stats data and came to the conclusion that the industry would maintain its supply "discipline," stating: "And then I looked at some numbers supplied by AgriStats earlier in the week and found some interesting facts….So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side…." Thus, either Defendants Lovette and Sandri had the knowledge they professed to have, in which case their statements were knowingly false or misleading when made; or, they did not have such knowledge, and were at the very least reckless in making those statements to the investing public without proper basis.  Either way, their conduct supports a finding of scienter.

272.304.        Beyond their roles as CEO and CFO, Defendants Lovette and Sandri were both in a position to know the details of the price-fixing scheme and had personal interaction with other companies' senior executives.  Prior to being appointed Pilgrim's CEO, Lovette was President and COO of Case Foods, spent 25 years at Tyson in various roles including President of Food Service, and served on the Board of Directors at Cobb-Vantress and Tyson de Mexico, in addition to serving in various different leadership capacities on poultry-related organizations with other poultry senior executives, such as the NCC and the U.S. Poultry & Egg Association.  Aside from the use of Agri Stats to monitor other companies' operations, these organizations gave him the necessary access to other decision-making executives to agree upon the supply- and price-fixing scheme alleged herein.  Defendant Sandri also served on the board of the USAPEEC with top executives from Tyson, Sanderson, Perdue and other companies.  Furthermore, Sandri, who had previously served as CFO of two different companies, came to Pilgrim in the wake of

its bankruptcy and would have known (and said he knew) what was driving the company's improved profit margins.

273.305.    Fourth, chicken is Pilgrim's entire business.   According to Pilgrim's annual reports, the Company only "operate[s] in one reportable business segment, as a producer and seller of chicken products we either produce or purchase for resale in the U.S., Puerto Rico and

Mexico."   Because revenue from chicken operations is the only driver of the Company's performance and the value of its stock, Pilgrim investors and financial analysts were laser-focused on the Company's representations regarding its financial and operational stability, industry conditions, and market forces affecting Pilgrim, especially during the Class Period, soon after the Company had emerged from a bankruptcy.  Defendants were keenly aware of this and, as discussed above, Defendants Lovette and Sandri often expressed their specific knowledge and insight into the minutia of the Pilgrim's chicken operations, the key drivers behind the Company's financial results, and the operations and impact of other poultry producers in the industry.  The Broiler price manipulation undertaken by Pilgrim and other industry participants fundamentally changed Pilgrim's performance from a company bankrupted by the financial pressures of a boom-and-bust cyclical industry to a company enjoying double-digit profit margins for an unprecedented four years straight, with two of those years seeing some of the highest feed costs in over a decade, which was the very market condition that torpedoed Pilgrim into bankruptcy in the first place.  These facts strongly support a cogent and compelling inference that Defendants Lovette and Sandri, the two highest ranking officers of Pilgrim, the second largest poultry producer in the United States, were aware of the undisclosed industry-wide Broiler supply and price-fixing agreement and Georgia Dock price manipulation discussed

in detail herein.

306.    Fifth, Pilgrim's Class Period Code of Conduct dated July 2014 specifically warns Company employees not to engage in the very behavior alleged herein, specifically acknowledging the inherent illegality of such anticompetitive behavior.  Specifically, the Code of Conduct states:

> [I]n order to comply with the antitrust laws and our policy of fair competition, employees should never engage in any of the following examples of unfair competitive behavior:
> 1) Discussing with competitors any matter directly involved in competition between us and the competitor (e.g., sales practices, marketing strategies, market shares, and sales policies).
> 2) Agreeing with a competitor to restrict competition by fixing prices….

307.    Sixth, Defendants Lovette and Sandri both profited from Pilgrim's artificially inflated stock price during the Class Period through insider stock sales, which, according to Forms-4 filed with the SEC, were suspiciously timed and unusual compared to non-Class Period trading practices.  After being awarded 200,000 shares of common stock when appointed CEO in January 2011, Defendant Lovette did not sell a single share until after the beginning of the Class Period, when on November 11, 2014, with the stock trading ten times higher than in August 2011, he sold 24,250 shares at $30.30 for proceeds of $734,775.  Then, on February 20, 2015, Lovette sold another 90,690 shares for proceeds of $2,499,416.  Neither of these trades were executed pursuant to a 10b5-1 disclosure plan.

308.    Similarly, Defendant Sandri did not sell any stock from the time he was hired at Pilgrim until after the beginning of the Class Period, when he executed three transactions: 1) on August 6, 2014, he sold 30,000 shares at $29.02 for proceeds of $870,465; 2) on February 20, 2015, he sold 30,657 shares at $27.57 for proceeds of $845,109; and 3) on February 23, 2015, he sold 25,400 shares at $27.55 for proceeds of $699,770.  These latter two transactions divested

45% of Sandri's total common stock holdings.  None of Defendant Sandri's trades were executed pursuant to a 10b5-1 disclosure plan.

274.309.    Defendants acted with scienter in that each Defendant knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and, knowingly or recklessly disregarded, and/or substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants Lovette and Sandri participated in the fraudulent scheme alleged by virtue of their receipt of information reflecting the true facts regarding Pilgrim, their control over the Company's alleged materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Pilgrim and the Company's collusive efforts and price manipulation scheme.

## XII.   ADDITIONAL SUPPORT FOR FALSITY AND SCIENTER: PILGRIM AND OTHER BROILER PRODUCERS MANIPULATE PRODUCTION AND SUPPLY FROM 2008-2016

### A.  The Broiler Industry Begins Coordinated Production Cuts in 2008

275.310.    In 2007 and into early 2008, the poultry market suffered a particularly difficult trough in the boom and bust cycle, where the market was oversupplied with chicken and feed prices were unusually high.  On a January 29, 2008 earnings call, Pilgrim's then-CFO Rick Cogdill explained that the industry was oversupplying Broilers, which was driving down chicken prices.  Cogdill acknowledged that Pilgrim was doing its part to cut production, but called other industry leaders to do their part or prices would remain depressed: "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs.  We were the

leader in cutting production last year to help drive that. . . . [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

276.311.    Later, in the question and answer portion of that same call, Cogdill and an analyst had the following exchange:

> **Pablo Zuanic [JP Morgan]**:  [Y]ou and Tyson have the evidence that your production call [sic] backs lead to significant price improvements last year….Clearly, there are more producers who are not following you.  On my mask [sic], according to the USDA, the industry was up 5% in the December quarter….So, it means that the rest of the industry was up about 9% in the December quarter.  So there is evidence that the rest of the industry is not following you.  You guys are the leaders….

> **Cogdill**:  I think you kind of hit on it there….It's not like we had 5% surplus capacity that we could just reduce our operations and not feel that…I mean we cannot be the ones that are out there continually reducing production, and let other producers capitalize on that.  I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

277.312.    Pilgrim, which had then recently acquired a company called Gold Kist for $1.3 billion, was particularly vulnerable financially given their debt level, even though they were the second largest chicken company in the country at the time. Over the next several months, Pilgrim continued to cut its production, closing processing plants, and implored others to do the same.  On March 12, 2008, Pilgrim's then-CEO Clint Rivers publicly announced massive closures at its processing plants, stating: "we believe [these] actions . . . are absolutely necessary to help bring supply and demand into better balance."

278.313.    Previously, as normal supply and demand would dictate, other Broiler producers would jump on the opportunity to fill the massive supply void left by Pilgrim's cut-backs.  Starting in 2008, however, something strange happened: other companies cut back production as well.  Indeed, in the month following Pilgrim's March 12, 2008 announcement, a

number of companies, including Pilgrim, announced production or processing cuts of their own:

- April 3, 2008: ~~Fieldade~~Fieldale Farms ~~(announced a~~ 5% ~~production~~ cut~~);~~. Executive Vice President Thomas Hensley stated that "We're hoping this cut puts supply and demand back into better balance.";

- ~~April 9, 2008: Simmons Foods (6% cut);~~

- April 9, 2008: Simmons Foods announced a 6% production reduction across all of its processing plants. BMO Capital Markets stated in a note to investors that production cuts from smaller Broiler companies like Simmons would be positive for pricing;

- April 10, 2008: Cagle's Inc. ~~(announced a~~ 4% ~~cut):~~reduction in processing of Broilers.);

- ~~April 14, 2008: Pilgrim (5% cut);~~

- April 14, 2008: Pilgrim announced "plans to reduce weekly chicken processing by approximately 5% in the second half of fiscal 2008 when compared to the same period a year ago as part of its continuing effort to better balance supply and demand….";

- April 3-11, 2008: Wayne Farms, O.K. Foods, and Koch Foods ~~(each announced~~ 2-8% cuts).

314.   According to Sanderson Farms CEO Joe Sanderson, other companies made cuts during this time, but did not announce them.  At a BMO Capital Markets Conference on May 28, 2008, Sanderson stated that "we have seen for the last 6 or 7 weeks . . . some companies in our industry announce cutbacks.  There have been I think six companies have announced cutbacks.  I know some companies have cut back and have not announced."  The fact that Sanderson knew about non-public production cuts by competitors strongly suggests secret communication among Broiler producers.

~~279.~~315.   The industry production cuts did not go unnoticed by financial analysts covering the market.  On April 29, 2008, during Tyson's second quarter fiscal 2008 earnings call, one such noted the industry's trending production cuts, and Tyson CEO Dick Bond,

responded by saying: "You are right.  I think the industry has changed.  Diane, I don't think the industry will be up that much anymore, we have seen some sizable declines here lately in egg sets and placements."

~~280.~~316.      Nevertheless, Pilgrim called for more production cuts from its fellow Broiler producers.  At the BMO Capital Markets Third Annual Ag & Protein Conference, which was attended by Sanderson Farms CEO Joe Sanderson and CFO Mike Cockrell, Tyson CEO Richard Bond, and Pilgrim then-CEO Rivers and then-CFO Cogdill, Rivers announced that he hoped to see the Broiler industry continue its production cuts, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets."

~~281.~~317.      The *Wall Street Journal* published an article on May 21, 2008, entitled "Chicken Producers in Price Pinch," which also acknowledged a trend change in industry production.   The article stated that "[t]hree things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article went on to further note that "[i]t is unusual for egg sets to decline at this time of the year."  Egg sets typically increase around May in order to produce more chicken meat for the summer grilling season.

