IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 16-cv-02611-RBJ

PATRICK HOGAN, individually and on behalf of all others similarly situated,

    Plaintiff,

v.

PILGRIM'S PRIDE CORPORATION,
WILLIAM W. LOVETTE,
FABIO SANDRI,

    Defendants.

ORDER ON DEFENDANTS' MOTION TO DISMISS

This matter is before the Court on defendants Pilgrim's Pride Corporation, William W. Lovette's, and Fabio Sandri's motion to dismiss plaintiff's second amended complaint, ECF No. 58. For the foregoing reasons, defendants' motion is GRANTED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is a federal securities class action against Pilgrim's Pride Corporation ("Pilgrim"), a leading chicken producer; William W. Lovette, Pilgrim's Chief Executive Officer; and Fabio Sandri, Pilgrim's Chief Financial Officer ("defendants"). ECF No. 48-1 at 6. George Fuller is the lead plaintiff in this case and asserts claims on behalf of not only himself but also all of those similarly situated, i.e., those who purchased or otherwise acquired Pilgrim securities between

February 21, 2014 and November 17, 2016.  The following facts are derived from the second amended complaint and are assumed to be true solely for the purposes of this order.

Pilgrim is one of the largest producers and sellers of chicken in the United States and accounts for 16.6 percent of the domestic market for chicken products.  ECF No. 47 at 14, ¶33.  Pilgrim specifically focuses on the production and sale of broilers, which are standard, non-kosher, non-organic chickens under thirteen weeks of age.  *Id*. at 19, ¶34.  Broilers comprise at least 98 percent of the chicken sold in the United States.  *Id*.  The broiler industry, including Pilgrim, is vertically integrated.  This means that companies in the broiler industry "own or tightly control almost all aspects of broiler production from breeding, hatching, rearing, feeding, processing, and selling."  *Id*. at 16–17, ¶40.  The broiler industry is characterized by inelastic demand, meaning that the demand for broilers "does not meaningfully increase or decrease with changes in price; however, a decrease in supply will increase prices."  *Id*. at 19, ¶35.  Traditionally the broiler market followed a boom and bust cycle.  When prices for broilers would rise, the chicken producers would ramp up production to capture more revenue, resulting in a boom.  However, the resulting oversaturation of the market would cause prices to fall, resulting in a bust.  *Id*. at 15–16, ¶36.

Another unique feature of the broiler industry is its "highly concentrated and familial" nature.  The number of companies involved in the broiler industry has apparently decreased significantly over the years.  *Id*. at 19, ¶45.  Three companies—Pilgrim, Tyson, and Sanderson—occupy 46 percent of the total market share, and the top five companies control over 65 percent of the market.  *Id*.  According to plaintiff it is common for executives of a company to leave and begin working for one of its competitors.  Additionally, like many industries, the broiler industry

has numerous associations and committees that individuals from broiler companies can join. These associations and committees host meetings and retreats that provide industry members opportunities to interact with one another. *Id*. at ¶49.

Although the relevant class period is February 21, 2014 through November 17, 2016, plaintiff alleges that the actions giving rise to this lawsuit date back to 2007. In 2007 and 2008 the broiler industry experienced a particularly low "bust," because rising feed ingredients resulted in significant market pressure. According to plaintiff, Pilgrim declared bankruptcy in December 2008 as a result of this dramatic bust. *Id*. at 4, ¶9. Pilgrim emerged from bankruptcy following a sale of its majority stake to its parent company, JBS SA ("JBS"). Plaintiff alleges that, in an effort to achieve post-bankruptcy stability, "Pilgrim coordinated with fellow industry participants—together comprising approximately 95 percent of the market—to embark an orchestrated reduction of the broiler supply." *Id*. at 8, ¶10. The broiler companies apparently worked together to ensure that each company adhered to the bargain and did not flood the market with chicken. To do this, the conspirators used a "unique, highly detailed data sharing service known as Agri Stats, through which the companies exchanged comprehensive proprietary data concerning each company's operations, production, inventory, cost and pricing, compiled in nearly real time." *Id*. The companies' tactics for keeping the chicken supply down included reducing eggs, reducing broiler breeder flocks, destroying chicks or eggs, temporarily or permanently shutting down facilities, and exporting eggs and chicks.