318.    On June 20, 2008, Agri Stats' subsidiary EMI issued a report noting that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce Broiler production and will result in slaughter falling below year-ago by mid-June."  The report went on to state that "[t]hose who have announced cutbacks indicate they will continue until

margins normalize.  At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."

~~282.~~319.          Throughout the summer of 2008, companies were calling for more cuts, and the market delivered:

- June 23, 2008: Wayne Farms announces additional 6% production cut only three days after Agri Stats report.

- July 2, 2008: Foster Farms announces abandonment of plan to build a new Broiler plant in Colorado that it had previously announced would employ about 1,000 people.  .

- July 7, 2008: O.K. Foods announces 7.5% reduction in egg sets.

- July 31, 2008: Tyson cancels contract with Petit Jean Poultry for processing of Broilers in Buffalo, Missouri, later telling the City of Buffalo that no amount of incentives would cause it to renew its contract

- August 11, 2008: Pilgrim announces ~~closure~~idling of processing plant in Clinton, Arkansas, and processing facility in Bossier City, Louisiana. The press release cited "an oversupply of chicken on the market" and "the continued imbalance in supply and demand in the U.S. chicken industry" as its rationale behind the actions.  The Company stated that "[w]hen completed, the idling of the Clinton processing plant will result in an approximate 1.25 percent incremental increase in the company's previously announced production cutback heading into the fall."

- August 2008: House of Raeford announces 5% reduction of Broiler production., stating that "[t]he current obstacles that face our industry require that supply be brought in line with demand."

~~283.~~320.          Shortly after the NCC held its annual meeting on October 2, 2008, Poultry News published an article on October 13, 2008 quoting Pilgrim spokesperson Gary Rhodes commenting on decreased egg placements, saying, "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."  The article also quotes Perdue president, Jim Perdue, saying that the industry has "been seeing about a 3 to 4 percent drop, but 3 percent isn't enough….[i]n the first quarter 2009,

I think we'll see a rise in prices...."

321.     Earlier in 2008, Pilgrim retained consultant Bain & Company ("Bain") to analyze its business operations, and Bain outlined strategy for Pilgrim to help reshape the dynamic of the Broiler industry by working to raise Broiler prices.   According to Magistrate Judge Everingham's Findings of Fact and Conclusions of Law entered on September 30, 2011 in *Adams v. Pilgrim's Pride Corp.*, 09-cv-397 (E.D. Tex.) (the "Fact Findings"), Bain's "Project Alpha Business Plan" predicted that with systematic production reductions, "chicken prices could jump 30% over the next 12 months."  The Fact Findings quoted the Bain Plan as noting that in an effort to 'move prices up, [Pilgrim] closed 3 production facilities and 7 [Distribution Centers] and has taken down volume across the system.'"   Further, Magistrate Everingham found that "[o]n November 18, 2008, Bain made a presentation to PPC that outlined a strategy to close certain plants to reshape the industry dynamic.  The purpose of the presentation was to impress upon PPC's management that it needed to take action to curtail the supply of chicken and apply a proactive stimulus to the market to raise prices.  Bain compared the present situation to the situation in other industries, such as the containerboard and aluminum industries.  Bain noted, for example, that when the containerboard industry closed 6% of its capacity in 1999-2000, prices jumped more than 40%."

322.   According to Judge Everingham's Fact Findings, the Bain plan to reduce the national supply of chicken remained in effect for 2009:

PPC hired Don Jackson as its President and CEO on January 27, 2009, replacing the former CEO and COO. Jackson worked with existing management to outline a business strategy to enhance financial performance. Although PPC eventually relieved Bain of some of its advisory services, vestiges of the Bain plan remained in place after PPC hired Jackson and remained during PPC's reorganization efforts. Bain employees continued to communicate with PPC employees concerning Bain's recommendations that idling certain plants would have a positive effect on pricing. Both Lazard & Freres Co., in its FY 2009 Operating Budget, and Moelis & Company, in a March 2009 presentation to the

Unsecured Creditors Committee, stated that "[o]ne key objective of this plan is to remove commodity meat from the market and address ~5% oversupply." Phase II of the plan required idling of three facilities immediately. These facilities were located in Douglas, Georgia, Farmerville, Louisiana, and El Dorado, Arkansas. Douglas and El Dorado were both commodity chicken production plants. Farmerville was a prepared food plant. PPC's efforts to affect market price by sharply curtailing the supply of chicken were therefore not limited to Bain's presentations.

323.   Tellingly, both Lazard and Moelis were contemporaneously involved in the 2009 bankruptcy reorganization of Smurfit-Stone Container Corporation ("Smurfit"), a large containerboard company named as a defendant in *Kleen Products LLC et al v. International Paper et al*, No. 1:10-cv-5711 (N.D. Ill. 2010). In *Kleen*, Judge Milton I. Shadur held that plaintiffs successfully pleaded antitrust claims against Smurfit and its co-defendants where plaintiffs alleged that the defendants agreed to restrict the supply of containerboard by cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory. Thus, Bain advised Pilgrim to follow the containerboard's industry's example in reducing capacity in order to reap massive increase in prices, but those same practices resulted in antitrust violations.   And notably, Lazard and Moelis contemporaneously offered the same business plan to Pilgrim and Smurfit coming out of bankruptcy, which was to illegally restrict supply in order to raise prices and boost revenue.

284.324.   Thereafter, Wayne Farms announced the closure of a Georgia production plant on October 18, 2008 and Sanderson later announced on December 4, 2008 that it had implemented a series of production cuts in the preceding months.

285.325.   The production cuts were not enough to save Pilgrim from its immediate financial crisis, and in December 2008, Pilgrim filed for bankruptcy.  According to Pilgrim's Director of Corporate Marketing from 1987 to March 2016, the bankruptcy allowed for Pilgrim to close plants, and thus when the Company emerged from bankruptcy a year later under a deal

that sold a majority stake of the Company to the Brazilian meat giant, JBS SA for $800 million, Pilgrim emerged with substantially reduced production.

286.326.        Production cuts continued through the first couple months of 2009.  News of the cuts, like the previous year, came after a major industry function, which in this case was the January 28-30, 2009 International Poultry Expo:

- February 2009: WATT Poultry USA reports that "[a]t least 11 companies reported reductions in weekly ready-to-cook production"

- February 18, 2009: Tyson former CEO Donnie Smith states: "Across our industry, we're down about six percent versus where we were a year ago."  He also stated that the coordinated cuts were having a positive effect, noting that Tyson was "seeing an impact from that on market prices [and] the industry fundamentals are improving."

- February 25, 2009:  The Poultry Site published article attributing statements to Sanderson that it had made cuts to production and was running plants at lower capacity, noting that any further "chicken market improvement will have to come from supply cuts."  Article also quotes Simmons Foods CEO saying, "[w]e have made adjustments in bird weights to ensure our production meets with our customer's needs."

287.327.        During the first two months of 2009, Pilgrim made historically large cuts to production (9-10%) and on February 27, 2009, announced the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, saying that the closures would "improve the company's product mix by reducing commodity production and significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession."

328.    With regard to the Farmerville plant, Judge Everingham noted that "[i]n March, 2009, the Governor of Louisiana announced his effort to have a third party purchase the Farmerville plant," and "PPC responded to the State of Louisiana's actions by threatening the closure of its complex in Natchitoches, Louisiana."  Judge Everingham concluded that "[u]nless

PPC's overriding motive was to curtail supply to force prices to rise on the national chicken market, it should have made no difference to PPC that the Governor of Louisiana was attempting to broker the sale of one of PPC's unprofitable facilities."

329.   Judge Everingham's also found that "PPC's idling of the El Dorado plant was done for the purpose of manipulating or controlling the price of chicken." (citing Dkt. No. 283, Tr. Transcript July 11, 2011 AM Session, at 46-47).  Specifically, Judge Everingham found that former Pilgrim President and CEO Clint Rivers wrote a letter to El Dorado growers on May 6, 2008, stating that "[w]e're also cutting production to balance supply and demand, which should lead to an increase in market pricing."

### B. Coordinated 2008 and 2009 Production Cuts Lead to Unprecedented Reductions in Broiler Breeder Flocks and Increased Broiler Prices

288.330.   Historically, Broiler producers would avoid any actions that would impact future production, as that would leave them unable to capture the opportunity when market conditions improved and therefore result in a competitive disadvantage.  The production cuts made by companies in 2008 and 2009, however, did just that.  Instead of simply limiting the pounds of Broilers they produced, USDA data on Broiler breeder flock populations indicates that producers also limited their ability to ramp up production in the future by reducing breeder flock numbers further up the supply chain.  By reducing the size of breeder flocks (by both terminating breeds at an early age and reducing purchases of Breeder pullets from genetics companies), all stages of the Breeder production cycle are correspondingly reduced in supply.  This approach had never been taken in the past, because it can take a year or more to reverse the effects of such actions.  By that time, a price spike would have likely passed and other companies would have filled the supply gap.

289.331.   Broiler breeder flocks actively lay eggs for 65 weeks, producing about 140

eggs per year, which are incubated at hatcheries owned by the producer companies, such as Pilgrim. As mentioned above, those breeders are created from a small number of grandparent Broilers from only three Broiler genetic companies: Cobb-Vantress, Aviagen, and Hubbard. These genetic lines ensure that the chicken produced maximize profits, yielding the most meat possible. Reduction of breeder flocks would in turn cause the genetic companies to reduce supplies of grandparent flocks at the very top of the production chain.

290.332.     Thus, by reducing the size of Broiler breeder flocks, the Broiler producers could force genetics companies to reduce their own flocks of grandparents, which in turn would increase the time to materially increase the supply of Broilers for 1-2 years.

291.333.     The data in the chart below shows that in mid-2008, when breeder populations were experiencing their natural decline, the industry as a whole bucked the historical trend and chose not to replenish them, and in fact made even more cuts to breeder flocks as the year went on, bringing populations to historic lows by the end of the year. In fact, after these 2008-09 supply cuts, the Broiler industry has never allowed breeder flocks to come close to reaching the levels to which they consistently replenished the flocks between 2000 and 2007.



Source: National Agricultural Statistical Service, U.S.D.A., https://quickstats.nass.usda.gov/

292.334.     The enormous supply cuts of 2008 and the first couple months of 2009 caused Broiler prices to rise to all-time highs by mid-2009, despite the fact that the U.S. was in the midst of the worst economic recession since the Great Depression.