The broiler companies allegedly used the Agri Stats data to coordinate two tranches of significant Broiler production cuts. The first major one occurred in 2009-2010, and the second in 2011-2012. In February 2014—the beginning of the class period—broiler prices were

expected to increase, and breeder flocks were reduced. The broiler companies also allegedly manipulated the Georgia Dock and Urner Barry, the leading wholesale chicken prices indices. While the rest of the chicken industry dealt with a drastic drop in prices in 2015 and 2016, there was no corresponding decline in broiler prices. In fact, the broiler price on the Georgia Dock barely moved during this time period, and it even increased slightly in 2015. *Id*. at 10, ¶12. During the class period, Pilgrim reported record-breaking financial results, including profit margins of more than 16 percent, which were nearly three times what other companies had historically achieved on average. *Id*. By December 2014 Pilgrim's stock was trading at over thirty-eight dollars per share, when just six years earlier it had been trading at under $0.15 per share.

Pilgrim explained their increased profit margins based on their fundamentally transforming their business model and improving better product mix and operational improvements "to achieve a level of unprecedented financial success and stability." *Id*. Plaintiff contends that Pilgrim's growth was instead a result of the price fixing scheme that is the subject of this lawsuit. According to plaintiff, the defendant company and the individual defendants made numerous false statements with regard to Pilgrim's success.

Various sources became aware of the alleged price fixing scheme in the poultry industry. On September 2, 2016 a group of Pilgrim's wholesale customers and numerous other broiler producers filed a class action in the Northern District of Illinois, alleging that Pilgrim and other broiler companies participated in an illegal anti-competitive scheme in violation of federal antitrust law. *Id*. at 7-8, ¶17. In November 2016 both the New York Times and the Washington

Post published articles discussing the apparent scheme. *Id*. at ¶18. This alleged scheme has continued to garner national media attention and has resulted in numerous federal lawsuits.

The initial complaint in this case was filed on October 20, 2016, and Patrick Hogan was listed as the lead plaintiff on this case. ECF No. 1  The initial complaint alleged two causes of action. The first involved Section 10(b) and Rule 10b-5 violations of the Securities and Exchange Act ("Exchange Act"). The second involved alleged violations of Section 20(a) of the Exchange Act. Id. at 22–25.

On May 11, 2017 plaintiff filed his first amended complaint in which George Fuller replaced Patrick Hogan as the lead plaintiff, and the same causes of action were alleged. *See* ECF No. 29.  Mr. Fuller purchased 3,859 shares of Pilgrim securities on January 16, 2015 at the price of $34.00 per share. On February 19, 2015 plaintiff purchased 3,627 additional Pilgrim shares at $27.95 per share. ECF No. 8-1 at 3. In the first amended complaint—the first complaint in which Mr. Fuller was included as lead plaintiff—the alleged misrepresentations began in fiscal year 2013. ECF No. 29 at 57. Mr. Fuller alleges that the misrepresentations continued through 2016. In addition, Mr. Fuller included "additional support for falsity and scienter" in the form of facts tending to show the following: the broiler industry coordinated production cuts in 2008 and 2009 and again in 2011 and 2012 that led to reductions in broiler breeder flocks. ECF No. 29 at 3.

On June 12, 2017 defendants filed a motion to dismiss the first amended class action complaint. ECF No. 34. That motion was granted on March 14, 2018 because the Court found that "plaintiff did not plead the underlying antitrust conspiracy with sufficient particularity." ECF No. 41 at 18. The Court further stated that plaintiff's securities case was "essentially

5

premature but not necessarily hopeless." *Id*. at 19. The case was therefore dismissed without prejudice.

Plaintiff filed a second amended complaint 576 days following that dismissal. *See* ECF No. 48-1. The second amended complaint listed the same causes of action as the first two complaints. Specifically, the second amended complaint alleged Section 10(b) violations of the Exchange Act and Rule10 b-5, and 10-b5(a) and (c) against all defendants and Section 20(a) violations against defendants Lovette and Sandri. ECF No. 48-1 at 171. As in the initial amended complaint, the alleged misstatements began in fiscal year 2013 and continued through 2016. In the second amended complaint, plaintiff alleged that additional facts had come to light that bolstered his claims so that they were no longer premature.