293.335.     By the end of 2009, Pilgrim was able to emerge from bankruptcy through a sale of a majority stake to JBS, and other Broiler producers were announcing strong financial results based on the vastly improved industry environment.

294.336.     On January 27, 2010, industry leaders met at the International Poultry/Feed Expo in Atlanta, during which Agri Stats vice president and economist Mike Donohue spoke during the "Poultry Market Intelligence Forum."   Donohue noted that coordinated production cuts were having their intended effect, explaining that "2009's

outstanding live Broiler performance can be attributed to increased downtime between Broiler flocks, which was a result of production cutbacks."

295.337.    While executives from Pilgrim and other Broiler companies continued to meet and confer with one another at trade association meetings and industry events over the course of 2009 and 2010, production of Broilers began to tick up in response to continued rising prices.  By the end of 2010, a reported oversupply resulted in depressed prices, which in turn led to a swift new round of coordinated production cuts by Broiler producers in the first half of 2011 that caused prices to promptly recover.

## C. Pilgrim and Its Industry Counterparts Coordinate a Second Round of Production Cuts in 2011 and 2012

296.338.    After their success in coordinating the 2008-2009 production cuts and reaping the benefits of the resulting high Broiler prices, Pilgrim and other industry participants were quick to coordinate another round of supply cuts when prices began to perk up in 2010 and early 2011.

297.339.    Shortly after Defendant Lovette was appointed CEO of Pilgrim, Agri Stats executives made an announcement during the 2011 International Poultry/Feed Expo on January 26-28, 2011 that called for dramatic production cuts.  Specifically, Mike Donohue championed the industry's response in 2008 and 2009 to limit production, but cautioned that slaughter volumes were again increasing.  Agra Stats economist Paul Aho added that the "[t]he market is calling for around a 5% reduction in chicken production."

298.340.    Just like in 2008 and the early part of 2009, the market responded in swift, coordinated fashion to reduce their supply, with reduction announcements taking place soon after a number of different conferences where executives would have met and consulted.  For example, soon after the January 26-28, 2011 International Poultry/Feed Expo, the following

actions were announced:

- February 16, 2011: Cagle's Inc. (20% reduction at a deboning operation); stated during the Company's earnings call that it had begun a 20% reduction at a deboning operation in an effort to balance supply and demand.  Company also explained that it was "optimistic that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins.";

- February 24, 2011: Sanderson Farms (announced on the Company's earnings call that it delayed plant construction); of a second complex in North Carolina;

- March 7, 2011: House of Raeford (announced a 10% reduction); in egg sets that began the previous month, with CEO Bob Johnson stating, "[h]opefully chicken prices will begin to increase later this year.";

- March 15, 2011: Simmons (announced that a 180 worker layoff). at its Siloam Springs, Arkansas processing plant, explaining that "we have decided to realign some of our production resulting in the elimination of 180 positions as of April 15.".

299.341.      On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at Brasstown Valley Resort in Georgia, attended by executives from top Broiler producers.  Shortly thereafter, on April 15, 2011, Mountaire Farms announced that it was abandoning a planned 3-5% capacity increase.  Explaining the move, Mountaire President Paul Downes stated: "The only way to higher prices is less supply.  The only way to less supply is chicken companies will shut down or cut back."

300.342.      On May 1-3, 2011, executives attended Urner Barry's Annual Executives Conference and Marketing Seminar at the Bellagio Casino in Las Vegas, which included a golf outing at a local golf course, and a keynote address by Tyson CEO Donnie Smith.  Then, two weeks later, on May 17-18, Defendant Lovette, Tyson CEO Donnie Smith, Sanderson CEO Joe Sanderson and others attended the BMO Farm to Market Conference, in which Defendant Lovette gave a presentation noting Pilgrim's shift away from fixed-rate contracts to market-

based pricing, a move that Tyson announced in the wake of the 2008-09 cuts in an effort to benefit from rising prices going forward. Lovette also spoke to Pilgrim's focus on matching production to forecasted demand.

301.343.    A week after the BMO conference, on May 24, 2011, Sanderson Farms CEO Joe Sanderson signaled the company's—and the market's—intention to continue cutting production, stating, "cuts will be forthcoming in our industry based on the losses we see in Agri Stats." Then on a June 6, 2011 earnings call, Cagle's announced that "[t]he industry must lower supply in order to offset reduced demand and to support higher market prices. Cagle's continues to process at 80 per cent of capacity at its Pine Mountain Valley, Georgia deboning facility and does not contemplate any increase in the foreseeable future."

302.344.    Just days after Pilgrim appointed Defendant Sandri as CFO, the USAPEEC—an organization on which Defendant Sandri sits as a board member—held its annual meeting at The Greenbrier America's Resort in West Virginia on June 7-10, 2011, and more production cut announcements ensued:

- June 20, 2011: According to statements made by Tyson's CEO during the company's August 8, 2011 earnings call, Tyson began pulling eggs from incubators on June 20, 2011 to reduce Broiler volumes;

- June 21, 2011: Cagle's announced 300 person layoff at its Pine Mountain Valley, Georgia plant to reduce Broiler volumes.

303.345.    Later that month, on June 27-29, 2011, the U.S. Poultry & Egg Association held a Financial Management Seminar at the Ritz Carlton in Amelia Island, Florida. Defendant Lovette was one of the many presenters who spoke to the group of approximately 150 attendees at the event. The US Poultry & Egg Association has a council called the Poultry Protein & Fat Council, among the current committee members of which are Mark Glover, Pilgrim VP of Operations Accounting, and a number of executives from Tyson, Simmons Foods,

Mountaire Farms, Fieldale Farms, and others.  That same day, Simmons announced layoffs at Siloam Springs, Arkansas plant.

304.346.      On July 29, 2011, two weeks after the 2011 Food Media Seminar that included executive panel members from Tyson, Sanderson, Perdue, and others, Pilgrim announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees. In explaining the cut backs, Defendant Lovette stated: "[W]e must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken."

305.347.      Soon after, during an August 1, 2011 earnings call, Sanderson Farms' CEO stated that "we aren't going to set any more eggs until we pick up a big account or we can't supply our customers' needs. . . . It wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November. .  . . I think the cutbacks may need to be more than the 6% in the head that the industry already has in place."

306.348.      Tyson made an announcement of cuts a week later during its earnings call on August 8, 2011, with CEO Donnie Smith stating: "[W]e cut production in the third quarter, but those cuts have not yet impacted the market."

307.349.      Ten days later, on August 18, 2011, Cagle's announced further production cuts at its Pine Mountain Valley plant, this time by 20%.

308.350.      On October 5-7, 2011, poultry senior executives attended the NCC's 57th Annual Conference.  At the time, Bernard Leonard of Tyson was NCC Chairman, Sanderson Farms CEO Lampkin Butts was Vice Chairman, and Defendant Lovette was Secretary Treasurer. Less than a month later, Defendant Lovette would be promoted to Vice Chairman.  At the event, Mark Kaminsky, COO and CFO of Koch Foods, sat on a panel with senior executives from

Perdue and stated that the industry would be on the "edge of recovery by April 2012, but only after reductions in the supply of chicken have occurred."

309.351.   In the weeks following the NCC conference, between November 17-21, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant, laying off 360 employees, and Sanderson Farms CEO Joe Sanderson responded to a question regarding production decreases by saying, "when we talk about the 4% number, that is what we project the industry to be.  Obviously we're going to be a part of that."

310.352.   Through the end of 2011 to the middle of 2012, Broiler company executives, including Pilgrim executives, met at a number of different conferences:

- December 6-8, 2011: USAPEEC held its annual Council members only winter meeting;, attended by Defendant Sandri and other top Broiler executive council members;

- January 24, 2012: US Poultry's Hatchery-Breeder Clinic;

- January 25-26, 2012: International Poultry and Processing Expo took place in Atlanta, Georgia;

- March 20-21, 2012: NCC Board Meeting; in Washington, D.C.  Notably, Pilgrim's Executive VP of Sales and Operations and Defendant Lovette's "right hand mand" Jayson Penn was elected to the Board on February 1, 2012; and

- April 29-May 1, 2012: Urner Barry Annual Executive Conference.

311.353.   Through correspondence and collaboration at these meetings, a number of production cuts ensued in the late spring and summer of 2012.  For example, on a May 7, 2012 earnings call, Tyson announced a 4% decrease in production through longer days between flocks for its contract growers, as well as increased reliance on its "Buy vs. Grow" program, which it had implemented the previous year in response to reported overproduction in 2010.  As the name implies, the Buy vs. Grow program was a method of decreasing supply of Broilers by purchasing them from its competitors, rather than using the company's own production.  The strategy not

146

only helped absorb excess market supply, but it also allowed Tyson to compensate other Broiler producers for their participation in the price-fixing scheme.  Of course, buying Broilers from competitors is far more expensive than producing them in-house (which is why most all major Broiler producing companies are vertically integrated), so the benefits to Tyson of controlling and limiting Broiler supply and production in the industry, compensating other scheme participants, and raising and maintaining market prices, clearly outweighed the more immediate profit-margin loss.  Indeed, on the May 7, 2012 call, then-COO Jim Lochner explained that to "help keep our production balanced, we bought chicken on the open market rather than growing all the birds we needed."  Tyson's Buy vs. Grow strategy operated as a means of collaborating with competitors to reduce overall supply.

312.354.      Additional production cuts and industry conferences took place during the course of the summer 2012:

- June 6, 2012: Pilgrim announces layoff of 190 employees at its Chattanooga, Tennessee processing plant;

- June 21, 2012: NCC annual summer board meeting in Lake Tahoe, California;

- July 15, 2012: NCC Marketing Committee meeting in Stowe, Vermont;

- August 6, 2012: Tyson CEO Donnie Smith signals that Tyson will maintain production cuts taken the prior year and notes that "we like our production model being well short of demand."

- August 28, 2012: Sanderson Farms announces further 2% production cuts.

313.355.      By September 2012, Pilgrim and other companies' production cuts that started in 2011 were beginning to increase Broiler prices, and would lead to record profits in the years to come.  These actions taken by Pilgrim and nearly every other major chicken producer, demonstrate a level of unprecedented coordination and supply "discipline" in the industry.