These additional facts are that on June 3, 2020, "a federal grand jury in the U.S. District Court in Denver, Colorado, returned an indictment against four executives for their role in a conspiracy to fix prices and rig bids for broiler chickens." ECF No. 48-1 at 7. Two of these executives were Pilgrim employees. *Id*. Based on the indictment, from at least 2012 until at least 2017 various chicken industry executives "conspired to fix prices and rig bids for broiler chickens." *Id*. at 2. Plaintiff alleges that the time period covered by the indictment fully overlaps with the class period (February 21, 2014 through November 21, 2016).

On July 31, 2020 defendants filed a motion to dismiss the second amended complaint. ECF No. 58. Their primary arguments are that plaintiff's Section 10(b) claims are time-barred by the five-year statute of repose for securities actions, and that plaintiff lacks standing to bring any remaining claims. Plaintiff filed his response on August 31, 2020. ECF No. 59. Defendants filed a reply on September 20, 2020. ECF No. 60. The matter is ripe for review.

## II. STANDARD OF REVIEW

When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id*.

Complaints in civil actions generally should contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). "A plaintiff suing under Section 10(b), however, bears a heavy burden at the pleading stage." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). To state a securities fraud claim, a plaintiff's complaint must allege that:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Id.* (citing *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003)).

Prior to the passage of the Private Securities Litigation Reform Act of 1995 (PSLRA), Fed. R. Civ. P. 9(b) governed the pleading requirements for securities fraud actions. *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001). Now, however, under the PSLRA, a heightened pleading standard applies to the first and third elements of

7

securities fraud claims, also referred to as falsity and scienter respectively. *Id.* Thus, with respect to falsity and scienter the PSLRA requires that:

> (1) [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> (2) [T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1)–(2).

### III. ANALYSIS

Defendants argue that plaintiff's claims must be dismissed for two reasons. First, they argue that any claims based on misrepresentations that occurred prior to June 8, 2015 are untimely and were brought outside of the five-year statute of repose. Second, they argue plaintiff lacks standing to bring any remaining claims on behalf of a class of individuals. I first consider whether the claims are time-barred.

**A. Whether plaintiff's claims are time barred**

Statutes of limitations and statutes of repose "both are mechanisms used to limit the temporal extent or duration of liability for tortious acts." *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) (internal quotations omitted). Although the two concepts are related, they each have a distinct purpose. *Id.* A statute of limitations is designed to "encourage plaintiffs to pursue diligent prosecution of known claims," while a statute of repose is a statute in which there is a "legislative judgment that a defendant should be free from liability after the legislatively determined period of time." *Id.* Statutes of repose thus give "more explicit and certain protection to defendants" than statutes of limitation. *Id.*

Congress has defined time limitations on the commencement of proceedings that arise out of congressional acts. Specifically, Congress has imposed a statute of repose for securities claims. 28 U.S.C. § 1658 states

> (a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than four years after the cause of action accrues.
> (b) Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of –
>> (1) two years after the discovery of the facts constituting the violation; or
>> (2) five years after such violation.

The parties agree that this case is subject to the five-year statute of repose outlined in § 1658(b)(2).

To better contextualize the parties' arguments, it is worth repeating certain aspects of this case's procedural history. Plaintiff initially filed this action on October 20, 2016 for misrepresentations that allegedly began in 2013. ECF No. 48-1 at 58. The initial complaint was thus well within the five-year statute of repose for all misstatements, including the earliest alleged misstatements that occurred in fiscal year 2013. However, on March 14, 2018 the Court dismissed plaintiff's first amended complaint without prejudice and stated that "plaintiff's securities case is essentially premature but not necessarily hopeless." ECF No. 48-1 at 6. On June 8, 2020—576 days after this Court's dismissal—plaintiff filed a second amended complaint. Due to this delay, defendants argue that many of plaintiff's claims are time-barred pursuant to 28 U.S.C. § 1658(b)(2). ECF No. 58 at 4. Plaintiff claims that defendants' untimeliness argument fails for three reasons. First, plaintiff argues that the date of the amended complaint is irrelevant for repose purposes because the initial complaint was timely. Second, plaintiff claims that even if the repose period applies to the second amended complaint, his

9

claims are timely under the continuing fraud exception for securities claims.  Third, plaintiff argues that his claims are not time-barred because they are saved by the relation-back doctrine.  I address each of plaintiff's contentions in turn.