Indeed, where Magistrate Everingham had concluded that Pilgrim's closure of the Company's El Dorado plant evidenced an effort to raise Broiler prices justifying a $25.8 million penalty, and the Fifth Circuit vacated that ruling on the grounds that insufficient evidence of industry participation and anticompetitive conduct, the foregoing concurrent supply reductions by numerous Broiler companies armed with Agri Stats data provide powerful indicia of industry wide collusion.

### D. Coordinated 2011 and 2012 Production Cuts Lead to Historical Reductions in Broiler Breeder Flocks and Record Profits for the Industry in 2013 and Into the Beginning of the Class Period

314.356.          Just like the production cuts that took place in 2008 and 2009, the industry did not simply cut the number of pounds of Broilers slaughtered, they greatly reduced the number of Broiler breeders, which in turn meant that Pilgrim and other companies were unable to ramp up Broiler production in the short term to take advantage of elevated prices, even if they wanted to.

315.357.          As seen in the chart below, the industry production cuts in 2011 and 2012 sent Broiler breeder flock numbers down to levels the market had not seen in twenty years, which led to record profits in 2013 and 2014.

148



316.358.    In fact, CW10, Pilgrim's Director of National Sales from July 2012 to August 2015, explained that throughout his/her employment, breeders were in very tight supply. CW10 stated that breeders and the genetics companies control the entire industry.  For example, CW10 explained that with "a little collusion" from other companies, Tyson, because it owned Cobb-Vantress, the largest of the three genetics companies, could control the entire supply line and with it the whole breeder population.

317.359.    On a May 3, 2013 earnings call, Defendant Lovette made a number of comments that spoke to industry coordination in lowering supply, and his knowledge that supply and pricing levels were unlikely to change.  For example, Lovette stated, "we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually

149

shrunk." He also said, "[w]ell, obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained. . . . So I think the industry is doing an admirable job in being disciplined on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying." He further commented that "I believe the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken and not necessarily what corn or soybean meal costs. I think I'm confident to say we've, we figured that out and we're doing a good job of balancing supply and demand."

318.360.    Chicken economics had not changed, however. They were the same as they have always been; the Broiler producers just changed the rules. Where in the past, Pilgrim and other poultry producers were quick to attribute lower profit margins on the high costs of feed, Defendant Lovette was now explaining that feed costs had nothing to do chicken economics, mentioning that "even paying nearly $8.50 for corn, we've been able to be profitable as an industry."

319.361.    During Pilgrim's earnings call a few months later, on August 1, 2013, Lovette again discussed the industry's "discipline" in reining in breeder populations, noting that "it appears the industry remains disciplined to the supply-demand fundamentals necessary for profitability. The breeder supply continues to be managed with disciplined restraint . . . we won't likely go back to the same levels of overproduction that have historically plagued the chicken industry."

320.362.    Other company executives parroted Lovette's optimism. On October 4, 2013, the NCC held its annual meeting in Washington D.C., featuring a panel including Tyson

150

CEO Donnie King, Simmons Foods CEO Todd Simmons, and GNP CEO Mike Helgeson. According to one publication writing about the panel's discussion, the CEO's were "chipper about the prospects for their industry in the next few years."

## XIII.   THE   GRAND   JURY   INDICTMENT   CONFIRMS   AND   PROVIDES EVIDENCE   OF   COORDINATED   ANTICOMPETITIVE   BEHAVIOR INVOLVING PILGRIM AND FALSITY AND SCIENTER

363.    On June 3, 2020, "[a] federal grand jury in the U.S. District Court in Denver, Colorado, returned an indictment against four executives for their role in a conspiracy to fix prices and rig bids for broiler chickens." *See* United States Department of Justice Press Release dated June 3, 2020 ("DoJ Press Release");[10] *see also U.S.A. v. Jayson Jeffrey Penn, at al.*, No. 1:20-cr-00152 (D. Colo.) (ECF No. 1) ("Grand Jury Indictment"). Two of those executives were employees of Pilgrim: 1) Jayson Penn and 2) Roger Austin. *See* DoJ Press Release and Grand Jury Indictment. Penn, who is alleged herein to be Defendant Lovette's right-hand man, was an Executive Vice President at Pilgrim starting in approximately January 2012 and became the President and Chief Executive Office at Pilgrim in approximately March 2019. *See id*. Austin was a Vice President at Pilgrim starting in approximately February 2007. *See id*. The other two men charged were Claxton Poultry President Mikell Fries and Vice President Scott Brady. *See id*.

364.    "According to the indictment, ***from at least as early as 2012 until at least early 2017***, Jayson Penn, Roger Austin, Mikell Fries, and Scott Brady conspired to fix prices and rig bids for broiler chickens across the United States." *See* DoJ Press Release (emphasis added).

365.    Specifically, the Grand Jury Indictment found "that Penn, FRIES, BRADY, and

---

[10] https://www.justice.gov/opa/pr/senior-executives-major-chicken-producers-indicted-antitrust-charges

AUSTIN, together with their co-conspirators known and unknown to the Grand Jury, in the State and District of Colorado and elsewhere, participated in a continuing network of Suppliers and co-conspirators, an understood purpose of which was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States." Grand Jury Indictment, ¶28.

366.    "It was further part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN, together with their co-conspirators, in the State and District of Colorado and elsewhere, utilized that continuing network: a. to reach agreements and understandings to submit aligned, though not necessarily identical, bids and to offer aligned, though not necessarily identical, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States; b. to participate in conversations and communications relating to nonpublic information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; c. to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by, Suppliers and co-conspirators for broiler chicken products sold in the United States." Grand Jury Indictment, ¶29.

367.    "It was further part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN, together with their co-conspirators, in the State and District of Colorado, and elsewhere, discussed protecting, and thereafter acted to protect, the purpose and effectiveness of the conspiracy." Grand Jury Indictment, ¶30.

368.    "It was further part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN,

together with their co-conspirators, in the State and District of Colorado, and elsewhere, sold and accepted payment for broiler chicken products that are the subject of the allegations in this Indictment in the United States through until at least approximately December 2015." Grand Jury Indictment, ¶31.

369.    The Grand Jury Indictment provides detailed telephone and text communications amongst so-called competitors, including Pilgrim, illegally coordinating price submissions to a buyer's cooperative. Grand Jury Indictment, ¶¶32-62.  Among other things, Pilgrim employees conferred directly with employees of other companies and specifically instructed them to raise prices in their bid submissions.  *Id*., ¶35.

370.    For example, the Grand Jury Indictment provides detailed text messages discussing conversations between Claxton Poultry Farms executives and Pilgrim executives in which they are coordinating price submissions, and also discuss the pricing submissions of other suppliers.  At one point, Scott Brady, Vice President at Claxton wrote to Mikell Fries, President of Claxton, saying that Pilgrim executive Austin "said to raise our prices, on wings he is market and market plus .10," to which Fries responded, "Tell him we are trying!"  Brady responded, "Will do." *Id*.

371.    Shortly thereafter, Penn gave Defendant Lovette a spreadsheet of the price submissions from Claxton as well as two other suppliers, prior to Lovette personally signing the agreement with the cooperative on the price of the chicken.  *Id*., ¶¶37-38.  Brady signed an agreement with the cooperative as well, which was within a penny of Pilgrim's pricing.  *Id*. at ¶39.

372.    The Grand Jury Indictment also details numerous other instances during the Class Period, including references to text messages and emails by Lovette, Penn and Austin, whereby

they conspired to fix prices and rig bids for broiler chickens. For example, on October 17, 2014, Penn and another employee of Pilgrim discussed via text message another supplier's offer:

Pilgrim Employee: "Buyer said we were .07 high so that must be [Supplier-3's] price…"

Penn: "They are morons"

373.   Moreover, Penn exchanged a series of emails with other Pilgrim employees on or about November 24, 2014, wherein they discussed the need to protect the purpose and effectiveness of the conspiracy:

   a.   "[Supplier-3] should pay for being short. It costs money for them to fill orders for which they don't have the chickens. They have been adding market share and still trying to do – selling cheap chicken and being short. Doesn't make sense. We are enabling the town drunk by giving him beer for Thanksgiving instead of walking him into an AA meeting."

   b.   "[Supplier-3] is not shorting [Grocer-2]. Note [Supplier-3] just added market share and distribution to [Grocer-2]. They took our business on price. Should we allow [Supplier-3] to not pay for poor decision making?"

   c.   "They need to pay so they start acting appropriately. How do they pay? Their customers need to feel the pain. By not feeling the pain – [Supplier-3] keeps marching along and the customers to [sic] blindly with them."

   d.   PENN forwarded his emails to Defendant Lovette and said: "Thoughts on deli strategy to [Grocer-1-Brand-1]? We are covering [Supplier-3] shortages. Continue and let [Grocer-1-Brand-1] know we are helping or start have [Supplier-3] feel the pain across their system so they can start making decisions commensurate with a profitable venture and not a philanthropic organization?"

e.   Defendant Lovette responded: "No question in my mind. [Supplier-3] should have to live with the decision they made. We made ours and are dealing with it. Why should it be any different for them? We SHOULD NOT HELP THEM ONE MICRON."

f.   PENN responded: "I agree. We are just allowing our competitor to continue their idiotic ways."

Grand Jury Indictment, ¶63.

374.   Another text exchange from October 17, 2014 between Penn and another Pilgrim employee evidences additional collaboration between suppliers in negotiating prices, which Penn expressly acknowledges is illegal:

| PENN | "Who is negotiating with [QSR-3]?" |
|---|---|
| Supplier-1-Employee-3 | "[Supplier-1-Employee-4] and Roger [AUSTIN]" |
| PENN | "Ok. Thanks" |
| Supplier-1-Employee-3 | "We know [Supplier-7], their biggest supplier is 0.02 higher than us and they are not going to negotiate." |
| PENN | "Good deal. Last time they did cave a cent or two with [QSR-1]" |
| Supplier-1-Employee-3 | "They are listening to my direction" |
| PENN | "Who is they?" |
| PENN | "If they is illegal don't tell me" |
| Supplier-1-Employee-3 | "Was referring to roger [AUSTIN] listening. Sorry, thought you were referring to roger [AUSTIN] caving. Got you on [Supplier-7] caving on [QSR-1]. [Supplier-7] might cave but I wouldn't think for our volume and their current." |
| PENN | "[Supplier-3] does the west. Hearing rumors out of them?" |
| Supplier-1-Employee-3 | "Buyer said we were .07 high so that must be [Supplier-3's] price…" |
| PENN | "They are morons" |
| Supplier-1-Employee-3 | ".07 back is in line with where we have priced everybody else but they did not add anything for the cost of doing business with [QSR-3] like us and [Supplier-7] did" |
| PENN | "[Supplier-7] is a solid competitor." |

375.   These allegations and the Grand Jury Indictment thus confirm Plaintiff's allegations of falsity and scienter during the Class Period.