> 1. <u>Whether the second amended complaint is timely by virtue of the initial complaint's timeliness</u>

There is no dispute that a five-year repose period applies to securities claims like those alleged here, nor is there a dispute over whether the initial complaint was timely.  Instead, defendants argue that the date of the second amended complaint controls, and that several claims in that complaint are predicated on acts that occurred outside of the repose period.  Mr. Hogan argues in response that he is well within the repose period because he filed suit on October 20, 2016, three years after the initial misrepresentations that form the basis of his claims, and because the second amended complaint is part of the same suit as the initial, timely complaint.  To support his position, plaintiff cites numerous cases that define dismissals without prejudice as "non-final decisions."  *See* ECF No. 59 at 12–13.  While I agree that a dismissal without prejudice is not a final decision for appellate purposes in most circumstances, I disagree that this Court's decision to dismiss the first amended complaint relates to a subsequent complaint's timeliness.

A dismissal without prejudice does not toll a statute of limitations.  *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 926 F.2d 959, 962 (10th Cir. 1991) ("In the absence of a statute to the contrary, the limitations period is not tolled during the pendency of a dismissed action.").  This concept is so well known that *Black's Law Dictionary* defines a dismissal without prejudice as "[a] dismissal that does not bar the plaintiff from refiling the lawsuit *within the limitations period*."  DISMISSAL, Black's Law Dictionary (11th ed. 2019) (emphasis added).  Thus, when a

case is dismissed without prejudice it may be refiled *so long as the refiling occurs within the limitations period*. Although neither *Brown* nor the Black's Law Dictionary definition mention a statute of repose, the Court notes that there are certain differences between statutes of repose and limitations that make repose periods more definite and certain than limitations periods. *California Pub. Employees' Retirement Sys.*, 137 S. Ct. at 2049 (explaining that "statutes of repose are enacted to give more explicit and certain protections to defendants."). For instance, unlike a statute of limitation, a statute of repose cannot be equitably tolled. The Supreme Court explains,

> The purpose and effect of repose, by contrast, is to override customary tolling rules arising from the equitable powers of courts. By establishing a fixed limit, a statute of repose implements a legislative decision that as a matter of policy there should be a specific time beyond which a defendant should no longer be subjected to protracted liability.

*Id*. (emphasis added); *see also CTS Corp. v. Waldburger*, 573 U.S. 1 (2014) ("Statutes of repose . . . generally may  not be tolled, even in cases of extraordinary circumstances beyond a plaintiff's control."). Additionally, while statutes of limitations are frequently not triggered until the plaintiff discovers the cause of action, statutes of repose are triggered the moment the violation occurs  of plaintiff's discovery. *CTS Corp.*, 573 U.S. 1. Statutes of repose therefore put an outer and "fixed limit" on a plaintiff's right to bring a civil action. Thus, based on a repose period's rigidity, it follows that a case dismissed without prejudice must be filed within the repose period, as well as within the limitations period.

Plaintiff's position—that the date of the second amended complaint has no bearing on the issue of timeliness—subverts the very purpose of statutes of repose, i.e. to provide certain, explicit protections. If the Court were to adopt plaintiff's position, a plaintiff could file a case,

have it dismissed without prejudice, and then file an amended complaint at any time irrespective of any repose period. Nothing is fixed or certain in such a scenario. I therefore find that plaintiff is not immune from the repose period merely because his initial filing of this case was timely. A timely initial filing does not excuse his nearly two-year delay in refiling this case. Accordingly, the Court finds that the second amended complaint is subject to 28 U.S.C. § 1658(b)(2)'s five-year statute of repose.