XIV.   **LOSS CAUSATION/ECONOMIC LOSS**

321.376.   During the Class Period, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated the price of Pilgrim's securities and operated as a fraud on Class Period purchasers of Pilgrim stock by failing to disclose the Company's participation in an illegal collusive scheme to manipulate the price and supply of Broilers, and misrepresenting the Company's business operations and financial status. Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed to investors, the value of Pilgrim securities declined precipitously – evidence that the prior artificial inflation in the price of Pilgrim's stock was eradicated.  As a result of their purchases of Pilgrim securities during the Class Period at artificially inflated prices, Plaintiff and other members of the Class suffered economic losses when the truth regarding the collusive scheme and Pilgrim's true business operations was finally revealed and the artificial inflation was removed from price of the Company's stock, *i.e.*, damages under the federal securities laws.

322.377.   Multiple partial disclosures revealed to the market in piecemeal fashion the false and misleading character of Defendants' statements and omissions.  The first partial disclosure came on September 2, 2016, when a group of wholesaler customers of Pilgrim and numerous other Broiler producers filed the *Maplevale* complaint in the Northern District of Illinois, after the close of the market, which included allegations revealing that the defendants participated in an anticompetitive scheme to fix the prices of Broiler chicken.  Accordingly, Pilgrim's stock declined in response to the revelations contained in the *Maplevale* complaint, and

a portion of the artificial inflation caused by Defendants' material misstatements and omissions was removed, thereby causing damage to Lead Plaintiff and the Class. Specifically, the price of Pilgrim's stock fell nearly 3% on above-average trading volume, from $23.54 at close on September 2, 2016 to $22.87 per share at close of the next trading day, and continued to slide over the following week on heavy volume.

323.378.   Second, on October 7, 2016, after the market closed, a veteran industry analyst at Pivotal Research Group covering Tyson issued a report analyzing how the price-fixing scheme as alleged in a September 2, 2016 antitrust lawsuit impacted Tyson's business performance and the strong likelihood that the allegations of the antitrust suit had merit.  This announcement partially revealed the truth concealed by Defendants misrepresentations, as the market absorbed the Pivotal Report's detailed analysis of the potential impact of a price-fixing scheme on Pilgrim's business.  In response to these revelations, Pilgrim's stock price declined from $21.11 at close on October 7, 2016 to $20.16 at close of trading on October 8, 2016, a decline of over 4%, on heavy trading volume.  This disclosure, however, did not reveal the full truth to investors, and Defendants publicly rejected the conclusions reached by the Pivotal Report analyst.

324.379.   Third, on November 3, 2016, *The New York Times* published an article entitled, "You Might Be Paying Too Much for Your Chicken," which provided more detail on Defendants' scheme.   With these revelations more of the artificial inflation caused by Defendants' misrepresentations and omissions was removed, thereby causing further damage to Lead Plaintiff and the Class.  In response to the November 3, 2016 article's revelations, Pilgrim's share price fell from $21.02 on November 2, 2016 to close at $19.31 on November 3, 2016, a more than 8% drop, again on heavy trading volume.

325.380.        Fourth, on November 17, 2016, *The Washington Post* published an article entitled, "If You Thought You Were Paying Fair Prices for Chicken at the Supermarket, Think Again," which shed further light on the collusive scheme of the poultry industry, and more particularly, the Georgia Dock index's susceptibility to manipulation Pilgrim's possible role in manipulating the index.  With these revelations more of the artificial inflation caused by Defendants' misrepresentations and omissions was removed, thereby causing further damage to Lead Plaintiff and the Class.  In response to the November 17, 2016 revelations, Pilgrim's share price fell from $19.64 at the close of trading on November 16, 2016 to $18.61 at the end of the day on November 17, 2016, a decline of over 5% on heavy trading.

326.381.        The foregoing disclosures of true, undisclosed facts concerning Pilgrim's participation in the supply- and price-fixing scheme caused substantial losses to investors, with the value of Pilgrim's securities falling precipitously from $21.11 on October 7, 2016 to $18.61 on November 17, 2016, representing a total market capitalization decline of over $1.1 billion. This decline in the price of Pilgrim's stock at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market.  The timing and magnitude of the price drop of Pilgrim's stock negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraud.


XV.   BASIS OF ALLEGATIONS

327.382.        Lead Plaintiff alleges the following based upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters.  Lead Plaintiff's

information and belief is based on, *inter alia*, the independent investigation of Lead Counsel. This investigation included a review and analysis of the following: (i) regulatory filings with the SEC and press releases made by Pilgrim; (ii) transcripts of Pilgrim's earnings and conference calls with analysts; (iii) information supplied by former employees of Pilgrim, Agri Stats and other companies implicated in the collusive scheme described herein; (iv) records from the Georgia state government; (v) publicly available data supplied by the USDA and private data supplier Urner Barry; (vi) news and investigative reports regarding Pilgrim's public court filings from lawsuits in which Pilgrim is or was a party; (vii) public court filings from lawsuits in which other companies implicated in the collusive scheme herein are or were parties; (viii) publicly available presentations made by Pilgrim; (ix) research reports by financial analysts; (x) economic analysis of the historical price movement and pricing data of Pilgrim's securities; and (xi) other publicly available material and data identified herein.   Lead Counsel's investigation into the factual allegations described herein is continuing, and many of the relevant facts and data are known only by Defendants or are exclusively within their custody or control.  Lead Plaintiff and Lead Counsel believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### ~~.~~XVI.  PRESUMPTION OF RELIANCE

~~328.~~383.      Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are in large part predicated upon omissions of material fact that there was a duty to disclose.  Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose Pilgrim's participation in a collusive scheme to manipulate the supply and prices of Broilers.

~~329.~~384.      Lead Plaintiff is also entitled to a presumption of reliance on Defendants

159

material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine, because the market for Pilgrim stock was open, well-developed, and efficient at all times, for the following reasons, among others:

      (a)      Pilgrim's securities was actively traded on the NASDAQ-GS;

      (b)      Pilgrim's securities had a large average weekly trade volume of multiple millions of shares per week;

      (c)      As a regulated issuer, Pilgrim filed periodic public reports with the SEC;

      (d)      Pilgrim regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      (e)      Pilgrim was followed by multiple financial analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

~~330.~~385.      As a result of the foregoing, the market for Pilgrim securities promptly digested current information regarding Pilgrim from all publicly available sources and reflected such information in Pilgrim's stock price. Under these circumstances, all purchasers of Pilgrim stock during the Class Period suffered similar injury through their purchase of Pilgrim stock at artificially inflated prices and a presumption of reliance applies.

    ~~.~~**XVII.PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY**

~~331.~~386.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there

were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Pilgrim who knew that those statements were false when made.

## XVIII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

332.387.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Pilgrim securities between February 21, 2014 and November 17, 2016, inclusive (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

333.388.     The members of the Class are so numerous that joinder of all members is impracticable. As of March 9, 2017, the Company has 248,752,508 shares of common stock outstanding, and throughout the Class Period, Pilgrim stock was actively traded with an average daily trading volume of over 1.75 million shares.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Pilgrim or its transfer agent and may be notified of the pendency of this action by mail, using the

form of notice similar to that customarily used in securities class actions.

334.389.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

335.390.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

336.391.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements and omissions made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pilgrim; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

337.392.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

XIX.  **CAUSES OF ACTION**

## **FIRST CLAIM**

**For Violations of Section 10(b) of
The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants**

338.393.      Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

339.394.      During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

340.395.      Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

- Employed devices, schemes and artifices to defraud;

- Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

- Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Pilgrim securities during the Class Period.

341.396.      Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Pilgrim publicly traded securities.  Lead Plaintiff and the Class would not have purchased Pilgrim stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

163

342.397.      As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's stock during the Class Period.

### **SECOND CLAIM**

**For Violations of § 10(b) of the Exchange Act and
Rule 10b-5(a) & (c) Against All Defendants**

343.398.      Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

344.399.      During the Class Period, Defendants violated Rules 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Pilgrim securities during the Class Period as alleged herein.

345.400.      During the Class Period, Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

346.401.      Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business practices, operations and financial position of Pilgrim as

specified herein.

347.402.        Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Pilgrim's true financial condition from the investing public and supporting the artificially inflated price of Pilgrim's securities.

348.403.        Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Pilgrim publicly traded securities. Lead Plaintiff and the Class would not have purchased Pilgrim publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for Pilgrim's securities had been artificially inflated by Defendants' materially false and misleading statements.

## THIRD CLAIM

### For Violation of Section 20(a) of
### The Exchange Act Against Defendants Lovette and Sandri

349.404.        Lead Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

350.405.        Defendants Lovette and Sandri used their control over Pilgrim to cause the Company to issue materially false and misleading information in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  By virtue of Defendants Lovette's and Sandri's acts resulting in the issuance by Pilgrim of materially false and misleading statements to the public, Defendants Lovette and Sandri, directly or indirectly, engaged in conduct that was unlawful for Defendants Lovette and Sandri to do under Section 10(b) of the Exchange Act and the rules and regulations promulgated thereunder through another

person, Pilgrim.

351.406.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV.     PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.  Determining that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.  Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.  Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.  Such other and further relief as the Court may deem just and proper.

## XVI.   JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated: May 11, 2017June 8, 2020                    By: /s/ Kim E. Miller
                                                   Kim E. Miller
                                                   J. Ryan Lopatka
                                                   **KAHN SWICK & FOTI, LLC**

250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

*Lead Counsel for Lead Plaintiff George James Fuller and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on ~~May 11, 2017~~June 8, 2020, I filed the Amended Class Action Complaint for Violation of the Federal Securities Laws attached thereto upon all counsel of record by using the CM/ECF system and via e-mail. The CM/ECF system will provide service of such filing(s) via Notice of Electronic Filing (NEF).