2. Whether the continuing fraud exception applies

The parties next disagree on when the repose period began to run. A repose period is typically triggered on the date of defendants' misstatement or violation. Plaintiff, however, urges this Court to find that the continuing fraud exception applies, and that plaintiff's second amended complaint was timely. Under that exception defendants' misstatements are considered to be part of a single, continuous fraudulent scheme, and the repose period does not begin to run until the date of defendants' last act within that scheme. Defendants reject the continuing fraud exception and instead argue that each alleged misrepresentation independently triggers the five-year repose period. Thus, according to defendants, because the second amended complaint was filed on June 8, 2020, all of the alleged misrepresentations on which the claims are based must have occurred after June 8, 2015. ECF No. 58 at 4.

Courts disagree as to whether the continuing fraud exception applies to securities fraud cases, and the Tenth Circuit has not yet decided the issue. Several courts, including this district, have held that the continuing fraud exception is inconsistent with statutes of repose because the exception's legal effect is to toll the repose period. I agree. As mentioned above, statutes of repose are not subject to equitable tolling in the same way that limitations periods are. *See* Fed.

Prac. & Proc. Civ. § 1056 (4th ed.),  240 (3d ed. 2002) ("A period of repose is inconsistent with tolling.").

Most recently, this district declined to adopt the continuing fraud exception to extend the statute of repose outlined in 28 U.S.C. § 1658(b)(2).  The court held that "[t]his securities claim is subject to a three-year [sic] statute of limitations and five-year statute of repose . . . . the statute of repose is not subject to equitable tolling . . . nor to any continuing fraud exception."  *Wu v. Colorado Reg'l Ctr. Project Solaris LLLP*, No. 19-CV-02443-RM-STV, 2021 WL 795831 at *11 (D. Colo. Mar. 2, 2021).  The *Wu* court relied on several other districts' decisions, all of which focused heavily on the continuing fraud exception's relationship to equitable tolling.

In *Carlucci v. Han*, the Eastern District of Virginia held that a statute of repose has an "unqualified nature," and that the continuing fraud exception is "akin to a continuing violation or fraudulent concealment theory premised on equitable tolling."  886 F. Supp. 2d 497, 515 (E.D. Va. 2012) (italics added).  In *Althaus v. Broderick*, the court reached a similar conclusion, and noted that at oral argument counsel could not differentiate the continuing fraud exception from general tolling principles.  *Althaus v. Broderick*, No. 1:15-CV-001640-JNP 2016 WL 3976639, at *3 (D. Utah, 2016).  The court therefore held that the continuing fraud exception was inconsistent with the statute of repose.  *Id*.  Similarly, in *Wolfe v. Bellos*, a Northern District of Texas case, the court likened the continuous fraud exception to equitable tolling and stated that "statute[s] of repose, however, are not subject to equitable tolling."  No. 3:11-CV-02015-L, 2012 WL 652090, at *6 (N.D. Tex. Feb. 28, 2012).

While not many courts have considered this precise issue, the Court agrees with the *Wu*, *Carlucci*, *Althaus*, and *Wolfe* courts and declines to adopt the continuing fraud exception because

13

it effectively tolls the repose period, and "a period of repose is inconsistent with tolling." 4 Fed. Prac. & Proc. Civ. § 1056.

### 3. Whether plaintiff's second amended complaint relates back to the date of the initial complaint

Plaintiff next contends that even if the statute of repose applies, the second amended complaint relates back to the initial complaint pursuant to Fed. R. Civ. P. 15(c). Fed. R. Civ. P. 15(c) permits certain amended pleadings to relate back to the date of an initial filing. The Rule states, in pertinent part,

> (1) An Amendment to a pleading relates back to the date of the original pleading when:
>
> > (B) the amendment asserts a claim or defense that arose out of conduct, transaction, or occurrence set out – or attempted be set out – in the original pleading. . . .

Fed. R. Civ. P. 15(c). Plaintiff contends that his second amended complaint is timely because it relates back to the date of the initial complaint under Rule 15. Defendants argue that such an interpretation violates the Rules Enabling Act because it would abridge defendants' substantive rights to be free from liability after the fixed repose period.