/s/ Kim E. Miller
Kim E. Miller

168

# EXHIBIT A

6/7/2020                                    Senior Executives at Major Chicken Producers Indicted on Antitrust Charges | OPA | Department of Justice

 An official website of the United States government
Here's how you know ⌄

**Department of Justice**

Office of Public Affairs

---

FOR IMMEDIATE RELEASE                                                             Wednesday, June 3, 2020

## Senior Executives at Major Chicken Producers Indicted on Antitrust Charges

### First Charges Filed in Ongoing Investigation into Fixing Prices of Broiler Chickens

A federal grand jury in the U.S. District Court in Denver, Colorado, returned an indictment against four executives for their role in a conspiracy to fix prices and rig bids for broiler chickens, the Department of Justice announced.

"Particularly in times of global crisis, the division remains committed to prosecuting crimes intended to raise the prices Americans pay for food," said Assistant Attorney General Makan Delrahim of the Department of Justice's Antitrust Division.  "Executives who cheat American consumers, restauranteurs, and grocers, and compromise the integrity of our food supply, will be held responsible for their actions."

The one-count indictment charges four current and former senior executives from two major broiler chicken producers with conspiring to fix prices and rig bids for broiler chickens.  Broiler chickens are chickens raised for human consumption and sold to grocers and restaurants.

According to the indictment, from at least as early as 2012 until at least early 2017, Jayson Penn, Roger Austin, Mikell Fries, and Scott Brady conspired to fix prices and rig bids for broiler chickens across the United States.  Penn is the President and Chief Executive Officer, and Austin is a former Vice President, of a chicken supplier headquartered in Colorado.  Fries is the President and a member of the board, and Brady is a Vice President, of a broiler chicken producer headquartered in Georgia.

"The FBI will not stand by as individuals attempt to line their pockets while hard-working Americans and restaurant owners are trying to put food on their tables," said Timothy R. Slater, Assistant Director in Charge of the FBI's Washington Field Office.  "Today's announcement shows the FBI's commitment to investigating allegations of price fixing so that the perpetrators can be held accountable."

"Rigging bids and fixing prices hurts consumers and undermines our economic system," said Peggy E. Gustafson, Inspector General of the Department of Commerce.  "We are committed to working with our law enforcement partners to root out those who take advantage of the American public's trust."

"We appreciate the commitment and investigative partnership with the Department of Justice's Antitrust Division, the Federal Bureau of Investigation, and the Department of Commerce, Office of Inspector General," said Special Agent in Charge Bethanne M. Dinkins of the U.S. Department of Agriculture (USDA), Office of Inspector General (OIG). "Ensuring the integrity of competition in agricultural markets in order for producers to receive competitive prices for their products, and to prevent consumers from being cheated, is of the utmost importance to USDA OIG, and we will continue to dedicate resources to the investigation of matters involving such potential of competitive harms."

Penn, Austin, Fries, and Brady are the first to be charged in an ongoing criminal investigation into price fixing and bid rigging involving broiler chickens.

An indictment alleges that crimes have been committed, and all defendants are presumed innocent until proven guilty beyond a reasonable doubt.

The offense charged carries a statutory maximum penalty of 10 years in prison and a $1 million fine.  The maximum fine may be increased to twice the gain derived from the crime or twice the loss suffered by victims if either amount is greater than $1 million.

This case is the result of an ongoing federal antitrust investigation into price fixing, bid rigging, and other anticompetitive conduct in the broiler chicken industry, which is being conducted by the Antitrust Division with the assistance of the U.S. Department of Commerce Office of Inspector General, Federal Bureau of Investigation Washington Field Office, and U.S. Department of Agriculture Office of Inspector General.  Special thanks to U.S. Attorney Jason R. Dunn and Assistant U.S. Attorney Hetal Doshi from the District of Colorado for their assistance.

Anyone with information on price fixing, bid rigging, and other anticompetitive conduct related to the broiler chicken industry should contact the Antitrust Division's Citizen Complaint Center at 1-888-647-3258 or visit www.justice.gov/atr/contact/newcase.html.

---

**Attachment(s):**
Download Indictment

**Topic(s):**
Antitrust

**Component(s):**
Antitrust Division

**Press Release Number:**
20-508

*Updated June 3, 2020*

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No.:     20-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  JAYSON JEFFREY PENN,

2.  MIKELL REEVE FRIES,

3.  SCOTT JAMES BRADY,

4.  ROGER BORN AUSTIN,

      Defendants.

---

## INDICTMENT

---

The Grand Jury charges that:

## <u>COUNT 1</u>

(Conspiracy to Restrain Trade)

1.      Beginning at least as early as 2012 and continuing through at least early 2017, the exact dates being unknown to the Grand Jury, in the State and District of Colorado and elsewhere, JAYSON PENN, MIKELL FRIES, SCOTT BRADY, and ROGER AUSTIN ("Defendants"), together with co-conspirators known and unknown to the Grand Jury, entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States.  The combination and conspiracy engaged in by the Defendants and co-conspirators was a *per se*

unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the Defendants and co-conspirators, the substantial terms of which were to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States.

## I.     BACKGROUND

3.      Broiler chickens are chickens raised to provide meat for human consumption.  Several companies ("Suppliers") produced broiler chicken products in the United States for sale either directly or indirectly such as through a distributor and a distribution center ("DC") to restaurants, grocery retailers, and others.  During the time period of the conspiracy alleged in this Indictment, those Suppliers included, but were not limited to, Supplier-1, Supplier-2, Supplier-3, Supplier-4, Supplier-5, Supplier-6, and Supplier-7.

4.      Restaurants, grocery retailers, and others who purchased large volumes of broiler chicken products generally received bids from or negotiated prices and other price-related terms, including discount levels, with Suppliers directly or, in the case of some fast-food restaurants, also known as quick-service restaurants ("QSRs"), having many independent franchisees, through a centralized buying cooperative.

5.      Some purchasers of broiler chicken products used a "cost-plus" pricing model for 8-piece bone-in broiler chicken products (alternatively called "8-piece COB" for 8-piece chicken-on-the-bone) that varied month-to-month or period-to-period

depending on the price of chicken feed and that also provided Suppliers with a per-pound margin and an "adjustment" that was effectively an additional per-pound margin. 8-piece COB consisted of two breasts, two wings, two thighs, and two drumsticks.

6.　　The price of 8-piece COB often served as a base price for other broiler chicken products.  Dark meat was often priced at a certain number of cents per pound less than, or "back" from, the price per pound of 8-piece COB.  As a result, a smaller number of cents back translated into a higher price for dark meat compared to a greater number of cents back.  For example, "30 back" was a higher price for dark meat than "31 back."

7.　　Prices for broiler chicken products were sometimes tied to a market index, such as the Urner-Barry Index ("UB"), as an alternative.  For example, cases of wings sold in bulk were sometimes priced at the UB per-pound price ("market") and cases of pre-counted wings were sometimes priced at the UB per-pound price plus a specified number of cents per pound ("market plus").

8.　　Bidding and negotiations usually occurred annually toward the end of the calendar year and established prices and other price-related terms, including discount levels, for the following calendar year.  In some instances, however, bidding and negotiation toward the end of the calendar year established prices and other price-related terms, including discount levels, for multiple calendar years.  In yet other instances, bidding and negotiations occurred throughout the year and sometimes established prices and other price-related terms, including promotional discounts, for discrete periods of time.

9.　　Bidding and negotiations often involved weekly volume commitments

3

between Suppliers and their respective customers.  If, in a given week, a Supplier could not meet its volume commitment to a customer, the Supplier could often buy broiler chicken products from another Supplier to cover the shortfall.  Alternatively, the Supplier could "short" the customer by not fulfilling its volume commitment that week.

## II.  DEFENDANTS AND OTHERS

10.    JAYSON PENN was an executive vice president at Supplier-1—located in Greeley, Colorado—starting in approximately January 2012. PENN became the President and Chief Executive Officer of Supplier-1 in approximately March 2019.

11.    ROGER AUSTIN was a vice president at Supplier-1 starting in approximately February 2007.

12.    MIKELL FRIES was a sales manager at Supplier-2—which was headquartered in the State of Georgia— starting in approximately 2004.  In approximately 2012, FRIES was appointed to Supplier-2's board of directors.  In approximately 2016, FRIES became the President of Supplier-2.

13.    SCOTT BRADY was a vice president at Supplier-1 starting in approximately 1999, and a vice president at Supplier-2 starting in approximately August 2012.

14.    Supplier-1-Employee-1 was Supplier-1's President and Chief Executive Officer starting in approximately January 2011 until approximately March 2019. Supplier-1-Employee-1 supervised PENN.

15.    Supplier-1-Employee-2 was a director and manager at Supplier-1 from approximately September 2012 until approximately May 2015, and a vice president at Supplier-1 from approximately March 2015 until approximately May 2016.

4

Case 1:20-cr-00152-PAB Document 1 Filed 06/02/20 USDC Colorado Page 5 of 20

16.     Supplier-1-Employee-3 was a director and manager at Supplier-1 starting in approximately March 2010.

17.     Supplier-1-Employee-4 was an employee of Supplier-1 starting at least as early as approximately September 2012.

18.     Supplier-3-Employee-1 was an employee of Supplier-3 starting in approximately January 1988.

19.     Supplier-3-Employee-2 was a manager and director at Supplier-3 starting in approximately 2009.

20.     Supplier-6-Employee-1 was an employee of Supplier-6.

21.     QSR-1 was a nationwide restaurant franchise that negotiated with Suppliers through a centralized buying cooperative, Cooperative-1.  Cooperative-1-Employee-1 was an employee of Cooperative-1 from approximately June 2008 until approximately May 2014.  Cooperative-1-Employee-2 was an employee of Cooperative-1 from approximately August 2004 until approximately February 2017.  Cooperative-1-Employee-3 was an employee of Cooperative-1 from approximately May 2014 until approximately December 2014.  Cooperative-1-Employee-4 was an employee of Cooperative-1 in 2014.

22.     QSR-2 was a nationwide restaurant franchise that negotiated with Suppliers through a centralized buying cooperative, Cooperative-2.  Cooperative-2-Employee-1 was an employee of Cooperative-2 starting in approximately July 2008.

23.     QSR-3 was a nationwide restaurant franchise that negotiated directly with Suppliers.  QSR-3-Employee-1 was an employee of QSR-3 starting in approximately September 2001.