The Supreme Court has the power "to prescribe general rules of practice and procedure . . . for cases in the United States district courts and courts of appeals." 20 U.S.C.A. §2072(a). However, pursuant to the Rules Enabling Act such rules "shall not abridge, enlarge, or modify any substantive right." 28 U.S.C.A. § 2072(b). The Tenth Circuit has recognized that unlike a statute of limitations, a statute of repose "creates a substantive right in those protected to be free from liability after a legislatively-determined period of time." *Amoco Prod. Co. v. Newton Sheep Co.*, 85 F.3d 1464, 1472 (10th Cir. 1996) (citing *Webb v. United States*, 66 F.3d 691, 700–01

14

(4th Cir. 1995)). Thus, because a statute of repose creates a substantive right in defendants' freedom from liability, Rule 15(c) cannot be interpreted in a way to expand or abridge that right.

Although neither the Tenth Circuit nor this district have considered whether an untimely complaint filed outside of the repose period can be saved by the relation back doctrine, several other courts have. The Southern District of New York declined to apply the relation-back doctrine to a complaint filed outside the repose period. There, the court held that allowing a plaintiff to bring claims extinguished by the statute of repose "would necessarily enlarge or modify a substantive right and violate the Rules Enabling Act." *Fed. Deposit Ins. Corp. for Colonial Bank v. First Horizon Asset Sec. Inc.*, 291 F. Supp. 3d 364, 372 (S.D.N.Y. 2018) (internal quotations omitted); *see also Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 263–64 (S.D.N.Y. 2019) ("allow[ing] a plaintiff to utilize Rule 15(c) to avoid the statute of repose would significantly abridge the substantive, statutory rights of [d]efendants in violation of the Rules Enabling Act.").

Similarly, the District of New Jersey held that a complaint filed outside of the repose period could "not be saved by the doctrines of equitable tolling or relation back." *DeVito v. Liquid Holdings Group*, Inc., 2-19 WL 6891832 (D.N.J. 2018). The *DeVito* court reasoned that "relation-back is in tension with the principle that a statute of repose is a rigid and essential limitation on the scope of the cause of action itself—an 'absolute bar on defendant's temporal liability.'" *Id*. at *24 (quoting *California Pub. Employees' Retirement Sys.*, 137 S. Ct. at 2050). Similarly, in *Resolution Trust Corp. v. Olson* the District of Arizona explained,

> Relation back under Rule 15 does not apply when the statute at issue defines substantive rights rather than merely limiting procedural remedies. . . . A statute of limitations is procedural in nature while a statute of repose is substantive in that it defines a right rather than merely limits its enforcement.

15

768 F. Supp. 283, 285 (D. Ariz. 1991).

As these cases illustrate, because statutes of repose create substantive rights in defendants, courts often refuse to save untimely complaints with the relation back doctrine. *See also In re Lehman Bros. Sec. & Erisa Litig.*, 800 F. Supp. 2d 477, 483 (S.D.N.Y. 2011) (explaining that because the statute of repose is substantive in nature, "the Rule 15(c) relation back doctrine does not apply to the statute of repose."); *Harris v. OSI Fin. Servs., Inc.*, 595 F. Supp. 2d 885, 898 (N.D. Ill. 2009) (holding that because the statute in question was a statute of repose, "[p]laintiffs may not rely on the relation back doctrine or on any other equitable extensions."). This Court therefore will not—and cannot—permit plaintiff to use the relation-back doctrine to save his untimely complaint because doing so would be improper under the Rules Enabling Act.

In summary, the Court finds that (1) the second amended complaint is subject to the five-year statute of repose; (2) the continuing fraud exception does not apply; and (3) the second amended complaint does not relate back to date of the initial complaint. Thus, any claims that are predicated on misstatements occurring prior to June 8, 2015 are time-barred and must be dismissed.

**B. Whether plaintiff has Article III standing**

Defendants next contend that any claims that are not time-barred should be dismissed because plaintiff lacks Article III standing to bring them. ECF No. 58 at 5. According to defendant, to have standing in a Section 10(b) case a plaintiff must have purchased or sold stock as a result of defendants' alleged misstatements. Plaintiff does not address defendants' standing argument.