24.     Grocer-1 was a nationwide grocery-store chain operating under various brand names in various geographical areas that negotiated directly with Suppliers. Grocer-1-Brand-1 was a grocery-store brand owned by Grocer-1.  Grocer-1-Brand-1 operated multiple stores in the State and District of Colorado.

25.     Grocer-2 was a nationwide grocery-store chain.

26.     Others not made Defendants in this Indictment participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance of the conspiracy.

27.     Whenever in this Indictment reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control or transaction of its business or affairs.

### III.     MEANS AND METHODS OF THE CONSPIRACY

28.     It was part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN, together with their co-conspirators known and unknown to the Grand Jury, in the State and District of Colorado and elsewhere, participated in a continuing network of Suppliers and co-conspirators, an understood purpose of which was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States.

29.     It was further part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN, together with their co-conspirators, in the State and District of Colorado and elsewhere, utilized that continuing network:

6

        a.      to reach agreements and understandings to submit aligned, though not necessarily identical, bids and to offer aligned, though not necessarily identical, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States;

        b.      to participate in conversations and communications relating to non-public information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States;

        c.      to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by, Suppliers and co-conspirators for broiler chicken products sold in the United States.

30.     It was further part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN, together with their co-conspirators, in the State and District of Colorado, and elsewhere, discussed protecting, and thereafter acted to protect, the purpose and effectiveness of the conspiracy.

31.     It was further part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN, together with their co-conspirators, in the State and District of Colorado, and elsewhere, sold and accepted payment for broiler chicken products that are the subject of the allegations in this Indictment in the United States through until at least approximately December 2015.

### QSR-1's Dark Meat and Wings Supply for 2013

32.     In approximately the autumn of 2012, Cooperative-1 was negotiating prices with Suppliers for dark meat and wings supply for calendar year 2013.

33.     It was further part of the conspiracy that in or around October 10, 2012, AUSTIN submitted Supplier-1's bid to Cooperative-1 to supply QSR-1 with dark meat for calendar year 2013 at .30 back of the 8-piece price.

34.     It was further part of the conspiracy that in or around October 2012, BRADY submitted Supplier-2's bid to Cooperative-1 to supply QSR-1 with dark meat for calendar year 2013 at .30 back.

35.     It was further part of the conspiracy that, after, Cooperative-1-Employee-1 told AUSTIN on or about October 26, 2012, that because some Suppliers had bid dark meat at .30 back and other Suppliers had bid dark meat at .32 back, Cooperative-1-Employee-1 planned to ask all Suppliers to change their bids to .31 back:

   a.     On November 13, 2012, at approximately 4:17 p.m. (EST), Supplier-6-Employee-1 called BRADY.  The duration of the call was approximately 5 minutes.

   b.     On November 13, 2012, at approximately 4:22 p.m. (EST), BRADY texted FRIES: "[Supplier-6] is .30 back on dark meat."

   c.     On November 13, 2012, at approximately 4:23 p.m. (EST), AUSTIN called BRADY.  The duration of the call was approximately 13 minutes.

   d.     On November 13, 2012, at approximately 4:34 p.m. (EST), BRADY texted FRIES: "[Supplier-1] is .30 back and [Supplier-3] is 31 back," to which FRIES responded "Ol [Cooperative-1-Employee-1]! He bluffing hard!"

8

      e.     On November 13, 2012, at approximately 4:37 p.m. (EST), BRADY texted FRIES: "I talked to roger [AUSTIN] and this month he is .03 higher than us on 8 piece."

      f.     On November 13, 2012, at approximately 4:45 p.m. (EST), BRADY texted FRIES: "he [AUSTIN] said to raise our prices, on wings he is market and market plus .10[.]"  FRIES responded, "Tell him we are trying!"  BRADY responded, "Will do[.]"

      g.     On November 13, 2012, at approximately 4:58 p.m. (EST), AUSTIN sent Supplier-1's second-round bid to Cooperative-1 with dark meat at .30 back, and bulk wings and pre-counted wings at "UB Mkt previous month average" and "UB Mkt previous month average + .10."

36.     It was further part of the conspiracy that on or about November 14, 2012, BRADY submitted Supplier-2's second-round bid with dark meat at .30 back.  In a cover email accompanying the second-round bid, BRADY stated, "[o]n the wings we would like to be at market for the bulk packed and market plus .10 on the precounted."

37.     It was further part of the conspiracy that on or about November 30, 2012, PENN sent Supplier-1-Employee-1 a spreadsheet containing the 8-piece COB quotes that Supplier-2, Supplier-5, and Supplier-6 had proposed to Cooperative-1.

38.     It was further part of the conspiracy that in or about December 2012, PENN and Cooperative-1-Employee-1 signed an agreement that the price for dark meat would be .30 back in calendar year 2013.

39.     It was further part of the conspiracy that in or about December 2012, BRADY and Cooperative-1-Employee-1 signed an agreement that the price for dark meat would be .3050 back in calendar year 2013.

### QSR-1's 2013 Request to Supply Reduced-Weight Product

40.    On or about March 5, 2013, Cooperative-1-Employee-1 asked various Suppliers and co-conspirators to provide a quote to supply QSR-1 with a reduced-weight 8-piece COB product.

41.    It was further part of the conspiracy that on or about March 8, 2013:

a.    At approximately 2:45 p.m. (EST), AUSTIN called BRADY. The duration of the call was approximately 1 minute.

b.    At approximately 2:48 p.m. (EST), BRADY called AUSTIN back. The duration of the call was approximately 8 minutes.

c.    At approximately 3:44 p.m. (EST), BRADY told FRIES, "I talked to roger [AUSTIN] about the [QSR-1] sizes and he is in agreement with us."

### QSR-1's Dark Meat Supply for 2014

42.    In approximately autumn of 2013, Cooperative-1 was negotiating with Suppliers for dark meat supply for calendar year 2014.

43.    It was further part of the conspiracy that in or about October 2013, AUSTIN submitted Supplier-1's bid to Cooperative-1 to supply QSR-1 dark meat for calendar year 2014 at .30 back.

44.    It was further part of the conspiracy that in or about October 2013, BRADY submitted Supplier-2's bid to Cooperative-1 to supply QSR-1 with dark meat for calendar year 2014 at .305 back.

45.    It was further part of the conspiracy that on or about November 19, 2013:

a.    At approximately 1:27 p.m. (EST), BRADY called AUSTIN.  The duration of the call was approximately 3 minutes.

b.     At approximately 1:31 p.m. (EST), BRADY texted FRIES: "Just an FYI last year we were .32 back on dark meat and this year we are 3050 back."  FRIES responded, "K.  Can do .31 if want."

c.     At approximately 1:31 p.m. (EST), BRADY texted FRIES: "Roger [AUSTIN] is at .30 back and not moving."  FRIES responded, "Stay .305 then[.]"

46.     It was further part of the conspiracy that in or about December 2013, PENN and Cooperative-1-Employee-1 signed an agreement that the price for dark meat would be .305 back in calendar year 2014.

47.     It was further part of the conspiracy that in or about December 2013, BRADY and Cooperative-1-Employee-1 signed an agreement that the price for dark meat would be .305 back in calendar year 2014.

### QSR-1's 8-Piece COB Supply for 2015

48.     Beginning approximately in the summer of 2014, Cooperative-1 was negotiating with Suppliers for 8-piece COB prices to take effect in approximately 2015.

49.     Supplier-1's price for 8-piece COB sold directly or indirectly to QSR-1 franchisees in calendar year 2014 included a margin of $.1175/lb.

50.     Supplier-2's price for 8-piece COB sold directly or indirectly to QSR-1 franchisees in calendar year 2014 included a margin of $.0673/lb.

51.     It was further part of the conspiracy that on or about August 18, 2014:

a.     At approximately 12:04 p.m. (EDT) AUSTIN called BRADY.  The duration of the call was approximately 24 minutes.

b.     At approximately 6:46 p.m. (EDT) Supplier-1-Employee-2 told PENN that "Roger [AUSTIN] did some checking around today and I included the below

11

regarding the range of the total increases (margin and costs) folks are going in with," and then reported the numbers to PENN: Supplier-2 at .14-.16/lb., Supplier-4 at .13-.15/lb., Supplier-5 at .14-.16/lb., Supplier-6 at .15-.17/lb., and Supplier-7 at .14-.16/lb.

     c.    Supplier-1-Employee-2 told PENN, "Considering the numbers above and the fact that we wanted to be the leader this would put us in at .1616/lb increase (.06 in cost and .10 in margin) which would equate to about $400k in additional revenue on equal volume from this year."

     d.    Supplier-1-Employee-2 emailed PENN a price proposal with a margin of $.2175/lb. Supplier-1-Employee-2's email included current 2014 margins and contemplated 2015 margins for Supplier-2, Supplier-4, Supplier-5, and Supplier-7.

52.    It was further part of the conspiracy that on or about August 19, 2014, PENN responded to Supplier-1-Employee-2's email from the previous day, asking "2.5 M lbs X. 16 =$400k per week is the math?"

53.    It was further part of the conspiracy that on or about August 26, 2014:

     a.    AUSTIN told PENN that Cooperative-1-Employee-2 asked if Supplier-1 would reduce its proposed increase. PENN told AUSTIN to hold firm.

     b.    At approximately 2:52 p.m. (EDT), AUSTIN called BRADY. The duration of the call was approximately 14 minutes.

     c.    At approximately 5:11 p.m. (EDT), BRADY texted FRIES: "I talked to roger [AUSTIN] about [QSR-1] and Greeley[, Colorado] told him not to come down on price. He called [Cooperative-1-Employee-3] today and told him."

54.    BRADY then texted FRIES: "[Supplier-5] is not moving either" to which FRIES replied that Supplier-7 was not "agreeing to anything today, just listening."

55.     It was further part of the conspiracy that on or about October 3, 2014, FRIES and Cooperative-1-Employee-4 signed an agreement that Supplier-2's effective margin for 8-piece COB would be $.1940/lb. in calendar year 2015.

56.     It was further part of the conspiracy that on or about October 31, 2014, AUSTIN and Cooperative-1-Employee-4 signed an agreement that Supplier-1's margin for 8-piece COB would be $.2175/lb. in calendar year 2015.

57.     It was further part of the conspiracy that in calendar year 2015, including as late as approximately December 26, 2015, Supplier-1 sold and accepted payment for 8-piece COB through a distributor to QSR-1 franchises in the United States at a margin of $.2175.

### *QSR-3's 8-Piece COB Supply for 2015*

58.     In approximately the autumn of 2014, QSR-3 was negotiating with Suppliers for its 2015 8-piece COB pricing.

59.     It was further part of the conspiracy that on or about October 17, 2014, the following text message exchange occurred between PENN and Supplier-1-Employee-3:

| PENN | "Who is negotiating with [QSR-3]?" |
|---|---|
| Supplier-1-Employee-3 | "[Supplier-1-Employee-4] and Roger [AUSTIN]" |
| PENN | "Ok.  Thanks" |
| Supplier-1-Employee-3 | "We know [Supplier-7], their biggest supplier is 0.02 higher than us and they are not going to negotiate." |
| PENN | "Good deal.  Last time they did cave a cent or two with [QSR-1]" |
| Supplier-1-Employee-3 | "They are listening to my direction" |
| PENN | "Who is they?" |
| PENN | "If they is illegal don't tell me" |
| Supplier-1-Employee-3 | "Was referring to roger [AUSTIN] listening. Sorry, thought you were referring to roger [AUSTIN] caving.  Got you on [Supplier-7] caving on [QSR-1].  [Supplier-7] might cave but I wouldn't think for our volume and their current." |

13

| PENN | "[Supplier-3] does the west. Hearing rumors out of them?" |
| Supplier-1-Employee-3 | "Buyer said we were .07 high so that must be [Supplier-3's] price…" |
| PENN | "They are morons" |
| Supplier-1-Employee-3 | ".07 back is in line with where we have priced everybody else but they did not add anything for the cost of doing business with [QSR-3] like us and [Supplier-7] did" |
| PENN | "[Supplier-7] is a solid competitor." |

60.    It was further part of the conspiracy that on or about November 7, 2014, Supplier-1-Employee-3 told PENN: "[QSR-3] just called back...came up on price. Would net somewhere around 1.00 and we went in at 1.04/1.08."

61.    It was further part of the conspiracy that on or about November 9, 2014, PENN told Supplier-1-Employee-1: "I raised [QSR-3] 15c per lb" and "[QSR-3-Employee-1] and his crew will pay market price plus the special A-Hole Premium."

62.    It was further part of the conspiracy that on or about November 10, 2014, Supplier-1-Employee-3 emailed Supplier-1-Employee-4 and AUSTIN: "I do not really want to get into a pricing war with [Supplier-7] over those two DCs."

### Protecting the Purpose and Effectiveness of the Conspiracy

63.    It was further part of the conspiracy that on or about November 24, 2014, after Supplier-3 asked to purchase broiler chicken products from Supplier-1 to cover a shortfall to Grocer-1-Brand-1 for approximately $.05/lb. more than the price Supplier-1 had negotiated with Grocer-1, PENN said in a series of emails to one or more co-conspirators employed by Supplier-1:

a.    "[Supplier-3] should pay for being short. It costs money for them to fill orders for which they don't have the chickens. They have been adding market share and still trying to do – selling cheap chicken and being short. Doesn't make sense. We

14

are enabling the town drunk by giving him beer for Thanksgiving instead of walking him into an AA meeting."

b. "[Supplier-3] is not shorting [Grocer-2]. Note [Supplier-3] just added market share and distribution to [Grocer-2]. They took our business on price. Should we allow [Supplier-3] to not pay for poor decision making?"

c. "They need to pay so they start acting appropriately. How do they pay? Their customers need to feel the pain. By not feeling the pain – [Supplier-3] keeps marching along and the customers to [sic] blindly with them."

d. PENN forwarded his emails to Supplier-1-Employee-1 and said: "Thoughts on deli strategy to [Grocer-1-Brand-1]? We are covering [Supplier-3] shortages. Continue and let [Grocer-1-Brand-1] know we are helping or start have [Supplier-3] feel the pain across their system so they can start making decisions commensurate with a profitable venture and not a philanthropic organization?"

e. Supplier-1-Employee-1 responded: "No question in my mind. [Supplier-3] should have to live with the decision they made. We made ours and are dealing with it. Why should it be any different for them? We SHOULD NOT HELP THEM ONE MICRON."

f. PENN responded: "I agree. We are just allowing our competitor to continue their idiotic ways."

64. It was further part of the conspiracy that on or about November 26, 2014, PENN said in a series of emails to one or more co-conspirators employed by Supplier-1:

a. "Our competition is offering lower margins on this item. Our competition is also currently shorting [QSR-2], [Grocer-1], and [another customer]. All

15

of which we have been asked to cover this week in very slow markets. So in essence they are cheap and to add insult to injury are short product."

b. "They are calling us – three tines [sic] this week – to help them cover loads on small birds to their new customers – their new customers with whom they just increased distribution at cheap prices. So – for Thanksgiving should we give Otis a bottle of Crown (aka loads of chicken) or take him to AA (aka make him face the shortage music)?"

c. "We are straight up taking Otis to AA. No juice for Otis. Otis must face the music for his misguided actions. Selling cheap in a short market – no bailout for you."

d. "In other words we are not covering the loads for which [Supplier-3] is asking for help."

65. It was further part of the conspiracy that on or about December 22, 2014, PENN told Supplier-1-Employee-1: "[Supplier-3] took this strategy of not worrying about what the competition is doing and it led to the unraveling on a competitive advantage. Have to keep our enemies close and ensure that we are not zigging when the competition is successfully zagging."

### QSR-2's 2015 Bone-In Promotional Discount

66. On or about March 25, 2015, Cooperative-2-Employee-1 asked Suppliers if QSR-2 could get "some type of discount" for a promotion in approximately September 2015 "[d]ue to the increases we incurred this year."

67. It was further part of the conspiracy that on or about March 26, 2015:

a. At approximately 1:41 p.m. (EDT), Supplier-3-Employee-1 called

16

BRADY.  The duration of the call was approximately 2 minutes.

b.     At approximately 1:43 p.m. (EDT), Supplier-3-Employee-1 called Supplier-6-Employee-1.  The duration of the call was approximately 25 seconds.

c.     At approximately 1:45 p.m. (EDT), Supplier-3-Employee-1 called Supplier-1-Employee-4.  The duration of the call was approximately 33 seconds.

d.     At approximately 8:22 p.m. (EDT), Supplier-3-Employee-1 told Supplier-3-Employee-2, "I have talked to a couple company's [sic] and they are thinking .02lb for September" and "Only bad thing is everyone else does it, it will be hard not to do it."

68.     It was further part of the conspiracy that on or about March 27, 2015:

a.     At approximately 10:30 a.m. (EDT), Supplier-3-Employee-2 told Supplier-3-Employee-1: "We discussed this morning, and we agree to offer the $0.02/lb. for the month of September."

b.     At approximately 10:40 a.m. (EDT), Supplier-3-Employee-1 sent a text message to BRADY.

c.     At approximately 10:42 a.m. (EDT), Supplier-6-Employee-1 called Supplier-3-Employee-1.  The duration of the call was approximately 3 minutes and 15 seconds.

69.     It was further part of the conspiracy that on or about March 31, 2015, Supplier-1-Employee-3 told PENN: "[QSR-2] is looking to get a $0.02/lb discount from all suppliers for a September promotion.  [Supplier-3], [Supplier-5], [Supplier-4], [Supplier-7], [Supplier-6], and [Supplier-2] have already agreed to the discount."

70.     It was further part of the conspiracy that on or about April 1, 2015, PENN

approved providing QSR-2 with a $.0200/lb. discount.

***QSR-1's Broiler Chicken Products for 2018***

71.　In or around January 2017, Cooperative-1 was negotiating with Suppliers for 2018 broiler chicken products.

72.　It was further part of the conspiracy that, for example, on or about Monday, January 16, 2017, between approximately 2:40 p.m. (EST) and approximately 4:51 p.m. (EST), there were at least 5 phone calls between BRADY and AUSTIN. The cumulative duration of the calls was approximately 15 minutes.

73.　It was further part of the conspiracy that on or about Tuesday, January 17, 2017:

　　a.　At approximately 10:11 a.m. (EST), AUSTIN called BRADY. The duration of the call was approximately 2 minutes.

　　b.　At approximately 5:54 p.m. (EST) AUSTIN told Supplier-1-Employee-4, "[Supplier-2] meets with [Cooperative-1] in [sic] Thursday and i will get a blow by blow Friday morning. [Supplier-5] meets with [Cooperative-1] in [sic] Friday."

74.　It was further part of the conspiracy that on or about Wednesday, January 18, 2017, at approximately 2:45 pm (EST), AUSTIN called BRADY. The duration of the call was approximately 1 minute.

75.　It was further part of the conspiracy that on or about Thursday, January 19, 2017, Supplier-2 met with Cooperative-1.

76.　It was further part of the conspiracy that on or about Friday, January 20, 2017, at approximately 3:12 pm (EST), AUSTIN called BRADY. The duration of the call was approximately 7 minutes.

18

77. It was further part of the conspiracy that on or about January 27, 2017, Supplier-1 met with Cooperative-1.

## IV.   TRADE AND COMMERCE

78. During the period covered by this Indictment, the Defendants and their co-conspirators shipped substantial quantities of broiler chicken products by truck in a continuous and uninterrupted flow of interstate trade and commerce to companies located in states outside the place of origin of the shipments.

79. During the period covered by this Indictment, the business activities of the Defendants and their co-conspirators in connection with the sale of broiler chicken products were within the flow of, and substantially affected, interstate trade and commerce.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.


A TRUE BILL:


Ink signature on file in Clerk's Office
FOREPERSON

19

MAKAN DELRAHIM
Assistant Attorney General

BERNARD A. NIGRO JR.
Principal Deputy Assistant Attorney
General

RICHARD A. POWERS *with permission by HJD.*
Deputy Assistant Attorney General
MARVIN N. PRICE JR.
Director of Criminal Enforcement

Antitrust Division
U.S. Department of Justice

JAMES J. FREDRICKS
Chief, Washington Criminal II Office

MICHAEL T. KOENIG
HEATHER D. CALL
CAROLYN M. SWEENEY
PAUL J. TORZILLI
JILLIAN M. ROGOWSKI
LAURA J. BUTTE
Trial Attorneys

Antitrust Division
U.S. Department of Justice
Washington Criminal II Office
450 Fifth Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-2165
Michael.Koenig@usdoj.gov