16

In general, a private plaintiff must have standing to bring a claim in a federal court. "Constitutional standing derives from Article III of the U.S. Constitution, which restricts federal courts' jurisdiction to suits involving an actual case or controversy." *Bd. of Cty. Commissioners of Sweetwater Cty. v. Geringer*, 297 F.3d 1108, 1111 (10th Cir. 2002). The constitutional minimum of Article III standing contains three requirements: (1) injury in fact; (2) causation; and (3) redressability. *Hutchinson v. Pfeil*, 211 F.3d 515, 521 (10th Cir. 2000) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)). Causation requires "a fairly traceable connection between the plaintiff's injury and the complained-of conduct." *Id.* And finally, redressability is "a likelihood that the requested relief will redress the alleged injury." *Id.*

In the Section 10(b) context, a judicially created standing requirement, often referred to as the *Birnbaum* rule, applies. This standing rule originated in *Birnbaum v. Newport Steele Corp.*, where the Second Circuit held that a party bringing a private action for money damages under Rule 10b-5 must be an actual purchaser or seller of securities. 193 F.2d 461, 462 (2nd Cir. 1952). In *Blue Chip Stamps v. Manor Drug Stores*, the United States Supreme Court adopted the *Birnbaum Rule*. In doing so the Court emphasized that the Exchange Act forbids "the use or employ[ment] . . . of any . . . deceptive device, (2) in connection *with the purchase or sale of any security*. . . ." 421 U.S. 723, 728 (1975) (citing 17 CFR s 150.10b-5). Thus, per the Act's language the purchase or sale of securities by the plaintiff is integral to Section 10(b) claims.

In adopting the *Birnbaum* rule, the Court acknowledged that the rule would preclude certain plaintiffs from filing private causes of action under Section 10(b):

> Three principal classes of potential plaintiffs are presently barred by the Birnbaum rule. First are potential purchasers of shares, either in a new offering or on the Nation's post-

17

> distribution trading markets, who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle than it actually was. Second are actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material. Third are shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5.

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737–38, 95 S. Ct. 1917, 1926, 44 L. Ed. 2d 539 (1975).

The second category of individuals that the *Birnbaum* rule precludes from bringing claims are those who merely hold their stock, as opposed to those who purchase or sell it as a result of alleged misrepresentations. According to *Blue Chip Stamps*, mere stockholders cannot bring a Section 10(b) claim because the claims would be entirely rooted in speculation, rather than having real, discernible damages amounts. The Court explained that "a putative plaintiff, who neither purchases nor sells securities but sues instead for intangible economic injury . . . is more likely to be seeking a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis." *Id*. at 1925.

Here, the lead plaintiff falls into this second category of individuals. Mr. Hogan purchased his stock in Pilgrim's Pride Corporation on January 16, 2015 and February 19, 2015. ECF No. 8-1 at 3. However, the Court has previously found that all of Mr. Hogan's claims predicated on acts or omissions occurring prior to June 8, 2015 are time-barred. *See* part III.A. During the timeframe that falls within the statute of repose—June 8, 2015 to June 8, 2020—Mr. Hogan did not purchase or sell any stock. Instead, he merely continued to hold the stock he had already purchased. Thus, according to the *Birnbaum* rule, Mr. Hogan does not have standing to bring a Section 10(b) claim because he was not an "actual purchaser or seller of securities"

during the repose period.  Because Mr. Fuller lacks standing on any remaining claims that are predicated on acts that occurred after June 8, 2015, the Court does not have jurisdiction to hear these claims.  Defendants' motion to dismiss is therefore GRANTED.

## ORDER

1. Defendants' motion to dismiss the amended complaint, ECF No. 58, is **GRANTED**

2. To the extent that claims are barred by the statute of repose, they are dismissed with prejudice.  To the extent Mr. Fuller's claims were barred by lack of standing, which means lack of subject matter jurisdiction, they are dismissed without prejudice, recognizing of course that unless he can plead that he bought or sold defendant's stock within the period of repose, his claims are effectively dismissed with prejudice.

3.  As the prevailing party, defendant is awarded reasonable costs pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1, to be taxed by the Clerk following the submission of a bill of costs pursuant to the rule.

DATED this 16th day of April, 2021.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge